

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

MAGISTRATE JUDGE
JOHNSON

| | |
|---|---|
| SECURITYLINK FROM AMERITECH,<br>INC., f/k/a AMERITECH MONITORING<br>SERVICES, INC., a wholly owned<br>subsidiary of AMERITECH<br>CORPORATION and AMERITECH<br>CORPORATION<br><br>    Plaintiffs,<br><br>v.<br><br>TITAN SECURITY SYSTEMS, INC.,<br>a dissolved Florida Corporation;<br>KERTZ SECURITY SYSTEMS, INC.,<br>a Florida Corporation;<br>MICHAEL HOWARD BRAUSER,<br>INDIVIDUALLY; SETH LEVINE,<br>INDIVIDUALLY; DAVID ORLANDO<br>GRAY, INDIVIDUALLY; HOLLIE SUE<br>GRAY, INDIVIDUALLY; and<br>MICHAEL MAPES, INDIVIDUALLY,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    CIVIL ACTION NO.<br>   MAGISTRATE JUDGE |

---

**COMPLAINT FOR UNFAIR COMPETITION, AND RELATED CLAIMS --**
**INJUNCTIVE RELIEF SOUGHT**

Plaintiffs, SECURITYLINK FROM AMERITECH, INC. f/k/a AMERITECH

MONITORING SERVICES, INC., a wholly owned subsidiary of AMERITECH

CORPORATION (hereinafter "SecurityLink"), and AMERITECH CORPORATION

(hereinafter "Ameritech") by and through its undersigned counsel, allege as follows:

**LOTT & FRIEDLAND, P.A.** • 255 Alhambra Circle • Suite 555 • Coral Gables, Florida 33134<br>(305) 448-7089 • (305) 446-6191 telecopier



Civil Action No.
Magistrate Judge

## The Parties

1.        SecurityLink is a corporation organized and existing under the laws of the State of Delaware and has its principal place of business at Two Mid America Plaza, Suite 200, Oakbrook Terrace, Illinois 60181.

2.        Ameritech is a corporation organized and existing under the laws of the State of Delaware and has its principal place of business at 30 South Wacker Drive, Chicago, Illinois 60606.

3.        Upon information and belief, Defendant, Titan Security Systems, Inc. (hereinafter "Titan") was a corporation organized and existing under the laws of the State of Florida that had its principal place of business at 10477 Lake Vista Circle, Boca Raton, Florida 33498, however, Titan has been voluntarily dissolved.

4.        Upon information and belief, Defendant, Kertz Security Systems, Inc. (hereinafter "KSSI") is a new corporation organized and existing under the laws of the State of Florida and has its principal place of business at 2101 North Andrews Avenue, Wilton Manors, Florida 33311.

5.        Upon information and belief, Defendant, Michael Howard Brauser (hereinafter "Brauser") is an individual residing within this district at 3700 Northeast 27th Avenue, Lighthouse Point, Florida 33064, and is otherwise sui juris.

6.        Upon information and belief, Defendant, Seth Levine (hereinafter "Levine") is an individual residing within this district at 6111 North West 60th Terrace, Parkland, Florida 33067 and is otherwise sui juris.

7.        Upon information and belief, Defendant, David Orlando Gray (hereinafter "D. Gray") is an individual residing within this district at 10477 Lake Vista Circle, Boca

2

Civil Action No.
Magistrate Judge

Raton, Florida 33498 and is otherwise <u>sui juris</u>. Defendant, D. Gray is one of the last

known officers and directors of Defendant, Titan, a dissolved Florida Corporation.

8.      Upon information and belief, Defendant, Hollie Sue Gray (hereinafter "H.

Gray") is an individual residing within this district at 10477 Lake Vista Circle, Boca Raton,

Florida 33498 and is otherwise <u>sui juris</u>. Defendant, H. Gray is one of the last known

officers and directors of Defendant, Titan, a dissolved Florida Corporation.

9.      Upon information and belief, Defendant, Michael Mapes (hereinafter

"Mapes") is an individual residing within this district at 18218 Blue Lake Way, Boca

Raton, Florida 33498 and is otherwise <u>sui juris</u>. Defendant, Mapes is one of the last

known officers and directors of Defendant, Titan, a dissolved Florida Corporation.

### The KERTZ name and trademarks

10.     SecurityLink is engaged in the security alarm business, including the sale,

installation, service, leasing, and monitoring of electronic security and fire alarm systems.

11.     Ameritech through SecurityLink, its wholly owned subsidiary, owns and

uses a family of trademarks, names and logos which includes, but is not limited to the

names "KERTZ SECURITY SYSTEMS", "KERTZ SECURITY" and "KERTZ"

(hereinafter "the KERTZ Marks").

12.     Plaintiffs acquired ownership of the KERTZ Marks as set forth below:

a.      On or about August 24, 1995, Kertz Security Systems, Inc., Kertz

Security Systems II, Inc., Leon H. Brauser, Robert Brauser, Michael Brauser and Joel

Brauser, the individual shareholders of the above listed companies (hereinafter collectively

3

Civil Action No.
Magistrate Judge

"Kertz[1]") entered into a merger agreement with Republic Waste Industries, Inc., RKSA, Inc. and RKSA II, Inc. (hereinafter collectively "Republic"). A copy of the Merger Agreement is attached hereto as Exhibit A and incorporated herein by reference.

      b.      Pursuant to the Merger Agreement Republic obtained all right, title, interest and ownership to all trademarks, service marks, trade names, corporate names and logos owned by Kertz (previously defined as "the Kertz Marks").

      c.      Upon information and belief, Republic continuously used the KERTZ Marks on yard signs and window stickers between October 24, 1995 and October 3, 1997.

      d.      On or about October 3, 1997, Republic Industries, Inc., Republic Security Companies Holding Co., Inc. and Republic Security Companies Holding Co. II, Inc. entered into an Asset Purchase Agreement with Plaintiffs.   A copy of the Asset Purchase Agreement is attached hereto as Exhibit B and incorporated herein by reference.

      e.      Pursuant to the Asset Purchase Agreement, Plaintiffs' acquired all "trademarks, service marks, trade dress, logos, trade names and corporate names" of Kertz (previously defined as "the Kertz Marks").

      f.      Ameritech authorized its wholly owned subsidiary SecurityLink, to use all KERTZ Marks.

      g.      SecurityLink has continuously used the KERTZ Marks without interruption, including, but not limited to, using the KERTZ Marks on yard signs, window stickers and in classified telephone directory listings from October 3, 1997 through the present date.

--------

[1]     The Kertz identified in Paragraph 12(a) is a different entity than KSSI.  The Paragraph 12(a) Kertz was merged into Republic by virtue of the transaction described in this paragraph.

4

Civil Action No.
Magistrate Judge

## The KERTZ Marks are Famous

13.    SecurityLink sells security products and services under the Kertz Marks to more than 44,500 customers in Florida.

14.    For almost fifty (50) years, the KERTZ Marks have appeared and continue to appear, on yard signs, window stickers and in classified telephone directory listings in Dade, Broward and Palm Beach counties.

15.    As such the Kertz Marks have developed a high brand name recognition and association with the Florida public as representing Plaintiffs' high quality products and services. The Kertz Marks have thus become famous in the security services field in the state of Florida.

16.    Ameritech considers the KERTZ Marks to be among its most valuable assets, as the public identifies its products and services through the use of these trademarks and names.

## Defendants' Wrongful Activities

17.    On or about January 21, 1998, Brauser and/or Levine acting alone or in concert with others, directly or indirectly caused Titan Security Systems, Inc. (previously defined as "Titan") to be incorporated in the State of Florida.

18.    On or about May 1, 1998, Brauser and/or Levine acting alone or in concert with others directly or indirectly caused Kertz Security Systems, Inc. (previously defined as "KSSI") to be incorporated in the State of Florida.

19.    On or about June 1, 1998, Titan filed a State of Florida fictitious name application for the fictitious name "KERTZ SECURITY".

5

Civil Action No.
Magistrate Judge

20.    Both Titan and KSSI directly compete with SecurityLink by offering for sale and selling products and services in the security services field in the same geographic markets as SecurityLink, including in this District.

21.    Upon information and belief, since June 1998 Defendants acting alone or in concert with others, have without authorization, re-adopted and are using the KERTZ Marks which Kertz and Brauser sold to Republic.

22.    In particular, Defendants have without authorization placed advertisements for KSSI in the 1998-1999 classified telephone directories published by BellSouth Advertising and Publishing Company ("BAPCO") in Greater Miami and Greater West Palm Beach.

23.    The KSSI classified telephone directory advertisements, copies of which are attached hereto as Composite Exhibit C, contain the following statements and/or images:

"We've helped protect more families, their homes and their businesses in Florida for almost 50 years.  We're back for the next 50!"; and

"Since 1949"; and

a logo design consisting of the shape of a shield with the words "protected by" at the top and the words "KERTZ Security Systems, Inc.  Since 1949."

24.    Furthermore, Defendants' advertisements in classified telephone directories appear under the "burglar alarms" heading and their advertisements appear on the same page as, or within a few pages of, SecurityLink's advertisements under the same heading.

25.    Upon information and belief, since June 1998, Defendants, have contacted multiple SecurityLink customers and provided false and misleading information to these customers in an effort to persuade these customers to become customers of Titan and/or KSSI.

6

Civil Action No.
Magistrate Judge

26. On or about August 28, 1998, Defendants sent a letter to multiple SecurityLink customers that contains false and misleading information in an effort to persuade these customers to become customers of Titan and/or KSSI. A copy of this letter is attached hereto as Exhibit D and incorporated herein by reference.

27. The letter, addressed to "Dear Friends and Customers" contains the following statements:

> ". . . ultimately, the alarm division [Kertz] fell into the hands of a large national telecommunications company called Ameritech."

> "With the passage of time, and following discussions with many of you regarding your dissatisfaction with the quality of your alarm service and monitoring, **it is our pleasure to report that we have taken the decision to return to the alarm industry.**"

> "The good old days of Kertz when any customer could call with no special arrangements and speak with the representative who designed their alarm or the installer who installed it have given way to impersonal, long distance, and inconsistent service."

> "We look forward to regaining your trust and confidence as we reassemble a new Kertz family for the future."

## Defendant Levine's Wrongful Actions

28. On or about December 17, 1997, Defendant Levine entered into a written employment agreement with Ameritech Monitoring Services, Inc. n/k/a SecurityLink from Ameritech, Inc. A copy of the employment agreement is attached hereto as Exhibit E and incorporated herein by reference.

29. The written employment agreement provides in part at paragraph 4 thereof:

> Employee further agrees that for a period of three years from and after the termination of his/her employment, without regard to the reason for such termination, and provided the Employer, or any successor thereto, is engaged in the electronic security and/or fire alarm business, the Employee shall not without written permission

7

Civil Action No.
Magistrate Judge

of the Employer or its successor thereto, either directly or indirectly, for himself/herself, or as agent of, or on behalf of, or in conjunction with any person, firm, association, partnership, corporation or other entity submit any proposal to or provide any form of alarm service to a then existing customer of the Employer.

30.    On or about June 1, 1998, Defendant   Levine left the employment of SecurityLink.

31.    Since leaving the employment of SecurityLink, Levine, either alone and/or through Titan and/or KSSI or acting in concert with others, has submitted proposals to and provided security related services to existing customers of SecurityLink under the KERTZ Marks as to security related services.

## Defendant Brauser's Wrongful Actions

32.    In August, 1996, Defendant Brauser and Republic entered into a Consulting Agreement.  A copy of the Consulting Agreement is attached hereto as Exhibit F and incorporated herein by reference.

33.    The Consulting Agreement specifically provides in relevant part:

4.1    ". . . Therefore, Consultant agrees that neither he nor any of his Affiliates[2] will, except for the sole benefit of or with the written consent of Republic:

(a)    during or at any time after the term of this Agreement, retain in his possession, use or disclose to any person, firm or corporation for any purpose whatsoever any of the Confidential Information, for so long as and to the extend that the Confidential Information has not become generally know to or available for use by the public other than by any act or omission of Consultant; or

(b)    during or any time after the term of this Agreement, use any corporate or trade name or trademark of Republic, Kertz or any of their Affiliates for any purpose whatsoever; or

---

2        Paragraph 4.3 of the Consulting Agreement provides: "As used in this Agreement, the term "Affiliate" means with respect to a specified person, any other person which directly, or indirectly through one or more intermediaries, controls or is under common control with, the person specified.

8

Civil Action No.
Magistrate Judge

(c)      during the term of this Agreement or within three years thereafter, in the State of Florida, engage (as an individual or as a stockholder, trustee, partner, financier, agent, employee or representative of any person, firm, corporation or association), or have any interest, direct or indirect, in any business in competition with the Business; provided however that the beneficial ownership of less than 5% of the outstanding shares of stock of any corporation having a class of equity securities traded on a national securities exchange or the over-the-counter market shall not be deemed, in and of itself, to violate the provisions of this subparagraph (c).

4.2      Consultant further agrees that neither he nor any of his Affiliates will, during the term of this Agreement or within three years thereafter:

(a)      induce any customer of Republic, Kertz or their Affiliates to patronize any business similar to the Business;

(b)      canvass, solicit or accept from any customer of Republic, Kertz or their Affiliates any business similar to the Business; or

(c)      request or advise any individual or company which is a customer of the Business to withdraw, curtail or cancel any such customer's business with Republic, Kertz or their Affiliates.

34.      The Consulting Agreement was an asset owned by Republic and Plaintiffs acquired all right, title and interest in the Consulting Agreement as part of the Asset Purchase Agreement detailed in paragraph 12 above.

35.      At all relevant times, Plaintiffs paid Defendant Brauser as required by the Consulting Agreement and Defendant Brauser accepted said payments.

36.      The Consulting Agreement terminated on August 30, 1998.

37.      After the termination of the Consulting Agreement Plaintiffs, as a result of mistake or inadvertence, continued to pay Defendant Brauser and Brauser continued to accept payments under the Consulting Agreement.

38.      Plaintiffs paid Defendant Brauser on September 11, 1998 (check no. 1200164157), on September 25, 1998 (check no. 1200174468) and on October 8, 1998

9

Civil Action No.
Magistrate Judge

(check no. 1200184659). Copies of the canceled checks are attached hereto as Composite Exhibit G and incorporated herein by reference.

39. Upon information and belief, Defendant Brauser has breached each of the provisions of the Consulting Agreement set forth in paragraph 33 above by directly or indirectly retaining and using Kertz customer lists in an effort to induce former Kertz customers to become customers of KSSI, readopting the Kertz corporate name, tradename, trademarks and establishing, directing and/or controlling, KSSI and/or Titan, businesses that are in direct competition with Plaintiffs.

## The Impact of Defendants' Activities

40. As a result of Defendants' wrongful actions set forth above, the yellow page books for the 1998-1999 classified telephone directories published by BAPCO in Greater Miami and Greater West Palm Beach refer customers looking for **KERTZ** to KSSI, whereas the business section of the white page books for the same classified telephone directories refer customers to Plaintiffs.

## COUNT I
## FEDERAL UNFAIR COMPETITION - TITAN AND KSSI

Plaintiffs incorporate by reference paragraphs 1 through 40 of the Complaint, as if set forth verbatim herein.

41. This is a claim for unfair competition under Section 43(a) of the Trademark Act of 1946, 15 U.S.C. § 1125(a), as amended. This Court has jurisdiction over this claim pursuant to the provisions of 15 U.S.C. § 1121 and 28 U.S.C §§ 1332(a) and 1338(a). Venue is proper under the provisions of 28 U.S.C. § 1391(b).

10

Civil Action No.
Magistrate Judge

42.   Defendants, Titan and KSSI without any license or permission from Plaintiffs prepared and distributed in commerce products, services and promotional materials which use or contain words, terms, symbols, and combinations thereof which are likely to cause confusion or mistake, or to deceive as to the affiliation, connection, or association of Defendants, Titan and/or KSSI with Plaintiffs or as to the origin, sponsorship, or approval of such goods and services by Plaintiffs.

## COUNT II
## VIOLATION OF FEDERAL ANTI-DILUTION STATUTE

Plaintiffs incorporate by reference paragraphs 1 through 40 of the Complaint, as if set forth verbatim herein.

43.   This is a claim for violation of the provisions of the Federal Anti-Dilution Statute, 15 U.S.C. § 1125(c). This court has jurisdiction over the claim pursuant to the provisions of 15 U.S.C. § 1121 and 28 U.S.C § 1338(a). Venue is proper under the provisions of 28 U.S.C. § 1391(b).

44.   Defendants' unauthorized commercial use in commerce of reproductions and imitations of the famous KERTZ Marks which use began after such marks became famous, has caused and continues to cause dilution of the distinctive quality of the famous KERTZ Marks.

## COUNT III
## VIOLATION OF FLORIDA ANTI-DILUTION STATUTE

Plaintiffs incorporate by reference paragraphs 1 through 40 of the Complaint, as if set forth verbatim herein.

11

Civil Action No.
Magistrate Judge

45.     Defendants, through their acts in this District, have injured and continue to injure the business reputation of Plaintiffs and have diluted and continue to dilute the distinctive quality of the KERTZ Marks in violation of Florida's anti-dilution statute, FL. STAT. § 495.151.

## COUNT IV
## COMMON LAW UNFAIR COMPETITION - TITAN AND KSSI

Plaintiffs incorporate by reference paragraphs 1 through 40 of the Complaint, as if set forth verbatim herein.

46.     This is a claim against Defendants Titan and KSSI for unfair competition under the laws of the State of Florida.

47.     Plaintiffs' have built up valuable goodwill in the KERTZ Marks.

48.     Defendants' Titan and KSSI use of the KERTZ Marks, specifically, Defendants' Titan and KSSI use of the Kertz name and trademarks is likely to and does permit these Defendants to palm off their goods as those of Plaintiffs all to the detriment of Plaintiffs and the unjust enrichment of Defendants.

49.     Defendants Titan and KSSI with full knowledge of the notoriety of the KERTZ Marks, intended to and did trade on the goodwill associated with the KERTZ Marks and have misled and will continue to mislead the public into assuming a connection between Plaintiffs and Defendants' Titan and KSSI goods and services, through these Defendants' sale and distribution of security products and services which bear imitations of one or more of the KERTZ Marks.

50.     Defendants' Titan and KSSI unauthorized use of the KERTZ Marks, including the Kertz name and trademarks, has caused and is likely to continue to cause

12

Civil Action No.
Magistrate Judge

damage to Plaintiffs by tarnishing the valuable reputation and image associated with Plaintiffs and Plaintiffs' goods and services. Defendants Titan and KSSI have further palmed off their goods as those of SecurityLink by their labeling and misrepresentations to the consuming public, members of which are likely to and do believe that Defendants' goods and services emanate from or are associated with Plaintiffs .

51.    Defendants Titan and KSSI are acting in a manner which permits and accomplishes confusion, misleads and deceives the public as to the source of these Defendants' goods and services, permits and accomplishes palming off of these Defendants' goods and services as those of Plaintiffs , and falsely suggests a connection with Plaintiffs, all of which constitute acts of unfair competition with Plaintiffs, in violation of Florida law.

## COUNT VI
## TORTIOUS INTERFERENCE WITH CONTRACTUAL AND/OR BUSINESS RELATIONSHIP

Plaintiffs incorporate by reference paragraphs 1 through 40 of the Complaint, as if set forth verbatim herein.

52.    This is a claim against Defendants for tortious interference with business and contractual relationship under the laws of the state of Florida.

53.    Defendants acting jointly and/or acting in concert with others, solicited individuals and businesses with whom Plaintiffs maintained a contractual and/or business relationship.

54.    Defendants' solicitation of individuals and businesses with whom Plaintiffs maintained a contractual and/or business relationship was intentional, unjustified and with

13

Civil Action No.
Magistrate Judge

Defendants' full knowledge of the existence and nature of the contractual and/or business relationship.

55.     As a result of Defendants' intentional and unjustified solicitation, Plaintiffs have been damaged.

### COUNT VII
### UNFAIR COMPETITION - BRAUSER

Plaintiffs incorporate by reference paragraphs 1 through 40, 41 through 42 and 46 through 51 of the Complaint, as if set forth verbatim herein.

56.     This is a claim for unfair competition under Section 43(a) of the Trademark Act of 1946, 15 U.S.C. § 1125(a), as amended, and under the laws of the State of Florida.

57.     Upon information and belief, Defendant Brauser, either directly or indirectly has directed and caused all of the activities alleged in paragraphs 1 through 40 of the Complaint.

58.     Upon information and belief, Defendant Brauser has intentionally hidden his involvement in the tortious and other unlawful conduct alleged herein.

59.     Upon information and belief, Defendant Brauser has, without consent or authorization, resumed use of the KERTZ Marks which Defendant Brauser sold to Republic and Republic ultimately sold to Plaintiffs.

60.     Defendant Brauser, without any license or permission from Plaintiffs prepared and distributed in commerce products, services and promotional materials which use or contain words, terms, symbols, and combinations thereof which are likely to cause confusion or mistake, or to deceive as to the affiliation, connection, or association of Defendants with Plaintiffs or as to the origin, sponsorship, or approval of such goods and services by Plaintiffs all in violation of Federal and Florida law.

14

Civil Action No.
Magistrate Judge

61.     Defendant, Brauser's has engaged in the alleged conduct intentionally, willfully and with malice.

## COUNT VII
## BREACH OF CONTRACT - LEVINE

Plaintiffs incorporate by reference paragraphs 1 through 40 of the Complaint, as if set forth verbatim herein.

62.     This is a claim for breach of contract under the laws of the State of Florida.

63.     Since June 1, 1998, Defendant Levine has breached the employment agreement by directly soliciting customers of Plaintiffs without Plaintiffs permission or authorization.

64.     Plaintiffs have been damaged by Defendant Levine's breach of the employment agreement and are entitled to all damages caused by Defendant Levine's breach of the employment agreement, including, but not limited to those damages specified therein.

## COUNT VIII
## BREACH OF CONTRACT - BRAUSER

Plaintiffs incorporate by reference paragraphs 1 through 40 of the Complaint, as if set forth verbatim herein.

65.     This is a claim for breach of contract under the laws of the State of Florida.

66.     Upon information and belief, since January 21, 1998, Defendant Brauser has breached the Consulting Agreement through some or all of the following actions and other actions:

a.     Directly or indirectly retaining in his possession and disclosing to other persons and/or entities confidential information including, but not limited to, the customer list of Kertz.

15

Civil Action No.
Magistrate Judge

    b.    Directly or indirectly readopting the KERTZ marks, including the Kertz trade names and corporate names.

    c.    Directly or indirectly engaging in a business that is in direct competition with Plaintiffs business within three (3) years after the term of the Consulting Agreement.

67.    Plaintiffs have been damaged by Defendant Brauser's breach of the Consulting agreement and are entitled to all damages caused by this breach.

## COUNT IX
## UNJUST ENRICHMENT - BRAUSER

Plaintiffs incorporate by reference paragraphs 1 through 40 of the Complaint, as if set forth verbatim herein.

68.    This is a claim for unjust enrichment under the laws of the State of Florida.

69.    Plaintiffs continued payments to Defendant Brauser after the August 30, 1998 expiration of the Consulting Agreement conferred a benefit on Defendant Brauser.

70.    Defendant Brauser with full knowledge that the Consulting Agreement had expired continued to accept and retain this benefit by cashing three additional checks after August 30, 1998.

71.    Defendant Brauser has been unjustly enriched in the amount of the payments received after August 30, 1998 and it would be inequitable for Defendant Brauser to retain the benefit of said payments.

## DAMAGE TO PLAINTIFFS

72.    By reason of Defendants' acts alleged herein, Plaintiffs have suffered and will continue to suffer damage to their business, reputation and goodwill and the loss of sales and profits Plaintiffs would have made but for Defendants' acts.

16

Civil Action No.
Magistrate Judge

73.    Defendants threaten to continue to do the acts complained of herein, and unless restrained and enjoined, will continue to do so, all to Plaintiffs' irreparable damage. It would be difficult to ascertain the amount of compensation which could afford Plaintiffs adequate relief for such continuing acts, and a multiplicity of judicial proceedings would be required.

74.    Plaintiffs have no adequate remedy at law and, if Defendants' activities are not enjoined, will suffer irreparable harm as a result thereof.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs SecurityLink from Ameritech, Inc. and Ameritech Corporation pray:

(1)    That Defendants, Titan Security Systems, Inc., Kertz Security Systems, Inc., Michael Howard Brauser, individually Seth Levine, individually, David Orlando Gray, individually, Hollie Sue Gray, individually, and Michael Mapes, individually, their agents and employees, and any other persons or entities acting under their direction or control, be enjoined during the pendency of this action and permanently from infringing and diluting the trademark rights of Plaintiffs and from committing any act of unfair competition or palming off with respect to Plaintiffs.

(2)    That Defendants, Titan Security Systems, Inc., Kertz Security Systems, Inc., Michael Howard Brauser, individually, Seth Levine, individually, David Orlando Gray, individually, Hollie Sue Gray, individually and Michael Mapes, individually, be required to pay to Plaintiffs:

      (a)    their profits and all damages sustained by Plaintiffs as a result of their trademark infringement; and

      (b)    all gains, profits, and advantages derived by them as a result of their unfair competition.

17

Civil Action No.
Magistrate Judge

(3)    That Defendants, Titan Security Systems, Inc., Kertz Security Systems, Inc., Michael Howard Brauser, individually, Seth Levine, individually, David Orlando Gray, individually, Hollie Sue Gray, individually and Michael Mapes, individually, be required to immediately deliver up to be impounded during the pendency of this action all infringing goods or copies in their possession or under their control, and to deliver up for destruction all infringing goods or copies and all patterns, dies, molds, and other paraphernalia used for making such infringing goods or copies.

(4)    That Defendants, Titan Security Systems, Inc., Kertz Security Systems, Inc., Michael Howard Brauser, individually, Seth Levine, individually, David Orlando Gray, individually, Hollie Sue Gray, individually and Michael Mapes, individually, pay to Plaintiffs treble damages.

(5)    That as a result of Defendants tortious and other unlawful conduct alleged herein, Defendants, Titan Security Systems, Inc., Kertz Security Systems, Inc., Michael Howard Brauser, individually, and Seth Levine, individually, David Orlando Gray, individually, Hollie Sue Gray, individually and Michael Mapes, individually, pay to Plaintiffs punitive damages.  Plaintiffs hereby give notice to Defendants of Plaintiffs intention to amend, or to seek leave to amend in order to seek recovery of punitive damages, should the Court require a prima facie showing of Plaintiffs right to seek punitive damages under Section 768.72, FLA. STAT.

(6)    That Defendants, Titan Security Systems, Inc., Kertz Security Systems, Inc., Michael Howard Brauser, individually Seth Levine, individually, David Orlando Gray, individually, Hollie Sue Gray, individually and Michael Mapes, individually, pay to Plaintiffs the costs of this action and reasonable attorney fees.

18

Civil Action No.
Magistrate Judge

(7)    That Defendants, Titan Security Systems, Inc., Kertz Security

Systems, Inc., Michael Howard Brauser, individually, Seth Levine, individually, David

Orlando Gray, individually, Hollie Sue Gray, individually and Michael Mapes,

individually, be ordered to take steps necessary to correct the public perception that Kertz,

SecurityLink and its related companies are no longer in the security services field, including

changing all telephone numbers.

(8) That Plaintiffs be awarded such other and further relief as the Court

finds just.

### Demand for Jury Trial

Plaintiffs respectfully request a trial by jury.

Date: **December 8, 1998**

Respectfully submitted,

**LOTT & FRIEDLAND, P.A.**

By:   Leslie J. Lott
      Florida Bar No. 182196
      David K. Friedland
      Florida Bar No. 833479
      Mark E. Stein
      Florida Bar No. 818666
      255 Alhambra Circle
      Suite 555 (zip code: 33134)
      Post Office Drawer 141098
      Coral Gables, Florida 33114
      (305) 448-7089
      (305) 446-6191 telecopier

      Attorneys for Plaintiffs,
      SecurityLink from Ameritech, Inc.
      and Ameritech Corporation

19

## MERGER AGREEMENT

This Merger Agreement (this "Agreement") is entered into as of August 24, 1995 among Republic Waste Industries, Inc., a Delaware corporation ("Republic"), RKSA, Inc., a Florida corporation and wholly-owned subsidiary of Republic ("RKSA I"), RKSA II, Inc., a Florida corporation and wholly-owned subsidiary of Republic ("RKSA II", and together with Republic and RKSA I, the "Republic Companies"), Kertz Security Systems, Inc., a Florida corporation ("Kertz I"), Kertz Security Systems II, Inc. ("Kertz II," and together with Kertz I, the "Kertz Companies"), and the shareholders of the Kertz Companies, Leon H. Brauser, Robert Brauser, Michael Brauser and Joel Brauser, each a resident of the State of Florida (together, the "Brausers"). The Brausers and the Kertz Companies are sometimes referred to herein as the "Brauser Group". Certain other capitalized terms used herein are defined in Article XI.

## RECITALS

The Boards of Directors of Republic and each of the Kertz Companies have determined that it is in the best interests of their respective shareholders for Republic to acquire the Kertz Companies upon the terms and subject to the conditions set forth in this Agreement. In order to effectuate the transaction, Republic has organized RKSA I and RKSA II as wholly-owned subsidiaries and the parties have agreed, subject to the terms and conditions set forth in this Agreement, to merge RKSA I with and into Kertz I, with Kertz I as the surviving corporation, and RKSA II with and into Kertz II, with Kertz II as the surviving corporation. As a result, Kertz I and Kertz II will become wholly-owned subsidiaries of Republic.

## TERMS OF AGREEMENT

In consideration of the mutual representations, warranties, covenants and agreements contained herein, the parties hereto agree as follows:

[KERTZ SECURITY MERGER AGREEMENT]

-1-



MICHAEL BRAUSER

EXHIBIT
A

# ARTICLE I

## THE MERGERS

1.1  **The Mergers**.  Subject to the terms and conditions of this Agreement, at the Effective Time (as defined below), (a) RKSA I shall be merged with and into Kertz I (the "Kertz I Merger") on the terms and conditions set forth in the Plan of Merger annexed hereto as Exhibit A (the "Kertz I Plan of Merger"), and (b) RKSA II shall be merged with and into Kertz II (the "Kertz II Merger" and together with the Kertz I Merger, the "Mergers") on the terms and conditions set forth in the Plan of Merger annexed hereto as Exhibit B (the "Kertz II Plan of Merger" and together with the Kertz I Plan of Merger, the "Plans of Merger").  The terms and conditions of each of the Plans of Merger are incorporated herein by reference as if fully set forth herein.  As a result of the Mergers, the separate corporate existences of RKSA I and RKSA II shall cease and Kertz I and Kertz II shall continue as surviving corporations and wholly-owned subsidiaries of Republic.

1.2  **The Closing**.  Subject to the terms and conditions of this Agreement, the consummation of the Mergers (the "Closing") shall take place as promptly as practicable (and in any event within five (5) business days) after satisfaction or waiver of the conditions set forth in Articles VI and VII, at the offices of Akerman, Senterfitt & Eidson, P.A., 801 Brickell Avenue, 24th Floor, Miami, Florida 33131.

1.3  **Filing of Articles of Merger**.  At the time of the Closing, the parties shall cause each of the Kertz I Merger and the Kertz II Merger to be consummated at the same time by filing duly executed Articles of Merger (with the respective completed Plan of Merger annexed thereto) with the Department of State of the State of Florida, in such form as Republic determines is required by and is in accordance with the relevant provisions of the Florida Business Corporation Act (the "FBCA") (the date and time of such filing is referred to herein as the "Effective Time").

1.4  **Issuance of Republic Shares**.  As of the Effective Time, by virtue of the Mergers and without any further action on the part of the parties hereto:

(a)  Republic shall be deemed to have issued to each shareholder of record of Kertz I listed on Schedule 3.5 that number of shares of the common stock, $0.01 par value per share, of Republic ("Republic Common Stock") set forth next to such shareholders name on Schedule 1.4(a); and

(b)  Republic shall be deemed to have issued to each shareholder of record of Kertz II listed on Schedule 3.5 that


Michael Brauser

number of shares of Republic Common Stock set forth next to such shareholders name on Schedule 1.4(b).

1.5   **Delivery of Certificates**.  At the Closing, each holder of shares of Kertz I Common Stock and Kertz II Common Stock shall deliver the certificates representing such shares to Republic for cancellation, and as soon as reasonably practicable following Closing, Republic shall deliver duly executed certificates, in valid form, representing the shares of Republic Common Stock to be issued pursuant to Section 1.4 in the following manner: (i) Republic shall deliver to each such holder one or more certificates evidencing ninety percent (90%) of such shares of Republic Common Stock (rounded to the nearest whole share), and (ii) Republic shall set aside and hold in accordance with Article IX the certificates evidencing the balance of such shares of Republic Common Stock (the "Held Back Shares").  The shares of Republic Common Stock issuable by Republic in exchange for the Kertz Common Stock and Kertz II Common Stock (including the Held Back Shares) are sometimes referred to herein as the "Republic Shares".

1.6   **Accounting Treatment**.  The parties hereto acknowledge and agree that the transactions contemplated hereby shall be treated as a pooling of interests combination and as a reorganization under Section 368(a)(2)(E) of the Internal Revenue Code of 1986, as amended.

**ARTICLE II**

**REPRESENTATIONS AND WARRANTIES
OF THE REPUBLIC COMPANIES**

As a material inducement to each of the Brausers to enter into this Agreement and to consummate the transactions contemplated hereby, each of the Republic Companies jointly and severally make the following representations and warranties to the Brausers:

2.1   **Corporate Status**.  Republic is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware.  Each of RKSA I and RKSA II is a corporation duly organized, validly existing and in good standing under the laws of the State of Florida.  Each of RKSA I and RKSA II is a wholly-owned subsidiary of Republic.

2.2   **Corporate Power and Authority**.  Each of the Republic Companies has the corporate power and authority to execute and deliver this Agreement, to perform its respective obligations hereunder and to consummate the transactions contemplated hereby. Each of the Republic Companies has taken all action necessary to authorize its execution and delivery of this Agreement, the

Michael Brauser

performance of its respective obligations hereunder and the consummation of the transactions contemplated hereby.

2.3   **Enforceability**.  This Agreement has been duly executed and delivered by each of the Republic Companies and constitutes a legal, valid and binding obligation of each of the Republic Companies, enforceable against each of the Republic Companies in accordance with its terms, except as the same may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and general equitable principles regardless of whether such enforceability is considered in a proceeding at law or in equity.

2.4   **Republic Common Stock**.  Upon consummation of the Mergers and the issuance and delivery of certificates representing the Republic Shares to the Brausers, the Republic Shares will be validly issued, fully paid and non-assessable shares of Republic Common Stock.

2.5   **No Commissions**.  None of the Republic Companies has incurred any obligation for any finder's or broker's or agent's fees or commissions or similar compensation in connection with the transactions contemplated hereby.


## ARTICLE III

### REPRESENTATIONS AND WARRANTIES OF THE BRAUSERS

As a material inducement to each of the Republic Companies to enter into this Agreement and to consummate the transactions contemplated hereby, each of the Brausers jointly and severally makes the following representations and warranties to the Republic Companies:

3.1   **Corporate Status**.  Each of the Kertz Companies is a corporation duly organized, validly existing and in good standing under the laws of the State of Florida and has the requisite power and authority to own or lease its properties and to carry on its business as now being conducted.  Each of the Kertz Companies is legally qualified to transact business as a foreign corporation in all jurisdictions where the nature of its properties and the conduct of its business requires such qualification (all of which jurisdictions are listed on Schedule 3.1) and is in good standing in each of the jurisdictions in which it is so qualified.  There is no pending or threatened proceeding for the dissolution, liquidation, insolvency or rehabilitation of either of the Kertz Companies.

/ Michael Brauser

3.2    **Power and Authority**.  Each of the Kertz Companies has
the power and authority to execute and deliver this Agreement, to
perform its respective obligations hereunder and to consummate the
transactions contemplated hereby.  Each of the Kertz Companies has
taken all action necessary to authorize the execution and delivery
of this Agreement, the performance of its respective obligations
hereunder and the consummation of the transactions contemplated
hereby.  Each of the Brausers are individuals residing in the State
of Florida with the requisite competence and authority to execute
and deliver this Agreement, to perform his respective obligations
hereunder and to consummate the transactions contemplated hereby.

3.3    **Enforceability**.  This Agreement has been duly executed
and delivered by each member of the Brauser Group and constitutes
the legal, valid and binding obligation of each member of the
Brauser Group, enforceable against each member of the Brauser Group
in accordance with its terms, except as the same may be limited by
applicable bankruptcy, insolvency, reorganization, moratorium or
similar laws affecting the enforcement of creditors' rights
generally and general equitable principles regardless of whether
such enforceability is considered in a proceeding at law or in
equity.

3.4    **Capitalization**.  Schedule 3.4 sets forth, with respect
to each of the Kertz Companies, (a) the number of authorized shares
of each class of capital stock, (b) the number of issued and
outstanding shares of each class of capital stock, and (c) the
number of shares of each of class of capital stock which are held
in treasury.  All of the issued and outstanding shares of capital
stock of each of the Kertz Companies (a) have been duly authorized
and validly issued and are fully paid and non-assessable, (b) were
issued in compliance with all applicable state and federal
securities laws, (c) were not issued in violation of any preemptive
rights or rights of first refusal, and (d) no preemptive rights or
rights of first refusal exist, and no such rights arise by virtue
of or in connection with the transactions contemplated hereby.
There are no outstanding or authorized rights, options, warrants,
convertible securities, subscription rights, conversion rights,
exchange rights or other agreements or commitments of any kind that
could require either of the Kertz Companies to issue or sell any
shares of its capital stock (or securities convertible into or
exchangeable for shares of its capital stock).  There are no
outstanding stock appreciation, phantom stock, profit participation
or other similar rights with respect to either of the Kertz
Companies.  There are no proxies, voting rights or other agreements
or understandings with respect to the voting or transfer of the
capital stock of either of the Kertz Companies.  Neither of the
Kertz Companies has any obligation to redeem or otherwise acquire
any of its outstanding shares of capital stock.

[KERTZ SECURITY MERGER AGREEMENT]                    -5-



Michael Brauser

3.5   <u>Shareholders of the Kertz Companies</u>.  Schedule 3.5 sets forth, with respect to each of the Kertz Companies, (a) the name, address and social security number of, and the number of outstanding shares of each class of capital stock owned by, each shareholder of record as of the close of business on the date of this Agreement; and (b) the name, address and social security number of, and number of shares of each class of capital stock beneficially owned by each beneficial owner of outstanding shares of capital stock (to the extent that record and beneficial ownership of any such shares are different).  Each of the holders of shares of capital stock of the Kertz Companies owns such shares free and clear of all Liens, restrictions and claims of any kind.

3.6   <u>No Violation</u>.  Except as set forth on Schedule 3.6, the execution and delivery of this Agreement by each member of the Brauser Group, the performance by each member of the Brauser Group of its respective obligations hereunder and the consummation by each member of the Brauser Group of the transactions contemplated by this Agreement will not (i) contravene any provision of the articles of incorporation or bylaws of either of the Kertz Companies, (ii) violate or conflict with any federal, state or local law, statute, ordinance, rule, regulation or any decree, writ, injunction, judgment or order of any Governmental Authority or of any arbitration award which is either applicable to, binding upon or enforceable against any of the members of the Brauser Group, (iii) conflict with, result in any breach of, or constitute a default (or an event which would, with the passage of time or the giving of notice or both, constitute a default) under, or give rise to a right to terminate, amend, modify, abandon or accelerate, any Contract which is applicable to, binding upon or enforceable against any member of the Brauser Group, (iv) result in or require the creation or imposition of any Lien upon or with respect to any of the property or assets of either of the Kertz Companies, or (v) require the consent, approval, authorization or permit of, or filing with or notification to, any governmental or regulatory authority, any court or tribunal or any other Person, except any applicable filings required under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended ("HSR") and any filings required to be made by the Republic Companies.

3.7   <u>Records of the Kertz Companies</u>.  The copies of the articles of incorporation and bylaws of each of the Kertz Companies which were provided to Republic are true, accurate and complete and reflect all amendments made through the date of this Agreement. The minute books for each of the Kertz Companies made available to Republic for review were correct and complete as of the date of such review, no further entries have been made through the date of this Agreement, each contains the true signatures of the persons purporting to have signed them.  All material corporate actions taken by either of the Kertz Companies have been duly authorized or ratified.

Michael Brauser

3.8 <u>Subsidiaries</u>. Neither of the Kertz Companies owns, directly or indirectly, any outstanding voting securities of or other interests in, or controls, any corporation, partnership, joint venture or other business entity.

3.9 <u>Financial Statements</u>. The Brauser Group has delivered to Republic the combined financial statements of the Kertz Companies, including the notes pertaining thereto, audited by Arthur Andersen LLP (collectively, the "Financial Statements") a copy of which is attached to Schedule 3.9 hereto. The combined balance sheet dated as of December 31, 1994 of the Kertz Companies included in the Financial Statements is referred to herein as the "Current Balance Sheet". The Financial Statements fairly present the combined financial position of the Kertz Companies at the balance sheet date and the results of operations for the period covered thereby, and have been prepared in accordance with GAAP consistently applied throughout the period indicated. The books and records of the Kertz Companies fully and fairly reflect all transactions, properties, assets and liabilities of the Kertz Companies which are material or otherwise required to be disclosed by GAAP. There are no material special or non-recurring items of income or expense during the period covered by the Financial Statements and the balance sheet included in the Financial Statements does not reflect any write-up or revaluation increasing the book value of any assets, except as specifically disclosed in the notes thereto.

3.10 <u>Changes Since the Current Balance Sheet Date</u>. Except as disclosed in Schedule 3.10, since the date of the Current Balance Sheet, neither of the Kertz Companies has (i) issued any capital stock or other securities; (ii) made any distribution of or with respect to its capital stock or other securities or purchased or redeemed any of its securities; (iii) paid any bonus to or increased the rate of compensation of any of its officers or salaried employees or amended any other terms of employment of such persons other than in the ordinary course of business consistent with past practice; (iv) sold, leased or transferred any of its properties or assets other than in the ordinary course of business consistent with past practice; (v) made or obligated itself to make capital expenditures out of the ordinary course of business consistent with past practice; (vi) made any payment in respect of its liabilities other than in the ordinary course of business consistent with past practice; (vii) incurred any obligations or liabilities (including any indebtedness) or entered into any transaction or series of transactions involving in excess of $25,000 in the aggregate out of the ordinary course of business, except for this Agreement and the transactions contemplated hereby; (viii) suffered any theft, damage, destruction or casualty loss, not covered by insurance for which a timely claim was filed, other than in the ordinary course of business consistent with past practice; (ix) suffered any extraordinary losses (whether or not covered by insurance); (x) waived, cancelled, compromised or

-7-

Michael Brauser

released any rights other than in the ordinary course of business
consistent with past practice; (xi) made or adopted any change in
its accounting practice or policies; (xii) made any adjustment to
its books and records (including, without limitation, any write-up
or revaluation increasing the book value of any assets) other than
in respect of the conduct of its business activities in the
ordinary course consistent with past practice; (xiii) entered into
any transaction with any Affiliate other than intercompany
transactions in the ordinary course of business consistent with
past practice; (xiv) entered into any employment agreement; (xv)
terminated, amended or modified any agreement other than in the
ordinary course of business consistent with past practice; (xvi)
imposed any security interest on the Owned Properties, the
Leasehold Premises or any of the Assets other than in the ordinary
course of business consistent with past practice; (xvii) delayed
paying any accounts payable which is due and payable except to the
extent being contested in good faith; (xviii) made or pledged any
charitable contribution other than in the ordinary course of
business consistent with past practice; or (xix) entered into any
other transaction or been subject to any event which has or may
have a Material Adverse Effect on either of the Kertz Companies; or
(xx) agreed to do or authorized any of the foregoing.

    3.11  **Liabilities of the Kertz Companies**.  Except as set forth
on Schedule 3.11 and other than in the ordinary course of business
consistent with past practice, neither of the Kertz Companies has
any liabilities or obligations whether accrued, absolute,
contingent or otherwise, except (a) to the extent reflected or
taken into account in the Current Balance Sheet and not heretofore
paid or discharged, (b) to the extent specifically set forth in or
incorporated by express reference in any of the Schedules attached
hereto, (c) normal accruals, reclassifications, and audit
adjustments which would be reflected on an audited financial
statement and which would not be material in the aggregate, and (d)
liabilities incurred in the ordinary course of business prior to
the date of the Current Balance Sheet which, in accordance with
GAAP consistently applied, were not recorded thereon, which in any
such case do not relate to breach of contract, breach of warranty,
tort, infringement or violation of law or arose out of any action,
suit, claim, governmental investigation or arbitration proceeding.

    3.12  **Litigation**.  Except as set forth on Schedule 3.12, there
is no action, suit, or other legal or administrative proceeding or
governmental investigation pending, threatened, anticipated or
contemplated against, by or affecting either of the Kertz
Companies, or any of their respective properties or assets, or the
Brausers, or which question the validity or enforceability of this
Agreement or the transactions contemplated hereby, and there is no
basis for any of the foregoing.  There are no outstanding orders,
decrees or stipulations issued by any Governmental Authority in any
proceeding to which either of the Kertz Companies is or was a party

Michael Brauser

which have not been complied with in full or which continue to impose any material obligations on either of the Kertz Companies.

3.13  Environmental Matters.  Except as set forth on Schedule 3.13:

(a)  Each of the Kertz Companies is and has at all times complied in all material respects with all Environmental, Health and Safety Laws (as defined herein) governing its business, operations, properties and assets, including, without limitation, Environmental, Health and Safety Laws with respect to discharges into the ground water, surface water and soil, emissions into the ambient air, and generation, accumulation, storage, treatment, transportation, labeling handling, manufacturing, use, spilling, leaking, dumping, discharging, release or disposal of Hazardous Substances (as defined herein). Neither of the Kertz Companies is currently liable for any penalties, fines or forfeitures for failure to comply with any Environmental, Health and Safety Laws. Each of the Kertz Companies has complied in all material respects with all notice, record keeping and reporting requirements of all Environmental, Health and Safety Laws, and has complied with all informational requests or demands arising under the Environmental, Health and Safety Laws.

(b)  Each of the Kertz Companies has obtained, or caused to be obtained, all material licenses, permits, approvals and registrations required by the Environmental, Health and Safety Laws for the ownership of its properties and assets and the operation of its business as presently conducted, including, without limitation, all air emission, water discharge and solid and hazardous waste generation, storage, treatment or disposal permits and registrations, and each of the Kertz Companies is in all material respects in compliance with all the terms, conditions and requirements of such licenses, permits, approvals and registrations, and that copies of such current licenses, permits, approvals and registrations have been made available or provided to the Republic Companies. There are no environmental administrative, judicial or regulatory proceedings pending or threatened by any Governmental Authority, or third parties against either of the Kertz Companies, their businesses, operations, properties, or assets, which question the validity or entitlement of either of the Kertz Companies to any permit, license, order, approval or registration required by the Environmental, Health and Safety Laws for the ownership of each of the Kertz Companies' properties and assets and the operation of its business or wherein an unfavorable decision, ruling or finding could have a Material Adverse Effect on either of the Kertz Companies, or which would impose any liability upon the Republic Companies in the event that the merger contemplated by this Agreement closes.


Michael Brauser

(c)  Neither of the Kertz Companies has received or is
aware of any notice of any outstanding or threatened non-compliance
order, warning letter, notice of violation. claim, suit, action,
judgment, administrative or judicial proceeding pending against or
involving  either  of  the  Kertz  Companies,  its  businesses,
operations,  properties,  or  assets  (collectively,  "Actions"),
issued by any Governmental Authority or third party with respect to
any Environmental, Health and Safety Laws in connection with the
ownership by either of the Kertz Companies of its businesses,
operations, properties and assets or the operation of its business,
operations properties or assets, which has not been resolved to the
satisfaction of the issuing Governmental Authority or third party
in a manner that would not impose any obligation, burden or
continuing liability on the Republic Companies in the event that
the merger contemplated by this Agreement closes, or which could
have a Material Adverse Effect on either of the Kertz Companies.

(d)  Each of the Kertz Companies is in compliance with,
and is not in breach of or default under any applicable writ,
order, judgment, injunction, governmental communication or decree
issued pursuant to the Environmental, Health and Safety Laws and no
event has occurred or is continuing which, with the passage of time
or the giving of notice or both, would constitute a material non-
compliance, or a material breach or default thereunder, or affect
the Owned Properties or Leasehold Premises.

(e)  Neither of the Kertz Companies has generated,
manufactured, used, transported, stored, handled, treated, spilled,
leaked, dumped, discharged, released or disposed, nor have they
permitted without authorization or arranged for any third parties
to generate, manufacture, use, transport, store, handle, treat,
spill, leak, dump, discharge, release or dispose of, Hazardous
Substances or other waste to or at any location other than a site
lawfully permitted to receive such Hazardous Substances or other
waste for such purposes, nor has it performed, arranged for or
permitted without authorization by any method or procedure such
generation, manufacture, use, transportation, storage, treatment,
spillage, leakage, dumping, discharge, release or disposal in
contravention of any Environmental, Health and Safety Laws.
Neither of the Kertz Companies has generated, manufactured, used,
stored, handled, treated, spilled, leaked, dumped, discharged,
released or disposed of, or permitted without authorization or
arranged for any third parties to generate, manufacture, use,
store, handle, treat, spill, leak, dump, discharge, release or
dispose of, Hazardous Substances or other waste upon property owned
or leased by it, except as permitted by law.  For purposes of this
Section 3.13, the term "Hazardous Substances" includes any toxic or
hazardous substance, material, or waste, and any other contaminant,
pollutant or constituent thereof, whether liquid, solid, semi-
solid,  sludge and/or gaseous, including without limitation,
chemicals, compounds, by-products, pesticides, asbestos containing

-10-



Governmental Authority; or (B) any special assessment which may affect any of the Leasehold Premises, and no such special assessment is contemplated by any Governmental Authority.

3.15   Good Title to and Condition of Assets

(a)   Each of the Kertz Companies has good and marketable title to all of its Assets (as hereinafter defined), free and clear of any Liens (other than Liens referenced in the Current Balance Sheet and notes thereto and Liens of public record) or restrictions on use.   For purposes of this Agreement, the term "Assets" means all of the properties and assets of the Kertz Companies, other than the Owned Properties and the Leasehold Premises, whether personal or mixed, tangible or intangible, wherever located.

(b)   The Fixed Assets (as hereinafter defined) currently in use or necessary for the business and operations of the Kertz Companies are in good operating condition, normal wear and tear excepted, and have been maintained in accordance with all applicable manufacturer's specifications and warranties.   For purposes of this Agreement, the term "Fixed Assets" means all vehicles, machinery, equipment, tools, supplies, furniture and fixtures used by or located on the premises of each of the Kertz Companies or set forth on the Current Balance Sheet or acquired by the Kertz Companies since the date of the Current Balance Sheet. Schedule 3.15 lists the vehicles owned, leased or used by the Kertz Companies, setting forth the make, model, description of body and chassis, vehicle identification number, and year of manufacture, and for each vehicle, whether it is owned or leased, and if owned, the name of any lienholder and the amount of the lien, and if leased, the name of the lessor and the general terms of the lease.

3.16   Compliance with Laws.

(a)   Each of the Kertz Companies is and has been in compliance with all laws, regulations and orders applicable to its business and operations (as conducted by it now and in the past), the payment of employees and independent contractors, the Assets, the Owned Properties and the Leasehold Premises and any other properties and assets (in each case owned or used by it now or in the past).   Except as set forth on Schedule 3.16 and on other Schedules attached hereto, neither the Kertz Companies has been cited, fined or otherwise notified of any asserted past or present failure to comply with any laws, regulations or orders and no proceeding with respect to any such violation is pending or threatened.

(b)   Neither of the Kertz Companies

materials, petroleum or petroleum products, and polychlorinated
biphenyls; which are regulated, listed or controlled by, under or
pursuant to any Environmental, Health and Safety Laws including,
without limitation, the United States Department of Transportation
Table (49 CFR 172, 101) or by the Environmental Protection Agency
as hazardous substances (40 CFR Part 302) and any amendments
thereto; the Comprehensive Environmental Response, Compensation and
Liability Act of 1980, as amended by the Superfund Amendment and
Reauthorization Act of 1986, 42 U.S.C. §9601, et seq. (hereinafter
collectively "CERCLA"); the Solid Waste Disposal Act, as amended by
the Resource Conversation and Recovery Act of 1976 and subsequent
Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. §6901 et
seq. (hereinafter, collectively "RCRA"); the Hazardous Materials
Transportation Act, as amended, 49 U.S.C. §1801, et seq.; the Clean
Water Act, as amended, 33 U.S.C. §1311, et seq.; the Clean Air Act,
as amended (42 U.S.C. §7401-7642); Toxic Substances Control Act, as
amended, 15 U.S.C. §2601 et seq; the Federal Insecticide,
Fungicide, and Rodenticide Act ("FIFRA"), as amended, 7 U.S.C.
§136-136y; the Emergency Planning and Community Right-to-Know Act
of 1986 ("EPCRA"), as amended, 42 U.S.C. §11001, et seq. (Title III
of SARA); the Occupational Safety and Health Act of 1970 ("OSHA"),
as amended, 29 U.S.C. §651, et seq.; any similar state statute,
including without limitation, and by way of example, Chapters 376
or 403 Florida Statutes; or in any future amendments to, or
regulations implementing such statutes, laws, ordinances, codes,
rules, regulations, orders, rulings, or decrees, or which has been
or shall be determined or interpreted at any time by any
Governmental Authority to be a hazardous or toxic substance
regulated under any other statute, law, regulation, order, code,
rule, order, or decree.

        (f)   Neither of the Kertz Companies has caused, or
permitted without authorization to be caused, either by action or
inaction, a Release or Discharge, or threatened Release or
Discharge, of any Hazardous Substance on, into or beneath the
surface of any parcel of the Owned Properties or the Leasehold
Premises.    There has not occurred, nor is there presently
occurring, a Release or Discharge, or threatened Release or
Discharge, of any Hazardous Substance on, into or beneath the
surface of any parcel of the Owned Properties or the Leasehold
Premises.  For purposes of this Section, the terms "Release" and
"Discharge" shall have the meanings given them in the
Environmental, Health and Safety Laws.

        (g)   Neither of the Kertz Companies has  generated,
handled, manufactured, treated, stored, used, shipped, transported
or disposed of, nor have they allowed or arranged, by contract,
agreement or otherwise, for any third parties to generate, handle,
manufacture, treat, store, use, ship, transport or dispose of, any
Hazardous Substance or other waste to or at a site which, pursuant
to CERCLA or any similar state law, (i) has been placed on the

National Priorities List or its state equivalent; or (ii) the Environmental Protection Agency or the relevant state agency has notified the Kertz Companies that it has proposed or is proposing to place on the National Priorities List or its state equivalent. No member of the Brauser Group has received notice of and no member of the Brauser Group has knowledge of, any facts which could give rise to any notice, that either of the Kertz Companies is a potentially responsible party for a federal or state environmental cleanup site or for corrective action under CERCLA, RCRA or any other applicable law or regulation. Neither of the Kertz Companies has submitted nor was required to submit any notice pursuant to Section 103(c) of CERCLA with respect to the Leasehold Premises or the Owned Properties. Neither of the Kertz Companies has received any written or oral request for information in connection with any federal or state environmental cleanup site. Neither of the Kertz Companies has been required to or has not undertaken any response or remedial actions or clean-up actions of any kind at the request of any Governmental Authority, or at the request of any other third party.

(h)   Except as set forth on Schedule 3.13, neither of the Kertz Companies uses, nor have they used, any Aboveground Storage Tanks or Underground Storage Tanks, and there are not now nor have there ever been any Underground Storage Tanks on the Leasehold Premises or the Owned Properties. For purposes of this Section 3.13, the terms "Aboveground Storage Tanks" and "Underground Storage Tanks" shall have the meanings given them in Section 6901 et seq., as amended, of RCRA, or any applicable state or local statute, law, ordinance, code, rule, regulation, order ruling, or decree governing Aboveground Storage Tanks or Underground Storage Tanks.

(i)   Schedule 3.13 identifies (i) all environmental audits, assessments or occupational health studies undertaken by either of the Kertz Companies or their agents or, to the knowledge of any member of the Brauser Group, undertaken by any Governmental Authority, or any third party, relating to or affecting the Kertz Companies or any of the Leasehold Premises or the Owned Properties; (ii) the results of any ground, water, soil, air or asbestos monitoring undertaken by either of the Kertz Companies or their agents or, to the knowledge of any member of the Brauser Group, undertaken by any Governmental Authority, or any third party, relating to or affecting either of the Kertz Companies or any of the Leasehold Premises or the Owned Properties; (iii) all written communications between either of the Kertz Companies and any Governmental Authority arising under or related to Environmental, Health and Safety Laws; and (iv) all citations issued under the Occupational Safety and Health Act of 1970, 29 U.S.C. Sections 651 et seq., as amended ("OSHA"), or similar state or local statutes, laws, ordinances, codes, rules, regulations, orders, rulings, or

Michael Brauser

decrees, relating to or affecting either of the Kertz Companies or any of the Leasehold Premises or the Owned Properties.

(j)  Neither of the Kertz Companies has any liability under any Environmental, Health and Safety laws for personal injury, property damage, natural resource damages or clean up obligations.

(k)  Schedule 3.13 contains a list of the assets of the Kertz Companies which contain "asbestos" or "asbestos-containing material" (as such terms are identified under the Environmental, Health and Safety Laws).  Schedule 3.13 also identifies (i) the degree of friability of all existing asbestos and asbestos-containing material and (ii) all actions taken by the Kertz Companies, directly or indirectly, or by any of their agents, employees, representatives or contractors with respect to asbestos or asbestos-containing materials, including but not limited to all methods and manner of abatement, removal, containment, encapsulation, repair, maintenance, renovation, demolition, salvage, installation, storage, transportation, disposal, monitoring, spill/emergency clean-up, protective health and safety measures and training of personnel (whether employees or independent contractors or otherwise).  Except as set forth in Schedule 3.13, each of the Kertz Companies has operated and continues to operate in compliance with all Environmental, Health & Safety Laws governing the handling, use and exposure to and disposal of asbestos or asbestos-containing materials.  Except as set forth in Schedule 3.13, there are no claims, actions, suits, governmental investigations or proceedings before any Governmental Authority or third party pending, or threatened against or directly affecting either of the Kertz Companies, or any of their assets or operations relating to the use, handling or exposure to and disposal of asbestos or asbestos-containing materials in connection with their assets and operations.

(l)  As used in this Agreement, "Environmental, Health and Safety Laws" means all federal, state, regional or local statutes, laws, rules, regulations, codes, orders, plans, injunctions, decrees, rulings, and changes or ordinances or judicial or administrative interpretations thereof, whether currently in existence or hereafter enacted or promulgated, any of which govern (or purport to govern) or relate to pollution, protection of the environment, public health and safety, air emissions, water discharges, hazardous or toxic substances, solid or hazardous waste or occupational health and safety, as any of these terms are or may be defined in such statutes, laws, rules, regulations, codes, orders, plans, injunctions, decrees, rulings and changes or ordinances, or judicial or administrative interpretations thereof, including, without limitation, RCRA, CERCLA, the Hazardous Materials Transportation Act, the Toxic

-13-

Michael Braucer

Substances Control Act, the Clean Air Act, the Clean Water Act, FIFRA, EPCRA and OSHA.

3.14   Real Estate

(a)   The Kertz Companies do not own any real property or any interest therein except as set forth on Schedule 3.14(a) (the "Owned Properties"), which Schedule sets forth the location and size of, and principal improvements and buildings on, the Owned Properties.  Except as set forth on Schedule 3.14(a), with respect to each such parcel of Owned Property:

(i)   The Kertz Company owning such Owned Property has good and marketable title to the parcel of Owned Property, free and clear of any Lien other than (x) liens for real estate taxes not yet due and payable; (y) recorded easements, covenants, and other restrictions which do not impair the current use, occupancy or value of the property subject thereto, and (z) encumbrances and restrictions described in the title insurance policies listed on Schedule 3.14(a), all of which policies have been previously delivered or made available to Republic by the Brauser Group;

(ii)   there are no pending or, to the knowledge of any of the member of the Brauser Group, threatened condemnation proceedings, suits or administrative actions relating to the Owned Properties or other matters affecting adversely the current use, occupancy or value thereof;

(iii)   the legal descriptions for the parcels of Owned Property contained in the deeds thereof describe such parcels fully and adequately; the buildings and improvements are located within the boundary lines of the described parcels of land, are not in violation of applicable setback requirements, zoning laws and ordinances (and none of the properties or buildings or improvements thereon are subject to "permitted non-conforming use" or "permitted non-conforming structure" classifications) and do not encroach on any easement which may burden the land; the land does not serve any adjoining property for any purpose inconsistent with the use of the land; and the Owned Properties are not located within any flood plain (such that a mortgagee would require a mortgagor to obtain flood insurance) or subject to any similar type restriction for which any permits or licenses necessary to the use thereof have not been obtained;

Michael Brauser

(iv)  all facilities have received all approvals of Governmental Authorities (including licenses and permits) required in connection with the ownership or operation thereof and have been operated and maintained in accordance with applicable laws, ordinances, rules and regulations;

(v)  there are no Contracts written or oral, granting to any party or parties the right of use or occupancy of any portion of the parcels of Owned Property;

(vi)  there are no outstanding options or rights of first refusal to purchase the parcels of Owned Property, or any portion thereof or interest therein;

(vii)  there are no parties (other than the Kertz Companies) in possession of the parcels of Owned Property, other than tenants under any leases disclosed in Schedule 3.14(a) who are in possession of space to which they are entitled;

(viii)  all facilities located on the parcels of Owned Property are supplied with utilities and other services necessary for the operation of such facilities, including gas, electricity, water, telephone, sanitary sewer and storm sewer, all of which services are adequate in accordance with all applicable laws, ordinances, rules and regulations, and are provided via public roads or via permanent, irrevocable, appurtenant easements benefitting the parcels of Owned Property;

(ix)  the parcels of Owned Property abut on and have direct vehicular access to a public road, or has access to a public road via a permanent, irrevocable, appurtenant easement benefitting the parcels of Owned Property, access to the property is provided by paved public right-of-way with adequate curb cuts available, and there is no pending or threatened termination of the foregoing access rights;

(x)  All improvements and buildings on the Owned Property are in good repair and are safe for occupancy and use, free from termites or other wood-destroying organisms, the roofs are watertight, and the structural components and systems (including plumbing, electrical, air conditioning/heating, and sprinklers) are in good working order and adequate for the use of such Owned Property in the manner in which presently used; and

Michael Brauser

(xi)  there are no service contracts, management agreements or similar agreements which affect the parcels of Owned Property.

(b)  Schedule 3.14(b) sets forth a list of all leases, licenses or similar agreements ("Leases") to which either of the Kertz Companies is a party (copies of which have previously been furnished to Republic), in each case, setting forth (A) the lessor and lessee thereof and the date and term of each of the Leases, (B) the location, including address, of each property covered thereby, and (C) a brief description (including size and function) of the principal improvements and buildings thereon (the "Leasehold Premises"), all of which are within the property set-back and building lines of the respective property. The Leases are in full force and effect and have not been amended except as set forth on Schedule 3.14(b), and no party thereto is in default or breach under any such Lease. No event has occurred which, with the passage of time or the giving of notice or both, would cause a material breach of or default under any of such Leases. There is no breach or anticipated breach by any other party to such Leases. Except as set forth on Schedule 3.14(b), with respect to each such Leased Premises:

(i)  The Kertz Companies have valid leasehold interests in the Leasehold Premises, free and clear of any Liens, covenants and easements or title defects of any nature whatsoever;

(ii) The portions of the buildings located on the Leasehold Premises that are used in the Kertz Companies' businesses are each in good repair and condition, normal wear and tear excepted, and are in the aggregate sufficient to satisfy each of the Kertz Companies' current and reasonably anticipated normal business activities as conducted thereat;

(iii) Each of the Leasehold Premises (A) has direct access to public roads or access to public roads by means of a perpetual access easement, such access being sufficient to satisfy the current and reasonably anticipated normal transportation requirements of each of the Kertz Companies' business as presently conducted at such parcel; and (B) is served by all utilities in such quantity and quality as are sufficient to satisfy the current normal business activities as conducted at such parcel; and

(iv) None of the Kertz Companies has received notice of (A) any condemnation proceeding with respect to any portion of the Leasehold Premises or any access thereto, and no such proceeding is contemplated by any

(KERTZ SECURITY MERGER AGREEMENT)

(KERTZ SECURITY MERGER AGREEMENT)

Michael Brauser

NOV 19 '98 17:35

954 769 6527   PAGE.01.

no funds have been set aside to be used in connection with the businesses of the Kertz Companies for any payment prohibited by law.

(c) Each of the Kertz Companies is and at all times has been in full compliance with the terms and provisions of the Immigration Reform and Control Act of 1986, as amended (the "Immigration Act"). With respect to each Employee (as defined in a C.F.R. 274a.1(f)) of the Kertz Companies for whom compliance with the Immigration Act by any of the Kertz Companies as employer is required, the Kertz Companies and the Brausers have previously made available to Republic a true, accurate and complete copy of (i) each Employee's Form I-9 (Employment Eligibility Verification Form) and (ii) all other records, documents or other papers prepared, procured and/or retained by the Kertz Companies pursuant to the Immigration Act. Neither of the Kertz Companies has been cited, fined, served with a Notice of Intent to Fine or with a Cease and Desist Order, nor has any action or administrative proceeding been initiated or threatened against either of the Kertz Companies by reason of any actual or alleged failure to comply with the Immigration Act.

(d) Neither of the Kertz Companies is subject to any Contract, decree or injunction in which either of the Kertz Companies is a party which restricts the continued operation of any business or the expansion thereof to other geographical areas, customers and suppliers or lines of business.

3.17  **Labor and Employment Matters**. Schedule 3.17 sets forth the name, address, social security number and current rate of compensation of each of the employees of each of the Kertz Companies. Neither of the Kertz Companies is a party to or bound by any collective bargaining agreement or any other agreement with a labor union, and there has been no effort by any labor union during the 24 months prior to the date hereof to organize any employees of any of the Kertz Companies into one or more collective bargaining units. There is no pending or threatened labor dispute, strike or work stoppage which affects or which may affect the business of either of the Kertz Companies or which may interfere with their continued operation. Neither of the Kertz Companies or any agent, representative or employee of either of the Kertz Companies has within the last 24 months committed any unfair labor practice as defined in the National Labor Relations Act, as amended, and there is not no pending or threatened charge or complaint against either of the Kertz Companies by or with the National Labor Relations Board or any representative thereof. There has been no strike, walkout or work stoppage involving any of the employees of either of the Kertz Companies during the 24 months prior to the date hereof. No member of the Brauser Group is aware that any executive or key employee or group of employees has any plans to terminate his, her or their employment with either of the

Kertz Companies as a result of the Mergers or otherwise. Schedule 3.17 contains detailed information about each contract, agreement or plan of the following nature, whether formal or informal, and whether or not in writing, to which either of the Kertz Companies is a party or under which either of the Kertz Companies has an obligation: (i) employment agreements, (ii) employee handbooks, policy statements and similar plans, (iii) noncompetition agreements and (iv) consulting agreements (copies of which have been made available to Republic). Each of the Kertz Companies has complied with applicable laws, rules and regulations relating to employment, civil rights and equal employment opportunities, including but not limited to, the Civil Rights Act of 1964, the Fair Labor Standards Act, and the Americans with Disabilities Act, as amended.

    3.18  **Employee Benefit Plans.**

       (a)  <u>Employee Benefit Plans</u>. Schedule 3.18 contains a list for each of the Kertz Companies setting forth each employee benefit plan or arrangement, including but not limited to employee pension benefit plans, as defined in Section 3(2) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), multiemployer plans, as defined in Section 3(37) of ERISA, employee welfare benefit plans, as defined in Section 3(1) of ERISA, deferred compensation plans, stock option plans, bonus plans, stock purchase plans, hospitalization, disability and other insurance plans, severance or termination pay plans and policies, whether or not described in Section 3(3) of ERISA, in which employees, their spouses or dependents, of the Kertz Companies participate ("Employee Benefit Plans") (true and accurate copies of which, together with the most recent annual reports on Form 5500 and summary plan descriptions with respect thereto, were furnished to Republic).

       (b)  <u>Compliance with Law</u>. With respect to each Employee Benefit Plan (i) each has been administered in all material respects in compliance with its terms and with all applicable laws, including, but not limited to, ERISA and the Internal Revenue Code of 1986, as amended (the "Code"); (ii) no actions, suits, claims or disputes are pending, or threatened; (iii) no audits, inquiries, reviews, proceedings, claims, or demands are pending with any governmental or regulatory agency; (iv) there are no facts which could give rise to any material liability in the event of any such investigation, claim, action, suit, audit, review, or other proceeding; (v) all material reports, returns, and similar documents required to be filed with any governmental agency or distributed to any plan participant have been duly or timely filed or distributed; and (vi) no "prohibited transaction" has occurred within the meaning of the applicable provisions of ERISA or the Code.


Michael Brauser

(c) <u>Qualified Plans</u>.  With respect to each Employee Benefit Plan intended to qualify under Code Section 401(a) or 403(a) (i) the Internal Revenue Service has issued a favorable determination letter, true and correct copies of which have been furnished to Republic, that such plans are qualified and exempt from federal income taxes; (ii) no such determination letter has been revoked nor has revocation been threatened, nor has any amendment or other action or omission occurred with respect to any such plan since the date of its most recent determination letter or application therefor in any respect which would adversely affect its qualification or materially increase its costs; (iii) no such plan has been amended in a manner that would require security to be provided in accordance with Section 401(a)(29) of the Code; (iv) no reportable event (within the meaning of Section 4043 of ERISA) has occurred, other than one for which the 30-day notice requirement has been waived; and (v) as of the Effective Date, the present value of all liabilities that would be "benefit liabilities" under Section 4001(a)(16) of ERISA if benefits described in Code Section 411(d)(6)(B) were included will not exceed the then current fair market value of the assets of such plan (determined using the actuarial assumptions used for the most recent actuarial valuation for such plan); (vi) except as disclosed on Schedule 3.18, all contributions to, and payments from and with respect to such plans, which may have been required to be made in accordance with such plans and, when applicable, Section 302 of ERISA or Section 412 of the Code, have been timely made; (vii) all such contributions to the plans, and all payments under the plans (except those to be made from a trust qualified under Section 401(a) of the Code) and all payments with respect to the plans (including, without limitation, PBGC and insurance premiums) for any period ending before the Effective Date that are not yet, but will be, required to be made are properly accrued and reflected on the Current Balance Sheet or are disclosed on Schedule 3.18.

(d) <u>Multiemployer Plans</u>.  With respect to any multiemployer plan, as described in Section 4001(a)(3) of ERISA ("MPPA Plan") (i) all contributions required to be made with respect to employees of the Kertz Companies have been timely paid; (ii) neither of the Kertz Companies has incurred or is expected to incur, directly or indirectly, any withdrawal liability under ERISA with respect to any such plan (whether by reason of the transactions contemplated by the Agreement or otherwise); (iii) Schedule 3.18 sets forth (A) the withdrawal liability under ERISA to each MPPA Plan, (B) the date as of which such amount was calculated, and (C) the method for determining the withdrawal liability; and (iv) no such plan is (or is expected to be) insolvent or in reorganization and no accumulated funding deficiency (as defined in Section 302 of ERISA and Section 412 of the Code), whether or not waived, exists or is expected to exist with respect to any such plan.

Michael Brauser

(e) <u>Welfare Plans</u>. Other than as disclosed in Schedule 3.18, (i) neither of the Kertz Companies is obligated under any employee welfare benefit plan as described in Section 3(1) of ERISA ("Welfare Plan"), whether or not disclosed in Schedule 3.18, to provide medical or death benefits with respect to any employee or former employee of either of the Kertz Companies or their predecessors after termination of employment; (ii) the Kertz Companies have complied with the notice and continuation coverage requirements of Section 4980B of the Code and the regulations thereunder with respect to each Welfare Plan that is, or was during any taxable year of the Kertz Companies for which the statute of limitations on the assessment of federal income taxes remains open, by consent or otherwise, a group health plan within the meaning of Section 5000(b)(1) of the Code, and (iii) there are no reserves, assets, surplus or prepaid premiums under any Welfare Plan which is an Employee Benefit Plan.  The consummation of the transactions contemplated by this Agreement will not entitle any individual to severance pay, and, will not accelerate the time of payment or vesting, or increase the amount of compensation, due to any individual.

(f) <u>Controlled Group Liability</u>.  Neither of the Kertz Companies, or any entity that would be aggregated with either of the Kertz Companies under Code Section 414(b), (c), (m) or (o): (i) has ever terminated or withdrawn from an employee benefit plan under circumstances resulting (or expected to result) in liability to the Pension Benefit Guaranty Corporation ("PBGC"), the fund by which the employee benefit plan is funded, or any employee or beneficiary for whose benefit the plan is or was maintained (other than routine claims for benefits); (ii) has assets subject to (or expected to be subject to) a lien for unpaid contributions to any employee benefit plan; (iii) has failed to pay premiums to the PBGC when due; (iv) is subject to (or expected to be subject to) an excise tax under Code Section 4971; (v) has engaged in any transaction which would give rise to liability under Section 4069 or Section 4212(c) of ERISA; or (iv) has violated Code Section 4980B or Section 601 through 608 of ERISA.

(g) <u>Other Liabilities</u>.  Except as set forth on Schedule 3.18, (i) none of the Employee Benefit Plans obligates either of the Kertz Companies to pay separation, severance, termination or similar benefits solely as a result of any transaction contemplated by this Agreement or solely as a result of a "change of control" (as such term is defined in Section 280G of the Code), (ii) all required or discretionary (in accordance with historical practices) payments, premiums, contributions, reimbursements, or accruals for all periods ending prior to or as of the Closing Date shall have been made or properly accrued on the Current Balance Sheet or will be properly accrued on the books and records of the Kertz Companies as of the Closing, and (iii) none of the Employee Benefit Plans has

_Michael Brauser_

any unfunded liabilities which are not reflected on the Current
Balance Sheet or the books and records of the Kertz Companies.

3.19  **Tax Matters**.  Except as set forth in Schedule 3.19
hereto, all Tax Returns required to be filed prior to the date
hereof with respect to each of the Kertz Companies or any of their
income, properties, franchises or operations have been timely
filed, each such Tax Return has been prepared in compliance with
all applicable laws and regulations, and all such Tax Returns are
true and accurate in all respects.  All Taxes due and payable by or
with respect to each of the Kertz Companies have been paid and are
accrued on the Current Balance Sheet or will be accrued on the
books and records of each of the Kertz Companies as of the Closing.
Each of the Kertz Companies have duly and validly filed elections
for "S" corporation status under the Code, and such "S" elections
have not been revoked or terminated and neither of the Kertz
Companies or their respective shareholders have taken any action
which would cause a termination of the "S" election.  Except as set
forth in Schedule 3.19 hereto: (i) with respect to each taxable
period of each of the Kertz Companies, either such taxable period
has been audited by the relevant taxing authority or the time for
assessing or collecting Taxes with respect to each such taxable
period has closed and such taxable period is not subject to review
by any relevant taxing authority; (ii) no deficiency or proposed
adjustment which has not been settled or otherwise resolved for any
amount of Taxes has been asserted or assessed by any taxing
authority against either of the Kertz Companies; (iii) neither of
the Kertz Companies has consented to extend the time in which any
Taxes may be assessed or collected by any taxing authority; (iv)
neither of the Kertz Companies has requested or been granted an
extension of the time for filing any Tax Return to a date later
than the Effective Time; (v) there is no action, suit, taxing
authority proceeding, or audit or claim for refund now in progress,
pending or threatened against or with respect to either of the
Kertz Companies regarding Taxes; (vi) neither of the Kertz
Companies has made an election or filed a consent under Section
341(f) of the Code (or any corresponding provision of state, local
or foreign law) on or prior to the Effective Time; (vii) there are
no Liens for Taxes (other than for current Taxes not yet due and
payable) upon the assets of either of the Kertz Companies; (viii)
neither of the Kertz Companies will be required (A) as a result of
a change in method of accounting for a taxable period ending on or
prior to the Effective Date, to include any adjustment under
Section 481(c) of the Code (or any corresponding provision of
state, local or foreign law) in taxable income for any taxable
period (or portion thereof) beginning after the Effective Time or
(B) as a result of any "closing agreement," as described in Section
7121 of the Code (or any corresponding provision of state, local or
foreign law), to include any item of income or exclude any item of
deduction from any taxable period (or portion thereof) beginning
after the Effective Time; (ix) neither of the Kertz Companies has

been a member of an affiliated group (as defined in Section 1504 of the Code) or filed or been included in a combined, consolidated or unitary income Tax Return; (x) neither of the Kertz Companies is a party to or bound by any tax allocation or tax sharing agreement and has no current or potential contractual obligation to indemnify any other Person with respect to Taxes; (xi) no taxing authority is entitled to any additional Taxes against either of the Kertz Companies for any period for which Tax Returns have been filed; (xii) neither of the Kertz Companies has made any payments, and is not and will not become obligated (under any contract entered into on or before the Effective Date) to make any payments, that will be non-deductible under Section 280G of the Code (or any corresponding provision of state, local or foreign law); (xiii) neither of the Kertz Companies has been a United States real property holding corporation within the meaning of Section 897(c)(2) of the Code (or any corresponding provision of state, local or foreign law) during the applicable period specified in Section 897(c)(1)(a)(ii) of the Code (or any corresponding provision of state, local or foreign law); (xiv) no claim has ever been made by a taxing authority in a jurisdiction where either of the Kertz Companies does not file Tax Returns that such Kertz Company is or may be subject to Taxes assessed by such jurisdiction; (xv) neither of the Kertz Companies has permanent establishment in any foreign country, as defined in the relevant tax treaty between the United States of America and such foreign country; (xvi) true, correct and complete copies of all income and sales Tax Returns filed by or with respect to the Kertz Companies for the past three years have been furnished or made available to Republic; (xvii) neither of the Kertz Companies will be subject to any Tax for the period ending at the Effective Time for any period for which a Tax Return has not been filed imposed pursuant to Section 1374 or Section 1375 of the Code (or any corresponding provision of state, local or foreign law); (xviii) no sales or use tax (other than sales tax on aircraft, boats, mobile homes and motor vehicles), non-recurring intangibles tax, documentary stamp tax or other excise tax (or comparable tax imposed by any governmental entity) will be payable by either the Kertz Companies or Republic by virtue of the transactions completed in this Agreement; and (xix) no taxing authority is entitled to any Taxes against Republic by virtue of the Mergers, including, without limitation, as a purchaser of a business pursuant to Section 212.10, Florida Statutes.

3.20  Insurance. Each of the Kertz Companies is covered by valid, outstanding and enforceable policies of insurance issued to it by reputable insurers covering its properties, assets and business against risks of the nature normally insured against by corporations in the same or similar lines of business and in coverage amounts typically and reasonably carried by such corporations (the "Insurance Policies"). Such Insurance Policies are in full force and effect, and all premiums due thereon have been paid.  As of the Effective Time, each of the Insurance

Michael Brauser

Policies will be in full force and effect. None of the Insurance Policies will lapse or terminate as a result of the transactions contemplated by this Agreement. Each of the Kertz Companies has complied with the provisions of such Insurance Policies. Schedule 3.20 contains (i) a complete and correct list of all Insurance Policies and all amendments and riders thereto (copies of which have been provided to Republic) and (ii) a detailed description of each pending claim under any of the Insurance Policies for an amount in excess of $10,000 that relates to loss or damage to the properties, assets or businesses of either of the Kertz Companies (other than those which are covered in full by insurance). Neither of the Kertz Companies has failed to give, in a timely manner, any notice required under any of the Insurance Policies to preserve its rights thereunder.

3.21 <u>Receivables</u>. All of the Receivables (as hereinafter defined) are valid and legally binding, represent bona fide transactions and arose in the ordinary course of business of the Kertz Companies. All of the Receivables are good and collectible receivables, and will be collected in full in accordance with the terms of such receivables (and in any event within six months following the Closing), without setoff or counterclaims, subject to the allowance for doubtful accounts, if any, set forth on the Current Balance Sheet, as such allowance for doubtful accounts shall be reasonably adjusted since the date of the Current Balance Sheet in the ordinary course of business consistent with past practice to account for Receivables accruing since the date of the Current Balance Sheet. For purposes of this Agreement, the term "Receivables" means all receivables of the Kertz Companies, including all trade account receivables arising from the provision of services, sale of inventory, notes receivable, and insurance proceeds receivable.

3.22 <u>Licenses and Permits</u>. Each of the Kertz Companies possesses all licenses and required governmental or official approvals, permits or authorizations (collectively, the "Permits") for its business and operations, including with respect to providing security alarm installation, maintenance and monitoring services and with respect to the operation of each of the Owned Properties and Leasehold Premises. All such Permits are valid and in full force and effect, each of the Kertz Companies is in full compliance with their requirements, and, except as disclosed in Schedule 3.12, no proceeding is pending or threatened to revoke or amend any of them. None of such Permits is or will be impaired or in any way affected by the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby.

3.23 <u>Adequacy of the Assets; Relationships with Customers and Suppliers; Affiliated Transactions</u>. The Assets, Owned Properties and Leasehold Premises constitute, in the aggregate, all of the assets and property necessary for the conduct of the businesses of

Michael Brauser

the Kertz Companies in the manner in which and to the extent to which such businesses are currently being conducted. No current supplier to either of the Kertz Companies of items essential to the conduct of their business will or has threatened to terminate its business relationship with the Kertz Companies for any reason. Except as set forth on Schedule 3.23, neither of the Kertz Companies has any direct or indirect interest in any customer, supplier or competitor of the Kertz Companies, or in any person from whom or to whom the Kertz Companies lease real or personal property. Except as set forth on Schedule 3.23 or as disclosed in the Current Balance Sheet (including the notes thereto), no officer, director or shareholder of any of the Kertz Companies, or any person related by blood or marriage to any such person or any entity in which any such person owns any beneficial interest, is a party to any Contract or transaction with any of the Kertz Companies or has any interest in any property used by any of the Kertz Companies.

3.24  **Intellectual Property**. Each of the Kertz Companies has full legal right, title and interest in and to all trademarks, servicemarks, tradenames, copyrights, know-how, patents, tradesecrets, licenses (including licenses for the use of computer software programs), and other intellectual property used in the conduct of its business (the "Intellectual Property"). The conduct of each of the Kertz Companies' business as presently conducted and the unrestricted conduct and the unrestricted use and exploitation of the Intellectual Property does not infringe or misappropriate any rights held or asserted by any Person, and no Person is infringing on the Intellectual Property. No payments are required for the continued use of the Intellectual Property. None of the Intellectual Property has ever been declared invalid or unenforceable, or is the subject of any pending or threatened action for opposition, cancellation, declaration, infringement, or invalidity, unenforceability or misappropriation or like claim, action or proceeding. Neither "Kertz" nor "Kertz Securities" is a registered tradename or trademark.

3.25  **Contracts**. Schedule 3.25 sets forth a list of each Contract to which either of the Kertz Companies is a party or by which either of the Kertz Companies or their properties and assets are bound and which is material to the business, assets, properties or prospects of either of the Kertz Companies (the "Designated Contracts"), true and correct copies of which have been provided to Republic. The copy of each Designated Contract supplied by the Brauser Group to Republic is a true and complete copy of the document it purports to represent and reflects all amendments thereto made through the date of this Agreement. Except as set forth on Schedule 3.25, neither of the Kertz Companies has violated any of the material terms or conditions of any Designated Contract (as such terms and conditions may have been modified or amended by Kertz and each of the other parties thereto) or any term or

Michael Brauser

condition which would permit termination or material modification of any Designated Contract, and all of the covenants to be performed by any other party thereto have been fully performed and there are no material uninsured claims for breach of indemnification or notice of default or termination under any Designated Contract. Except as set forth on Schedule 3.25 or any other Schedule attached to this Agreement, no event has occurred, which constitutes, or after notice or the passage of time, or both, would constitute a material default by either of the Kertz Companies under any Designated Contract, and no such event has occurred which constitutes or would constitute a material default by any other party. Neither of the Kertz Companies is subject to any material liability or payment resulting from renegotiation of amounts paid it under any Designated Contract. As used in this Section, Designated Contracts shall include, without limitation, (a) loan agreements, indentures, mortgages, pledges, hypothecations, deeds of trust, conditional sale or title retention agreements, security agreements, equipment financing obligations or guaranties, or other sources of contingent liability in respect of any indebtedness or obligations to any other Person, or letters of intent or commitment letters with respect to same; (b) contracts obligating the Kertz Companies to provide products or services for a period of one year or more, excluding standard alarm monitoring contracts entered into in the ordinary course of business without material modification from the preprinted forms used by the Kertz Companies in the ordinary course of its business; (c) leases of real property, and leases of personal property not cancelable without penalty on notice of sixty (60) days or less or calling for payment of an annual gross rental exceeding Twenty-Five Thousand Dollars ($25,000.00); (d) distribution, sales agency or franchise or similar agreements, or agreements providing for an independent contractor's services, or letters of intent with respect to same; (e) employment agreements, management service agreements, consulting agreements, confidentiality agreements, non-competition agreements and any other agreements relating to any employee, officer or director of either of the Kertz Companies; (f) licenses, assignments or transfers of trademarks, trade names, service marks, patents, copyrights, trade secrets or know how, or other agreements regarding proprietary rights or intellectual property; (g) any Contract relating to pending capital expenditures by either of the Kertz Companies; and (h) other material Contracts or understandings, irrespective of subject matter and whether or not in writing, not entered into in the ordinary course of business and not otherwise disclosed on the Schedules.

3.26 **Customer Lists and Recurring Revenue.** Schedule 3.26 is a true, correct and complete list of all existing customers of the Kertz Companies who have entered into valid and enforceable alarm monitoring contracts in substantially the form of one or more of the preprinted standard forms attached to Schedule 3.26, and who represent in the aggregate substantially all of the customers of

Michael Brauser

the Kertz Companies that are subscribing to its alarm monitoring services as of the date of this Agreement. Schedule 3.26 sets forth each such customer's name, address, account number, billing cycle, type of service and rates charged. Except as set forth on Schedule 3.26, no customer of the Kertz Companies will account for more than 1% of its combined annual revenue for the current fiscal year. The average gross combined monthly billing for monitoring and service provided by the Kertz Companies (but expressly excluding billing for installation done by the Kertz Companies) to the customers listed on Schedule 3.26 during the three calendar month period ended June 30, 1995 (the "Test Period") was not less than Five Hundred Fifty-One Thousand Dollars ($551,000.00).

3.27  **Accuracy of Information Furnished by Brauser Group.**  No representation, statement or information made or furnished by a member of the Brauser Group to Republic or any of Republic's representatives, including those contained in this Agreement and the various Schedules attached hereto and the other information and statements referred to herein and previously furnished by members of the Brauser Group, contains or shall contain any untrue statement of a material fact or omits or shall omit any material fact necessary to make the information contained therein not misleading. The Brauser Group has provided or made available to Republic true, accurate and materially complete copies of all documents listed or described in the various Schedules attached hereto.

3.28  **Investment Intent; Accredited Investor Status; Securities Documents.**  Each of Brausers is acquiring the Republic Shares hereunder for his own account for investment and not with a view to, or for the sale in connection with, any distribution of any of the Republic Shares, except in compliance with applicable state and federal securities laws. Each of the Brausers has had the opportunity to discuss the transactions contemplated hereby with Republic and has had the opportunity to obtain such information pertaining to the Republic Companies as has been requested. Each of the Brausers is an "accredited investor" within the meaning of Regulation D promulgated under the Securities Act, and has such knowledge and experience in business or financial matters that he is capable of evaluating the merits and risks of an investment in the Republic Shares. Each of the Brausers represents that he has received the filings made by Republic with the SEC and the notice set forth on Schedule 3.28.

3.29  **Business Locations.**  As of the date hereof, neither of the Kertz Companies has any office or place of business other than as identified on Schedules 3.14(a) and 3.14(b) and the Kertz Companies' principal place of business and chief executive offices (as such terms are used in subsection 9-401 of the Uniform Commercial Code as enacted in the State of Florida as of the date hereof) are indicated on Schedule 3.14(a) or 3.14(b) and, except

for equipment leased to customers in the ordinary course of business, all locations where the Kertz Companies' equipment, inventory, chattel paper and books and records are located as of the date hereof are fully identified on Schedules 3.14(a) and 3.14(b).

3.30  Names; Prior Acquisitions.  All names under which each of the Kertz Companies does business as of the date hereof are notified on Schedule 3.30.  Except as set forth on Schedule 3.30, neither of the Kertz Companies has changed its name or used any assumed or fictitious name, or been the surviving entity in a merger, acquired any business or changed its principal place of business or chief executive office, within the past three years.

3.31  No Commissions.  No member of the Brauser Group has incurred any obligation for any finder's or broker's or agent's fees or commissions or similar compensation in connection with the transactions contemplated hereby.

3.32  No Other Interests.  Except for the Brausers' interests in the Kertz Companies, the Brausers do not own, directly or indirectly, any other interests in Persons or entities that are engaged in the business conducted by the Kertz Companies consisting of the installation and monitoring of alarm and security systems for residential and commercial customers.

3.33  Net Worth.  The combined net worth of the Kertz Companies was not be less than $588,000.00 as of July 31, 1995, and there has not been (and will not be prior to the Effective Time) any reduction in the combined net worth of the Kertz Companies since that date.

3.34  Certain Accounting and Tax Letter.  All representations, warranties and other statements made in the letter from the Brausers to Arthur Anderson LLP (a copy of which is attached to Schedule 3.34 hereto) relating to certain accounting and tax matters are true and correct, and Republic may rely on each such representation, warranty and statement as if such letter were addressed to it.

3.35  Certain Licenses.  Each of Michael Brauser and Robert Brauser possesses all licenses and permits required by any Governmental Authority that is necessary for the operation of the Kertz Companies' business, including with respect to providing security and alarm installation, maintenance and monitoring services, and all such licenses and permits are in full force and effect.  Except as set forth on Schedule 3.12, no proceeding is pending or threatened to revoke or amend any such licenses or permits, and each of Michael Brauser and Robert Brauser is in full compliance with the requirements of such licenses and permits.

Michael Brauser

ARTICLE IV

CONDUCT OF BUSINESS PENDING THE MERGER

4.1   Conduct of Businesses by the Kertz Companies Pending the Merger. Except as set forth on Schedule 4.1 and any other Schedule attached hereto, each of the Kertz Companies covenants and agrees that, between the date of this Agreement and the Effective Time, the businesses of each of the Kertz Companies shall be conducted only in, and neither of the Kertz Companies shall take any action except in, the ordinary course of business, consistent with past practice. Each of the Kertz Companies shall use its best efforts to preserve intact its business organization, to keep available the services of its current officers, employees and consultants and to preserve its present relationships with customers, suppliers and other persons with which it has significant business relations. By way of amplification and not limitation, except as contemplated by this Agreement, neither of the Kertz Companies shall, between the date of this Agreement and the Effective Time, directly or indirectly, do or propose or agree to do any of the following without the prior written consent of Republic:

(a)   amend or otherwise change its articles of incorporation or bylaws or equivalent organizational documents;

(b)   issue, sell, pledge, dispose of, encumber, or, authorize the issuance, sale, pledge, disposition, grant or encumbrance of (i) any shares of its capital stock of any class, or any options, warrants, convertible securities or other rights of any kind to acquire any shares of such capital stock, or any other ownership interest, of it or (ii) any of its assets, tangible or intangible, except in the ordinary course of business consistent with past practice;

(c)   declare, set aside, make or pay any dividend or other distribution, payable in cash, stock, property or otherwise, with respect to any of its capital stock;

(d)   reclassify, combine, split, subdivide or redeem, purchase or otherwise acquire, directly or indirectly, any of its capital stock;

(e)   (i) acquire (including, without limitation, for cash or shares of stock), by merger, consolidation, or acquisition of stock or assets) any interest in any corporation, partnership or other business organization or division thereof or any assets, or make any investment either by purchase of stock or securities, contributions

[KERTZ SECURITY MERGER AGREEMENT]

Michael Brauser

of capital or property transfer, or, except in the ordinary course of business, consistent with past practice, purchase any property or assets of any other Person, (ii) incur any indebtedness for borrowed money or issue any debt securities or assume, guarantee or endorse or otherwise as an accommodation become responsible for, the obligations of any Person, or make any loans or advances, or (iii) enter into any Contract other than in the ordinary course of business, consistent with past practice;

(f)  increase the compensation payable or to become payable to its officers or employees, or, except as presently bound to do, grant any severance or termination pay to, or enter into any employment or severance agreement with, any of its directors, officers or other employees, or establish, adopt, enter into or amend or take any action to accelerate any rights or benefits which any collective bargaining, bonus, profit sharing, trust, compensation, stock option, restricted stock, pension, retirement, deferred compensation, employment, termination, severance or other plan, agreement, trust, fund, policy or arrangement for the benefit of any directors, officers or employees;

(g)  take any action other than in the ordinary course of business and in a manner consistent with past practice with respect to accounting policies or procedures;

(h)  pay, discharge or satisfy any existing claims, liabilities or obligations (absolute, accrued, asserted or unasserted, contingent or otherwise), other than the payment, discharge or satisfaction in the ordinary course of business and consistent with past practice of due and payable liabilities reflected or reserved against in its financial statements, as appropriate, or liabilities incurred after the date hereof in the ordinary course of business and consistent with past practice;

(i)  except as disclosed in Schedule 3.11, increase or decrease prices charged to its customers, except for previously announced price changes, or take any other action which might reasonably result in any material increase in the loss of customers through non-renewal or termination of service contracts or other causes; or

(j)  agree, in writing or otherwise, to take or authorize any of the foregoing actions or any action which would make any representation or warranty in Article III untrue or incorrect.

Michael Brauser

## ARTICLE V

### ADDITIONAL AGREEMENTS

5.1   <u>Further Assurances</u>.   Each party shall execute and deliver such additional instruments and other documents and shall take such further actions as may be necessary or appropriate to effectuate, carry out and comply with all of the terms of this Agreement and the transactions contemplated hereby.

5.2   <u>Covenants of the Kertz Companies</u>.   The Brausers shall cause the Kertz Companies to comply with all of the covenants of the Kertz Companies under this Agreement.

5.3   <u>Cooperation</u>.   Each of the parties agrees to cooperate with the other in the preparation and filing of all forms, notifications, reports and information, if any, required or reasonably deemed advisable pursuant to any law, rule or regulation or the rules of any exchange on which the Republic Common Stock is listed or the NASDAQ National Market in connection with the transactions contemplated by this Agreement and to use their respective best efforts to agree jointly on a method to overcome any objections by any Governmental Authority to any such transactions.

5.4   <u>Other Actions</u>.   Each of the parties hereto shall use its reasonable best efforts to take, or cause to be taken, all appropriate actions, and to do, or cause to be done, all things necessary, proper or advisable under applicable laws and regulations to consummate and make effective the transactions contemplated herein, including, without limitation, using its best efforts to obtain all licenses, permits, consents, approvals, authorizations, qualifications and orders of Governmental Authorities and parties to Contracts with the Kertz Companies as are necessary for the consummation of the transactions contemplated hereby.   Each of parties shall make on a prompt and timely basis all governmental or regulatory notifications and filings required to be made by it for the consummation of the transactions contemplated hereby.

5.5   <u>Access to Information</u>.   From the date hereof to the Effective Time, each of the Kertz Companies shall (and shall cause its directors, officers, employees, auditors, counsel and agents) to afford Republic and Republic's officers, employees, auditors, counsel and agents reasonable access at all reasonable times to its properties, offices, and other facilities, to its officers and employees and to all books and records, and shall furnish such persons with all financial, operating and other data and information as may be requested.   No information provided to or obtained by Republic shall affect any representation or warranty in

-31-

Michael Brauser

this Agreement.  Following the Effective Date, the Brausers shall have full and complete access to all financial information of the Kertz Companies regarding any period occurring on or prior to December 31, 1995, and, at their expense, shall be entitled to copies of such books, records and other information as may be reasonably requested.

5.6   Notification of Certain Matters.   Each of the Kertz Companies shall give prompt notice to Republic of the occurrence or non-occurrence of any event which would likely cause any representation or warranty contained herein to be untrue or inaccurate, or any covenant, condition, or agreement contained herein not to be complied with or satisfied.

5.7   Tax and Accounting Treatment.   Republic and each of the Kertz Companies will use its reasonable best efforts to cause the Merger to: (a) qualify as a reorganization under the provisions of Section 368(a)(2)(D) of the Code and (b) treated as a pooling of interests combination.   Republic agrees that from and after the Mergers, it will not take any action after the Mergers are effected to cause the Mergers to lose their tax-free status.   All parties hereto agree to file the Plans of Merger with their respective federal income tax returns for the year in which the Mergers are effective, and to comply with the reporting requirements of Treasury Regulation 1.368-3.   The parties agree and acknowledge that (a) no election will be made in 1995 under Section 338 of the Code, and (b) an election not to a apply a pro rata allocation of "C" income will be made pursuant to Treasury Regulation § 1.1362-6(a)(5).

5.8   Confidentiality; Publicity.   Except as may be required by law or as otherwise permitted or expressly contemplated herein, no party hereto or their respective Affiliates, employees, agents and representatives shall disclose to any third party this Agreement or the subject matter or the consideration or other terms and conditions hereof without the prior consent of the other parties hereto.   No press release or other public announcement related to this Agreement or the transactions contemplated hereby shall be issued by any party hereto without the prior approval of the other parties, except that Republic may make such public disclosure which it believes in good faith to be required by law or by the terms of any listing agreement with a securities exchange (in which case Republic will consult with the other parties prior to making such disclosure).

5.9   No Other Discussions.   The members of the Brauser Group and their respective Affiliates, employees, agents and representatives will not (i) initiate, encourage the initiation by others of discussions or negotiations with third parties or respond to solicitations by third persons relating to any merger, sale or other disposition of any substantial part of the assets, business

Michael Brauser

or properties of the Kertz Companies (whether by merger, consolidation, sale of stock or otherwise) or (ii) enter into any agreement or commitment (whether or not binding) with respect to any of the foregoing transactions.  The Brauser Group will immediately notify Republic if any third party attempts to initiate any solicitation, discussion or negotiation with respect to any of the foregoing transactions.

5.10  <u>Rights to "Kertz" Mark</u>.  The Brausers agree to execute any documents reasonably required by Republic to transfer to Republic any and all rights to and interest in the marks "Kertz" and "Kertz Security Systems" to the extent such marks are not registered in the name of either of the Kertz Companies.  Within thirty (30) days following the Closing, the Brausers agree to change the corporate name of Kertz Telecom, Inc. to another name which does not contain the mark "Kertz" or any similar or derivative mark and to otherwise cease and desist from any other use of the mark "Kertz" or any similar or derivative mark in any business or context.

5.11  <u>Brausers' Right to Remove Certain Property</u>.  Notwithstanding anything to the contrary set forth herein, the Brausers shall have the right on or prior to the Effective Time to transfer to themselves, individually, those Assets which are set forth on Schedule 5.11, provided that such Assets are free and clear of all Liens and no purchase money financing or other debt with respect to such Assets remains outstanding.

5.12  <u>Trading in Republic Common Stock</u>.  Except as otherwise expressly consented to by Republic, from the date of this Agreement until the Effective Time, no members of the Brauser Group (nor any Affiliate thereof) will directly or indirectly purchase or sell (including short sales) any shares of Republic Common Stock in any transactions effected on NASDAQ National Market, the Toronto Stock Exchange or otherwise.

ARTICLE VI

<u>CONDITIONS TO THE OBLIGATIONS OF THE REPUBLIC COMPANIES</u>

The obligations of the Republic Companies to effect the Merger shall be subject to the fulfillment at or prior to the Effective Time of the following conditions, any or all of which may be waived in whole or in part by the Republic Companies:

6.1  <u>Accuracy of Representations and Warranties and Compliance with Obligations</u>.  The representations and warranties of each of the Brausers contained in this Agreement shall be true and correct at and as of the Effective Time with the same force and effect as though made at and as of that time except (i) for changes

specifically permitted by or disclosed pursuant to this Agreement, and (ii) that those representations and warranties which address matters only as of a particular date shall remain true and correct as of such date.  Each of the members of the Brauser Group shall have performed and complied with all of its obligations required by this Agreement to be performed or complied with at or prior to the Effective Time.  Each member of the Brauser Group shall have delivered to the Republic Companies a certificate, dated as of the Effective Time, and signed in the case of each of the Kertz Companies, by the Chief Executive Officer and Chief Financial Officer, certifying that such representations and warranties are true and correct and that all such obligations have been performed and complied with.

6.2   No Material Adverse Change or Destruction of Property. Between the date hereof and the Effective Time, (i) there shall have been no Material Adverse Change of either of the Kertz Companies, (ii) there shall have been no adverse federal, state or local legislative or regulatory change affecting in any material respect the services, products or business of either of the Kertz Companies, and (iii) none of the properties and assets of the Kertz Companies shall have been damaged by fire, flood, casualty, act of God or the public enemy or other cause (regardless of insurance coverage for such damage) which damages may have a Material Adverse Change on either of the Kertz Companies, and there shall have been delivered to the Republic Companies a certificate to that effect, dated the Effective Time and signed by or on behalf of each member of the Brauser Group.

6.3   Corporate Certificate.  The Brauser Group shall have delivered to the Republic Companies (i) true, correct and complete copies of the articles of incorporation and bylaws of each of the Kertz Companies as in effect immediately prior to the Effective Time, (ii) copies of resolutions adopted by the Board of Directors and shareholders of each of the Kertz Companies authorizing the transactions contemplated by this Agreement, and (iii) a certificate of good standing of the Kertz Companies issued by the Department of State of the State of Florida and each other state in which the Kertz Companies are qualified to do business as of a date not more than ten days prior to the Effective Time, certified in each case as of the Effective Time by the Secretary of each of the Kertz Companies as being true, correct and complete.

6.4   Opinion of Counsel.  The Republic Companies shall have received an opinion dated as of the Effective Time from counsel for the Brauser Group, in form and substance acceptable to the Republic Companies.

6.5   Contract and Lease Consents.  The Kertz Companies shall have received consents to the transactions contemplated hereby and waivers of rights to terminate or modify any material rights or

[KERTZ SECURITY MERGER AGREEMENT]

Michael Brauser

obligations of the Kertz Companies from any person from whom such consent or waiver is required under any Designated Contract or instrument as of a date not more than ten days prior to the Effective Time, or who, as a result of the transactions contemplated hereby, would have such rights to terminate or modify such Contracts or instruments, either by the terms thereof or as a matter of law.

6.6   <u>Securities Laws</u>.   Republic shall have received all necessary consents and otherwise complied with any state Blue Sky or securities laws applicable to the issuance of the Republic Shares, in connection with the transactions contemplated hereby.

6.7   <u>Pooling Letters</u>.   Republic shall have received from Arthur Andersen LLP, independent certified public accounts for the Kertz Companies, a letter dated the Effective Time, in form and substance acceptable to Republic, confirming that, to their knowledge after due and diligent inquiry of management, there have been no transactions or events with respect to the Kertz Companies which would, and the structure of the Kertz Companies and the Brausers would not, prescribe the transactions contemplated hereby, if consummated, from being considered as a pooling of interests combination.   Republic shall have received from Arthur Andersen LLP, a letter dated the Effective Time, confirming that the transactions contemplated hereby, if consummated, can properly be accounted for as a pooling of interests combination in accordance with GAAP and the criteria of Accounting Principles Board Opinion No. 16 and the regulations of the SEC.

6.8   <u>Undertakings</u>.   At or prior to the Closing, the Brausers shall have delivered to Republic a letter agreement relating to Rule 145 under the Securities Act and "pooling of interests" criteria, in form and substance satisfactory to the Republic Companies.

6.9   <u>Kertz Common Stock</u>.   At the Closing, each of the Brausers shall have delivered to the Republic Companies all certificates evidencing the Kertz Common Stock held by him.

6.10   <u>Stock Powers</u>.   At the Closing, each of the Brausers shall have delivered to Republic, for use in connection with the Held Back Shares, ten stock powers executed in blank.

6.11   <u>No Adverse Litigation</u>.   There shall not be pending or threatened any action or proceeding by or before any court or other governmental body which shall seek to restrain, prohibit, invalidate or collect damages arising out of the Merger or any other transaction contemplated hereby, and which, in the judgment of Republic. makes it inadvisable to proceed with the Merger and other transactions contemplated hereby.

[KERTZ SECURITY MERGER AGREEMENT]

Michael Brauser

6.12  <u>Board Approval</u>.  The Board of Directors of Republic shall have authorized and approved this Agreement, the Merger and transactions contemplated hereby and thereby.


ARTICLE VII

<u>CONDITIONS TO THE OBLIGATIONS OF THE BRAUSER GROUP</u>

The obligations of the members of the Brauser Group to effect the Merger shall be subject to the fulfillment at or prior to the Effective Time of the following conditions, any or all of which may be waived in whole or in part by the Brauser Group:

7.1  <u>Accuracy of Representations and Warranties and Compliance with Obligations</u>.  The representations and warranties of each of the Republic Companies contained in this Agreement shall be true and correct at and as of the Effective Time with the same force and effect as though made at and as of that time except (i) for changes specifically permitted by or disclosed pursuant to this Agreement, and (ii) that those representations and warranties which address matters only as of a particular date shall remain true and correct as of such date.  Each of the Republic Companies shall have performed and complied with all of its obligations required by this Agreement to be performed or complied with at or prior to the Effective Time.  Each of the Republic Companies shall have delivered to the Brausers a certificate, dated as of the Effective Time, and signed by the Chief Executive Officer and Chief Financial Officer, certifying that such representations and warranties are true and correct and that all such obligations have been performed and complied with.

7.2  <u>Republic Shares</u>.  As soon as reasonably practicable following the Closing, Republic shall deliver to the Brausers (i) certificates representing the Republic Shares required to be issued to them hereunder, other than the Held Back Shares, and (ii) copies of stock certificates representing the Held Back Shares.

7.3  <u>No Adverse Litigation</u>.  There shall not be pending or threatened any action or proceeding by or before any court or other governmental body which shall seek to restrain, prohibit, invalidate or collect damages arising out of the Merger or any other transaction contemplated hereby, and which in the judgment of the members of the Brauser Group makes it inadvisable to proceed with the Merger and other transactions.

Michael Brauser

ARTICLE VIII

REGISTRATION RIGHTS

The Brausers shall have the following registration rights with respect to the Republic Shares issued to them hereunder:

8.1   Registration Rights for Republic Shares; Filing of Registration Statement. Republic will utilize its reasonable best efforts to cause, as soon as practicable following the Effective Time, a registration statement to be filed under the Securities Act or an existing registration statement to be amended for the purpose of registering the Republic Shares for resale by a Holder thereof (the "Registration Statement"). For purposes of this Article, a person is deemed to be a "Holder" of Republic Shares whenever such person owns Republic Shares. Republic will use its reasonable best efforts to have the Registration Statement become effective and cause the Republic Shares to be registered under the Securities Act, and registered, qualified or exempted under the state securities laws of such jurisdictions as any Holder of Republic Shares reasonably requests, as soon as is reasonably practicable.

8.2   Expenses of Registration.   Republic shall pay all expenses incurred by Republic in connection with the registration, qualification and/or exemption of the Republic Shares, including any SEC and state securities law registration and filing fees, printing expenses, fees and disbursements of Republic's counsel and accountants, transfer agents' and registrars' fees, fees and disbursements of experts used by Republic in connection with such registration, qualification and/or exemption, and expenses incidental to any amendment or supplement to the Registration Statement or prospectuses contained therein. Republic shall not, however, be liable for any sales, broker's or underwriting commissions upon sale by any Holder of any of the Republic Shares.

8.3   Furnishing of Documents. Republic shall furnish to the Holders such reasonable number of copies of the Registration Statement, such prospectuses as are contained in the Registration Statement and such other documents as the Holders may reasonably request in order to facilitate the offering of the Republic Shares.

8.4   Amendments and Supplements. Republic shall prepare and promptly file with the SEC and promptly notify the Holders of the filing of such amendments or supplements to the Registration Statement or prospectuses contained therein as may be necessary to correct any statements or omissions if, at the time when a prospectus relating to the Republic Shares is required to be delivered under the Securities Act, any event shall have occurred as a result of which any such prospectus or any other prospectus as then in effect would include an untrue statement of a material fact

Michael Brauser

or omit to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.  Republic shall also advise the Holders promptly after it shall receive notice or obtain knowledge thereof, of the issuance of any stop order by the SEC suspending the effectiveness of the Registration Statement or the initiation or threatening of any proceeding for that purpose and promptly use its reasonable best efforts to prevent the issuance of any stop order or to obtain its withdrawal if such stop order should be issued.

8.5   <u>Duration</u>.  Republic shall maintain the effectiveness of the Registration Statement until such time as Republic reasonably determines, based on an opinion of counsel, that the Holders will be eligible to sell all of the Republic Shares then owned by the Holders without the need for continued registration of the shares, in the three month period immediately following the termination of the effectiveness of the Registration Statement.   Republic's obligations contained in Sections 8.1 and 8.4 shall terminate on the third anniversary of the Effective Dates.

8.6   <u>Further Information</u>.  If Republic Shares owned by a Holder are included in any registration, such Holder shall furnish Republic such information regarding itself as Republic may reasonably request and as shall be required in connection with any registration, qualification or compliance referred to in this Agreement.

8.7   <u>Indemnification</u>

(a)  Republic will indemnify and hold harmless the Holders and each person, if any, who controls a Holder within the meaning of the Securities Act, from and against any and all losses, damages, liabilities, costs and expenses to which the Holders or any such controlling person may become subject under the Securities Act or otherwise, insofar as such losses, claims, damages, liabilities, costs or expenses are caused by any untrue statement or alleged untrue statement of any material fact contained in the Registration Statement, any prospectus contained therein or any amendment or supplement thereto, or arise out of or based upon the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading; provided, however, that, Republic will not be liable in any such case to the extent that any such loss, claim, damage, liability, cost or expense arises out of or is based upon an untrue statement or alleged untrue statement or omission or alleged omission so made in conformity with information furnished by or on behalf of any Holder or such controlling person in writing specifically for use in the preparation thereof.

Michael Brauser

(b)  The obligation of Republic to include in the Registration Statement the Republic Shares of each Holder is subject to the requirement that such Holder deliver to Republic an agreement pursuant to which the Holders, jointly and severally, will indemnify and hold harmless Republic and each person, if any, who controls Republic within the meaning of the Securities Act, from and against any and all losses, damages, liabilities, costs and expenses to which Republic or any such controlling person may become subject under the Securities Act or otherwise, insofar as such losses, damages, liabilities, costs or expenses are caused by any untrue statement or alleged untrue statement of any material fact contained in the Registration Statement, any prospectus contained therein or any amendment or supplement thereto, or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, to the extent that such untrue statement or alleged untrue statement or omission or alleged omission was so made in reliance upon and in strict conformity with written information furnished by or on behalf of any Holder specifically for use in the preparation thereof.

(c)  Promptly after receipt by an indemnified party pursuant to the provisions of paragraph (a) or (b) of this Section 8.7 of notice of the commencement of any action involving the subject matter of the foregoing indemnity provisions, such indemnified party will, if a claim thereof is to be made against the indemnifying party pursuant to the provisions of said paragraph (a) or (b), promptly notify the indemnifying party of the commencement thereof; but the omission to so notify the indemnifying party will not relieve it from any liability which it may have hereunder unless the indemnifying party has been materially prejudiced thereby nor will such failure to so notify the indemnifying party relieve it from any liability which it may have to any indemnified party otherwise than hereunder.  In case such action is brought against any indemnified party and it notifies the indemnifying party of the commencement thereof, the indemnifying party shall have the right to participate in, and, to the extent that it may wish, jointly with any other indemnifying party similarly notified, to assume the defense thereof, with counsel satisfactory to such indemnified party; provided, however, if the defendants in any action include both the indemnified party and the indemnifying party and there is a conflict of interest which would prevent counsel for the indemnifying party from also representing the indemnified party, the indemnified party or parties shall have the right to select separate counsel to participate in the defense of such action on behalf of such indemnified party or parties.  After notice from the indemnifying party to such indemnified party of its election to so assume the defense thereof, the indemnifying party will not be liable to such indemnified party pursuant to the provisions of said paragraph (a)

[KERTZ SECURITY MERGER AGREEMENT]

Michael Brauser

or (b) for any legal or other expense subsequently incurred by such indemnified party in connection with the defense thereof other than reasonable costs of investigation, unless (i) the indemnified party shall have employed counsel in accordance with the provisions of the preceding sentence, (ii) the indemnifying party shall not have employed counsel satisfactory to the indemnified party to represent the indemnified party within a reasonable time after the notice of the commencement of the action, or (iii) the indemnifying party has authorized the employment of counsel for the indemnified party at the expense of the indemnifying party. Notwithstanding anything to the contrary set forth in this Agreement, the indemnifying party shall not in the defense of any such claim, except with the prior written consent of the indemnified party, consent to the entry of any judgment or enter into any settlement which (i) does not include as an unconditional term the release by the claimant or plaintiff of the indemnified party from all further liability in respect of such claim, and (ii) will not, in the sole judgment of the indemnified party, result in or have a Material Adverse Effect on the indemnified party.

(d)   In the event any of the Republic Shares are sold by any Holder or Holders in an underwritten public offering consented to by Republic, Republic shall provide indemnification to the underwriters of such offering and any person controlling any such underwriter on behalf of the Holder or Holders making the offering; provided, however, that Republic shall not be required to consent to any such underwriting or to provide such indemnification in respect of the matters described in the proviso to the first sentence of Section 8.7(a).


## ARTICLE IX

### INDEMNIFICATION

9.1   **Agreement by the Brausers to Indemnify.**   The Brausers jointly and severally agree to indemnify and hold each of the Republic Companies harmless from and against the aggregate of all Indemnifiable Damages (as defined below).

(a)   For purposes of this Agreement, "Indemnifiable Damages" means, without duplication, the aggregate of all expenses, losses, costs, deficiencies, liabilities and damages (including, without limitation, related counsel and paralegal fees and expenses) incurred or suffered by any of the Republic Companies, on a pre-tax basis, to the extent (i) resulting from any breach of a representation or warranty made by any of the Brausers in or pursuant to this Agreement, (ii) resulting from any breach of the covenants or agreements made by any member of the Brauser Group in this Agreement, (iii) resulting from any inaccuracy in any certificate delivered by any member of the Brauser Group pursuant

Michael Brauser

to this Agreement, or (iv) resulting from any liability or obligation of the Brausers or their Affiliates (other than the Kertz Companies) related to the ownership of the Kertz Companies or the operation of their respective businesses prior to the Closing.

(b)   Without limiting the generality of the foregoing, with respect to the measurement of Indemnifiable Damages, each of the Republic Companies shall have the right to be put in the same pre-tax financial position as it would have been in had each of the representations and warranties of each of the member of the Brauser Group been true and correct and had the covenants of each of the members of the Brauser Group been performed in full.

(c)   Each of the representations and warranties made by the Brausers in this Agreement or pursuant hereto, shall survive for a period of one year after the Effective Time, notwithstanding any investigation at any time made by or on behalf of the Republic Companies, and upon expiration of such one year period, such representations and warranties shall expire except that (i) with respect to claims resulting from a breach of any representation, warranty or covenant relating to Republic incurring any Taxes because of the disqualification of either of the Kertz Companies' "S" corporation elections prior to the date preceding the Effective Date (a "Tax Claim"), written notice of any such Tax Claim must be received prior to the expiration of the statutory period during which any taxing authority may bring a claim against the Kertz Companies, the Brausers or Republic for Taxes which are the subject of any such Tax Claim and (ii) with respect to any claim relating to a breach of the representations and warranties of the Brausers contained in Sections 3.1, 3.2, 3.3, 3.4, and 3.5, no such time limitations shall be applicable.   No claim for the recovery of Indemnifiable Damages may be asserted by the Republic Companies against the Brausers after such representations and warranties shall thus expire, provided, however, that claims for Indemnifiable Damages first asserted within the applicable period shall not thereafter be barred.   Notwithstanding any knowledge of facts determined or determinable by any party by investigation, each party shall have the right to fully rely on the representations, warranties, covenants and agreements of the other parties contained in this Agreement or in any other documents or papers delivered in connection herewith.   Each representation, warranty, covenant and agreement of the parties contained in this Agreement is independent of each other representation, warranty, covenant and agreement.

(d)   In the event that Republic shall have determined, based on a report of a firm of independent certified public accountants, that the actual average gross combined monthly billing for monitoring and service provided by the Kertz Companies (but expressly excluding billing for installment done by the Kertz Companies) to the customers listed in Schedule 3.26 during the Test Period were less than the amount represented and warranted in

Michael Brauser

Section 3.26, then, notwithstanding any other provision of this Agreement to the contrary, an amount equal to thirty-six (36) times the deficiency shall be deemed to be the amount of the Indemnifiable Damages incurred as a result of such breach of the representation and warranty set forth in Section 3.26 for purposes of Section 9.1(a) and (b) above. Such determination shall be made by Republic within one year following the Effective Date.

(e) In the event that Republic believes that it is entitled to a claim for any Indemnifiable Damages hereunder, Republic shall promptly give written notice to the Brausers of such claim and the amount or the estimated amount of such claim, and the basis for such claim. If the Brausers do not pay the amount of the claim for Indemnifiable Damages to Republic within ten (10) days, then Republic may set off the amount of such claim by selling some or all of the Held Back Shares and retaining the net proceeds thereof as a set off against the claim in accordance with the procedures, and subject to the Brausers right to contest such claim, as set forth in Section 9.2 below. If the Held Back Shares are insufficient to set off the claim (or have been delivered to the Brausers prior to the making or resolution of such claim), then Republic may take any action or exercise any remedy available to it by appropriate legal proceedings to collect the Indemnifiable Damages.

(f) Notwithstanding anything to the contrary in this Section 9.2, the Brausers shall not be liable to Republic with respect to any claim for Indemnifiable Damages unless all Indemnifiable Damages (other than claims for Indemnifiable Damages arising from a breach of a representation, warranty or covenant contained in Section 3.13 or Section 3.33) incurred by Republic exceed an aggregate of $500,000 (the "Indemnification Threshold"), in which case the Brausers shall be liable for the full amount of such Indemnifiable Damages. Notwithstanding anything to the contrary set forth herein, (i) the Brausers shall be responsible for the full amount of any claim for Indemnifiable Damages arising as a result of a breach of any representation, warranty or covenant set forth in Section 3.13 or Section 3.33 and such claim shall not be subject to the limitation set forth in the immediately preceding sentence, and (ii) any claim for Indemnifiable Damages arising as a result of a breach of any representation, warranty or covenant set forth in Section 3.13 or Section 3.33 shall not be included in determining whether the Indemnification Threshold has been met.

(g) Notwithstanding anything to the contrary set forth herein, Republic shall not be entitled to recover Indemnifiable Damages in excess of the aggregate of the fair market value of the Republic Shares at the Effective Time.

(h) Promptly after receipt by any Republic Company of notice of the commencement of any action by a third party, which is

[KRATZ SECURITY MERGER AGREEMENT]

Michael Brauser

likely to give rise to Indemnifiable Damages, such Republic Company shall promptly notify the Brausers of the commencement thereof; but the omission to so notify the Brausers will not relieve them from any liability which they may have hereunder unless the Brausers have been materially prejudiced thereby nor will such failure to so notify the Brausers relieve them from any liability which they may have to any of the Republic Companies otherwise than hereunder. In case such action is brought against any Republic Company and it notifies the Brausers of the commencement thereof, the Brausers shall have the right to participate in, and, to the extent that they may wish, to assume the defense thereof, with counsel satisfactory to such Republic Company; provided, however, if the defendants in any action include both a Republic Company and any of the Brausers and there is a conflict of interest which would prevent counsel for the Brausers from also representing such Republic Company, the Republic Company or Companies shall have the right to select separate counsel to participate in the defense of such action on behalf of such Republic Company or Companies. After notice from the Brausers to such Republic Company of its election to so assume the defense thereof, the Brausers will not be liable to such Republic Company for any legal or other expense subsequently incurred by such Republic Company in connection with the defense thereof other than reasonable costs of investigation, unless (i) the Republic Company shall have employed counsel in accordance with the provisions of the preceding sentence, (ii) the Brausers shall not have employed counsel satisfactory to the Republic Company to represent the Republic Company within a reasonable time after the notice of the commencement of the action, or (iii) the Brausers have authorized the employment of counsel for the Republic Company at the expense of the Brausers. Notwithstanding anything to the contrary set forth in this Agreement, the Brausers shall not in the defense of any such claim, except with the prior written consent of Republic, consent to the entry of any judgment or enter into any settlement which (i) does not include as an unconditional term the release by the claimant or plaintiff of the Republic Companies from all further liability in respect of such claim, and (ii) will not, in the sole judgment of Republic, result in or have a Material Adverse Effect on Republic or the any of the Republic Companies.

(i) The parties agree that any payment made by the Kertz Companies to or for the benefit of the Brausers on or prior to the date of Closing shall not be subject to a claim for Indemnifiable Damages hereunder; provided, however, the preceding clause shall not affect the tax and net worth representations in sections 3.19 and 3.33, respectively.

9.2 <u>Security for the Brauser Indemnification Obligation</u>. As security for the agreement by the Brausers to indemnify and hold the Republic Companies harmless as described in Sections 9.1, at the Closing, Republic shall set aside and hold certificates

-43-

Michael Brauser

representing the Held Back Shares issued pursuant to this Agreement on the following terms and conditions:

(a)   Each of the Republic Companies may set off against the Held Back Shares any Indemnifiable Damages for which any member of the Brauser Group may be responsible pursuant to this Agreement (including without limitation, any Indemnifiable Damages for which any member of the Brauser Group may be responsible pursuant to this Agreement) subject, however, to the following terms and conditions:

(1)   The Republic Companies shall give written notice to the Brausers of any claim for Indemnifiable Damages or any other damages hereunder, which notice shall set forth (i) the amount or estimated amount of Indemnifiable Damages or other loss, damage, cost or expense which the Republic Companies' claim to have sustained by reason thereof, and (ii) the basis of the claim therefore;

(2)   Unless the Brausers otherwise pay the amount of Indemnifiable Damages to Republic, such set off shall be effected on the later to occur on the expiration of 10 days from the date of such notice (the "Notice of Contest Period") or, if such claim is contested, the date the dispute is resolved, and such set off shall be charged proportionally against the shares set aside;

(3)   If, prior to the expiration of the Notice of Contest Period, the Brausers shall notify the Republic Companies in writing of an intention to dispute the claim and if such dispute is not resolved within 30 days after expiration of the Notice of Contest Period (the "Resolution Period"), then Republic may elect that such dispute shall be resolved by a committee of three arbitrators (one appointed by the Brausers, one appointed by Republic and one appointed by the two arbitrators so appointed), which shall be appointed within 60 days after the expiration of the Resolution Period.  The arbitrators shall abide by the rules of the American Arbitration Association and their decision shall be made within 45 days of being appointed and shall be final and binding on all parties;

(4)   As soon as the Held Back Shares are registered and any restrictions on sale imposed under Rule 145 of the Securities Act are terminated, the Brausers may instruct Republic to sell some or all of the Held Back Shares and the net proceeds thereof shall be substituted for such Held Back Shares in any set off to be made by the Republic Companies pursuant to any claim hereunder; and

-44-

(5)   For purposes of this Section 9.2, the shares of Republic Common Stock held as Held Back Shares not sold as provided in clause (4) of this Section 9.2 shall be valued at their fair market value at the Effective Time.

(b)   Except with respect to shares transferred pursuant to the foregoing right of setoff (and in the case of such shares, until the same are transferred), all Held Back Shares shall be deemed to be owned by the Brausers and the Brausers shall be entitled to vote the same; provided, however, that, there shall also be deposited with Republic subject to the terms of this Section 9.2, all shares of Republic Common Stock issued to the Brausers as a result of any stock dividend or stock split and all cash issuable to the Brausers as a result of any cash dividend, with respect to the Held Back Shares. All stock and cash issued or paid upon Held Back Shares shall be distributed to the person or entity entitled to receive such Held Back Shares together with such Held Back Shares.

(c)   The Republic Companies agree to deliver to the Brausers, no later than the first anniversary of the Effective Date, any Held Back Shares then held by them (or proceeds from the Held Back Shares) unless there then remains unresolved any claim for Indemnifiable Damages or other damages hereunder as to which notice has been given, in which event any Held Back Shares remaining on deposit (or proceeds from the sale of Held Back Shares) after such claim shall have been satisfied shall be returned to the Brausers promptly after the time of satisfaction.

(d)   The remedies provided for in this Section 9.2 shall be in addition to and not in lieu of any other remedies available to the Republic Companies under this Agreement.

9.3   <u>Adjustments to Merger Consideration</u>. All payments for Indemnifiable Damages made pursuant to this Article IX shall be treated as adjustments to the consideration granted in the Merger.

ARTICLE X

<u>SECURITIES LAW MATTERS</u>

The parties agree as follows with respect to the sale or other disposition after Effective time of the Republic Shares:

10.1   <u>Disposition of Shares</u>. The Brausers represent and warrant that the shares of Republic Common Stock being acquired by them hereunder are being acquired and will be acquired for their own respective accounts and will not be sold or otherwise disposed of, except pursuant to (a) an exemption from the registration

Michael Brauser

requirements under the Securities Act, which does not require the filing by Republic with the SEC of any registration statement, offering circular or other document, in which case, the Brausers shall first supply to the Republic Companies an opinion of counsel (which counsel and opinions shall be satisfactory to the Republic Companies) that such exception is available, or (ii) a registration statement filed by Republic with the SEC under the Securities Act.

10.2 **Legend**.   The certificate representing the Republic Shares shall bear the following legend:

> THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND MAY NOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF BY THE HOLDER WITHOUT AN EFFECTIVE REGISTRATION STATEMENT BEING FILED UNDER OR PURSUANT TO SAID ACT OR AN OPINION OF COUNSEL IN FORM AND SUBSTANCE SATISFACTORY TO THE ISSUER THAT AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

> THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO THE PROVISIONS OF RULE 145(D) PROMULGATED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND MAY NOT BE TRANSFERRED OR DISPOSED OF BY THE HOLDER WITHOUT COMPLIANCE WITH SAID RULE AND SECURITIES AND EXCHANGE COMMISSION ACCOUNTING SERIES RELEASES 130 AND 135.

Republic may, unless a registration statement is in effect covering such shares and the holding periods under the Commission's regulations and requirements regarding "pooling of interests" combinations are complied with, place stop transfer orders with its transfer agents with respect to such certificates.

ARTICLE XI

DEFINITIONS

11.1 **Defined Terms**.   As used herein, the following terms shall have the following meanings:

> "Affiliate" shall have the meaning ascribed to it in Rule 12b-2 of the General Rules and Regulations under the Exchange Act, as in effect on the date hereof.

Michael Brauser

"Contract" means any indenture, lease, sublease, license, loan agreement, mortgage, note, indenture, restriction, will, trust, commitment, obligation or other contract, agreement or instrument, whether written or oral.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"GAAP" means generally accepted accounting principles in effect in the United States of America from time to time.

"Governmental Authority" means any nation or government, any state, regional, local or other political subdivision thereof, and any entity or official exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Lien" means any mortgage, pledge, security interest, encumbrance, lien or charge of any kind (including, but not limited to, any conditional sale or other title retention agreement, any lease in the nature thereof, and the filing of or agreement to give any financing statement under the Uniform Commercial Code or comparable law or any jurisdiction in connection with such mortgage, pledge, security interest, encumbrance, lien or charge).

"Material Adverse Change (or Effect)" means a change (or effect), in the condition (financial or otherwise), properties, assets, liabilities, rights, obligations, operations, business or prospects which change (or effect) individually or in the aggregate, is materially adverse to such condition, properties, assets, liabilities, rights, obligations, operations, business or prospects.

"Person" means an individual, partnership, corporation, business trust, joint stock company, estate, trust, unincorporated association, joint venture, Governmental Authority or other entity, of whatever nature.

"Register", "registered" and "registration" refer to a registration of the offering and sale of securities effected by preparing and filing a registration statement in compliance with the Securities Act and the declaration or ordering of the effectiveness of such registration statement.

-47-

Michael Brauser

"Republic Shares" means the shares of Republic Common Stock which the Brausers receive in connection with the Mergers.

"SEC" means the Securities and Exchange Commission.

"Securities Act" means the Securities Act of 1933, as amended.

"Tax Return" means any tax return, filing or information statement required to be filed in connection with or with respect to any Taxes, reporting of income or related matters; and

"Taxes" means all taxes, fees or other assessments, including, but not limited to, income, excise, property, sales, franchise, intangible, withholding, social security and unemployment taxes imposed by any federal, state, local or foreign governmental agency, and any interest or penalties related thereto.

11.2   Other Definitional Provisions.

(a)   All terms defined in this Agreement shall have the defined meanings when used in any certificates, reports or other documents made or delivered pursuant hereto or thereto, unless the context otherwise requires.

(b)   Terms defined in the singular shall have a comparable meaning when used in the plural, and vice versa.

(c)   All matters of an accounting nature in connection with this Agreement and the transactions contemplated hereby shall be determined in accordance with GAAP applied on a basis consistent with prior periods, where applicable.

(d)   As used herein, the neuter gender shall also denote the masculine and feminine, and the masculine gender shall also denote the neuter and feminine, where the context so permits.

ARTICLE XII

TERMINATION, AMENDMENT AND WAIVER

12.1   Termination.  This Agreement may be terminated at any time prior to the Effective Time:

(a)   by mutual written consent of all of the parties hereto at any time prior to the Closing;

Michael Brauser

(b)   by Republic at any time prior to the Effective Date if there shall be a pending or threatened action or proceeding before any court or other governmental body which shall seek to restrain, prohibit or invalidate the transactions contemplated hereby, and which, in the judgment of Republic, makes it inadvisable to proceed with the transactions contemplated by this Agreement;

(c)   by Republic in the event of a material breach by any member of the Brauser Group of any provision of this Agreement, or by the Brauser Group in the event of a material breach by the Republic Companies of any provision of this Agreement; or

(d)   if the Closing shall not have occurred by August 31, 1995.

12.2   **Effect of Termination**.  Except as provided in Article IX, in the event of termination of this Agreement pursuant to Section 12.1, this Agreement and the Plans of Merger shall forthwith become void, there shall be no liability on the part of the parties hereto or thereto to each other and all rights and obligations of the parties hereto or thereto shall cease; provided, however, that nothing herein shall relieve any party from liability for the willful breach of any of its representations, warranties, covenants or agreements set forth in this Agreement.

**ARTICLE XIII**

**GENERAL PROVISIONS**

13.1   **Notices**.  All notices, requests, demands, claims, and other communications hereunder shall be in writing and shall be delivered by certified or registered mail (first class postage pre-paid), guaranteed overnight delivery, or facsimile transmission if such transmission is confirmed by delivery by certified or registered mail (first class postage pre-paid) or guaranteed overnight delivery, to the following addresses and telecopy numbers (or to such other addresses or telecopy numbers which such party shall designate in writing to the other party):

(a)   if to any of the Republic Companies to:

Republic Waste Industries, Inc.
200 East Las Olas Blvd., Suite 1400
Ft. Lauderdale, FL  33301
Attn: Harris W. Hudson, President
Telecopy:  (305) 779-3884

-49-

[XERTA SECURITY MERGER AGREEMENT]                    Michael Brauser

with a copy to:

Akerman, Senterfitt & Eidson, P.A.
24th Floor, One Brickell Square
801 Brickell Avenue
Miami, Florida 33131
Attention: Stephen K. Roddenberry, Esq.
Telecopy: (305) 374-5095

(b)   if to any member of the Brauser Group to:

Kertz Security Systems, Inc.
1830 West Broward Blvd.
Ft. Lauderdale, FL
Attention: Michael Brauser
Telecopy: (305) 523-2363

with a copy to:

Gutter, Josepher, Ruffin & Sheehy, P.A.
Trade Center South, Suite 900
100 West Cypress Creek Road
Ft. Lauderdale, FL 33309
Attention: Marvin C. Gutter, Esq.
Telecopy: (305) 938-9555

13.2  **Entire Agreement.**  This Agreement (including the
Exhibits and Schedules attached hereto) and the other documents
delivered at the Closing pursuant hereto or in connection herewith,
contains the entire understanding of the parties in respect of its
subject matter and supersedes all prior agreements and under-
standings (oral or written) between or among the parties with
respect to such subject matter.  The Exhibits and Schedules
constitute a part hereof as though set forth in full above.

13.3  **Expenses.**  Except as otherwise provided herein, the
parties shall pay their own fees and expenses, including their own
counsel fees, incurred in connection with this Agreement or any
transaction contemplated hereby.

13.4  **Amendment; Waiver.**  This Agreement may not be modified,
amended, supplemented, canceled or discharged, except by written
instrument executed by all parties. No failure to exercise, and no
delay in exercising, any right, power or privilege under this
Agreement shall operate as a waiver, nor shall any single or
partial exercise of any right, power or privilege hereunder
preclude the exercise of any other right, power or privilege. No
waiver of any breach of any provision shall be deemed to be a
waiver of any preceding or succeeding breach of the same or any
other provision, nor shall any waiver be implied from any course of
dealing between the parties. No extension of time for performance

Michael Brauser

of any obligations or other acts hereunder or under any other agreement shall be deemed to be an extension of the time for performance of any other obligations or any other acts. The rights and remedies of the parties under this Agreement are in addition to all other rights and remedies, at law or equity, that they may have against each other.

13.5  **Binding Effect; Assignment**. The rights and obligations of this Agreement shall bind and inure to the benefit of the parties and their respective successors and assigns. Nothing expressed or implied herein shall be construed to give any other person any legal or equitable rights hereunder. Except as expressly provided herein, the rights and obligations of this Agreement may not be assigned by any member of the Brauser Group without the prior written consent of Republic.

13.6  **Counterparts**. This Agreement may be executed in any number of counterparts, each of which shall be an original but all of which together shall constitute one and the same instrument.

13.7  **Interpretation**. When a reference is made in this Agreement to an article, section, paragraph, clause, schedule or exhibit, such reference shall be deemed to be to this Agreement unless otherwise indicated. The headings contained herein and on the schedules are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement or the schedules. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." Time shall be of the essence in this Agreement.

13.8  **Governing Law; Interpretation**. This Agreement shall be construed in accordance with and governed for all purposes by the laws of the State of Florida applicable to contracts executed and to be wholly performed within such State.

13.9  **Investment Representations**. Each party herein expressly represents and warrants to all other parties hereto that (a) before executing this Agreement, said party has fully informed itself of the terms, contents, conditions and effects of this Agreement; (b) said party has relied solely and completely upon its own judgment in executing this Agreement; (c) said party has had the opportunity to seek and has obtained the advice of counsel before executing this Agreement; (d) said party has acted voluntarily and of its own free will in executing this Agreement; (e) said party is not acting under duress, whether economic or physical, in executing this Agreement; and (f) this Agreement is the result of arms' length negotiations conducted by and among the parties and their respective counsel.

[SIGNATURES ON FOLLOWING PAGE]

michael brauser

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as of the day and year first above written.

REPUBLIC WASTE INDUSTRIES, INC.

By: _____
Name: GREGORY R. FAIRBANKS
Title: EXECUTIVE VICE PRESIDENT

RKSA, INC.

By: _____
Name: GREGORY K. FAIRBANKS
Title: EXECUTIVE VICE PRESIDENT

RKSA II, INC.

By: _____
Name: GREGORY K. FAIRBANKS
Title: EXECUTIVE VICE PRESIDENT

KERTZ SECURITY SYSTEMS, INC.

By: _____
    Leon H. Brauser, President

KERTZ SECURITY SYSTEMS II, INC.

By: _____
    Leon H. Brauser, President

_____
Leon H. Brauser

_____
Michael Brauser

_____
Joel Brauser

_____
Robert Brauser

[BIM.Republic-Kertz]010

[KERTZ SECURITY MERGER AGREEMENT]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as of the day and year first above written.

REPUBLIC WASTE INDUSTRIES, INC.

By: _____
    Name: _____
    Title: _____

RKSA, INC.

By: _____
    Name: _____
    Title: _____

RKSA II, INC.

By: _____
    Name: _____
    Title: _____

KERTZ SECURITY SYSTEMS, INC.

By: _____
    Leon H. Brauser, President

KERTZ SECURITY SYSTEMS II, INC.

By: _____
    Michael Brauser, President

_____
Leon H. Brauser

_____
Michael Brauser

_____
Joel Brauser

_____
Robert Brauser

[BIM.Republic-Kertz] 013

[KERTZ SECURITY MERGER AGREEMENT]

ASSET PURCHASE AGREEMENT

Among

REPUBLIC INDUSTRIES, INC.

REPUBLIC SECURITY COMPANIES HOLDING CO., INC.

REPUBLIC SECURITY COMPANIES HOLDING CO. II, INC.

AMERITECH CORPORATION

and

AMERITECH MONITORING SERVICES, INC.

September 26, 1997

MONTE.11



## TABLE OF CONTENTS

Page

ARTICLE 1 - DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARTICLE 2 - THE TRANSACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    2.1    Acquired Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    2.2    Excluded Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    2.3    Assumed Liabilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    2.4    Excluded Liabilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    2.5    Purchase Price . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    2.6    Closing Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    2.7    Purchase Price Allocation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

ARTICLE 3 - REPRESENTATIONS AND WARRANTIES . . . . . . . . . . . . . . . . . . . . . . . 13
    3.1    Representations and Warranties of Republic, RSC and the Seller . . . . . . . . . . . . 13
    3.2    Representations and Warranties of Buyer and Ameritech . . . . . . . . . . . . . . . . . . 22

ARTICLE 4 - PRE-CLOSING COVENANTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
    4.1    Covenants Concerning the Alarm Service Assets . . . . . . . . . . . . . . . . . . . . . . . 23
    4.2    Reasonable Access . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
    4.3    Exclusivity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
    4.4    General Obligation to Close . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
    4.5    Notice of Developments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
    4.6    Obligation to Remove Liens . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

ARTICLE 5 - CERTAIN COVENANTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
    5.1    Post-Closing Assistance Matters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
    5.2    Survival Period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
    5.3    Indemnification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
    5.4    Employees and Employee Benefit Plans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
    5.5    Noncompete and Nonsolicitation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
    5.6    Cooperation with Tax Matters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
    5.7    Confidentiality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
    5.8    Hart-Scott-Rodino Act Filing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
    5.9    Retention of Records . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
    5.10   Real Property . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

ARTICLE 6 - TERMINATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

MONTE.11

|       |                                           |      |
|-------|-------------------------------------------|------|
| 6.1   | Termination Events                        | 34   |
| 6.2   | Effect of Termination/Remedies            | 34   |

**ARTICLE 7 - MISCELLANEOUS** .......................................... 34

| 7.1   | Press Releases and Announcements          | 35   |
| 7.2   | No Third Party Beneficiaries              | 35   |
| 7.3   | Entire Agreement                          | 35   |
| 7.4   | Succession and Assignment                 | 35   |
| 7.5   | Counterparts                              | 35   |
| 7.6   | Headings                                  | 35   |
| 7.7   | Notices                                   | 35   |
| 7.8   | Governing Law                             | 36   |
| 7.9   | Amendments and Waivers                    | 37   |
| 7.10  | Severability                              | 37   |
| 7.11  | Expenses                                  | 37   |
| 7.12  | Transfer Taxes                            | 37   |
| 7.13  | Construction                              | 37   |
| 7.14  | Incorporation of Exhibits and Schedules   | 38   |
| 7.15  | Directly or Indirectly                    | 38   |

MONTE.11

- ii -

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is made and entered into as of September 26, 1997, by and among Republic Industries, Inc., a Delaware corporation ("Republic"), Republic Security Companies Holding Co., Inc., a Delaware corporation wholly owned by Republic ("RSC"), Republic Security Companies Holding Co. II, Inc., a Delaware corporation wholly owned by RSC and indirectly wholly owned by Republic ("Seller"), Ameritech Corporation, a Delaware corporation ("Ameritech") and Ameritech Monitoring Services, Inc., a Delaware corporation wholly owned by Ameritech ("Buyer").

Subject to the terms and conditions set forth in this Agreement, Republic, RSC and Seller desire to cause the Alarm Subsidiaries (as defined below) to sell all of the Alarm Service Assets (as defined below) to Buyer for cash and the assumption by Buyer of specified liabilities.

NOW, THEREFORE, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties, and covenants herein contained, the Parties hereby agree as follows:

## ARTICLE 1 - DEFINITIONS

"Acquired Assets" has the meaning set forth in Section 2.1.

"Affiliate" means, with respect to any particular person or entity, any person or entity controlling, controlled by or under common control with such person or entity.

"Alarm Service Assets" means all of the assets of each Alarm Subsidiary (other than Excluded Assets) used in the provision of Services and the operations and activities of the Alarm Subsidiaries conducted on the date hereof pursuant to which the Alarm Subsidiaries provide Services.

"Alarm Subsidiaries" has the meaning set forth in Section 3.1(a)

"Assumed Contracts" has the meaning set forth in Section 2.1(f).

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Balance Sheet" has the meaning set forth in Section 3.1(e).

"Basis" means any past or present fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, failure to act, or transaction that forms or reasonably could be expected to form the basis for any specified consequence.



"Billing Date" means, for any recurring period (such as a month, a quarter or a year) during which Services are to be provided pursuant to Customer Contracts, the first day of such period.

"Buyer Covered Person" means Buyer, its Affiliates (including Ameritech) and their respective accounting and legal representatives (internal and external), as well as their respective officers, directors, employees and agents.

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended.

"Closing" and "Closing Date" have the meanings set forth in Section 2.7.

"Code" means the Internal Revenue Code of 1986, as amended, and all rules and regulations promulgated thereunder.

"Companies" means Republic, RSC, Seller and the Alarm Subsidiaries.

"Confidentiality Agreement" means that certain Nondisclosure Agreement, dated as of September 12, 1997, between Buyer and Republic.

"Covered Person" means any or all Buyer Covered Persons, any or all Seller Covered Persons, or any or all Buyer Covered Persons and Seller Covered Persons, as the context requires.

"Customer Contract" means any written or oral contract, agreement or arrangement (including all amendments thereto) between any of the Alarm Subsidiaries (or any party who has validly assigned its rights and obligations with respect to the provision of Services to any of the Alarm Subsidiaries) and any of their respective customers with respect to the provision of Services.

"Disclosure Schedule" means any and all disclosure schedules attached hereto in the manner permitted hereby.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Employee Pension Benefit Plan" has the meaning set forth in ERISA Sec. 3(2).

"Employees" has the meaning set forth in Section 3.1(q).

"Environmental, Health, and Safety Laws" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, the Resource Conservation and Recovery Act



of 1976, and the Occupational Safety and Health Act of 1970, each as amended, together with all other laws (including rules, regulations, codes, plans, injunctions, judgments, orders, decrees, rulings, and charges thereunder) of federal, state, local, and foreign governments (and all agencies thereof) concerning pollution or protection of the environment, public health and safety, or employee health and safety, including laws relating to emissions, discharges, releases, or threatened releases of pollutants, contaminants, or chemical, industrial, hazardous, or toxic materials or wastes into ambient air, surface water, ground water, or lands or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport, or handling of pollutants, contaminants, or chemical, industrial, hazardous, or toxic materials or wastes.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended and all rules and regulations promulgated thereunder.

"Extremely Hazardous Substance" has the meaning set forth in §302 of the Emergency Planning and Community Right-to-Know Act of 1986, as amended.

"Financial Statements" has the meaning set forth in Section 3.1(e).

"GAAP" means United States generally accepted accounting principles as in effect from time to time, consistently applied.

"Hart-Scott-Rodino Act" has the meaning set forth in Section 3.1(d).

"Indebtedness" of any entity means all obligations of such entity which in accordance with GAAP should be classified upon a balance sheet of such entity as indebtedness of such entity, and in any event, regardless of how classified in accordance with GAAP, shall include, without duplication:  (i) all obligations of such entity for borrowed money or purchase money financing which has been incurred in connection with the acquisition of property, assets or services, (ii) obligations secured by any lien or other charge upon property or assets owned by such entity, even though such entity has not assumed or become liable for the payment of such obligations, (iii) obligations created or arising under any conditional sale or other title retention agreement with respect to property acquired by such entity, whether or not the rights and remedies of the lender or lessor under such agreement in the event of default are limited to repossession or sale of the property, and (iv) capitalized rentals under any capitalized lease (as defined in GAAP).

"Intellectual Property" means all (i) patents, patent applications, patent disclosures, and improvements thereto, (ii) trademarks, service marks, trade dress, logos, trade names, and corporate names and registrations and applications for registration therefor, (iii) copyrights and registrations and applications for registration thereof, (iv) mask works and registrations and applications for registration thereof, (v) computer software, data and documentation including, without limitation, ownership or rights to use, source code and object code, (vi) trade secrets and confidential business

CONFIDENTIAL

information (including ideas, formulas, compositions, inventions (whether patentable or unpatentable and whether or not reduced to practice), know-how, research and development information, software products in development, drawings, specifications, designs, plans, proposals, technical data, copyrightable works, financial (excluding employee benefit plans), marketing, and business data, pricing and cost information, business and marketing plans, and customer and supplier lists and information), and (vii) copies and tangible embodiments thereof (in whatever form or medium).

"Interim Balance Sheet" has the meaning set forth in Section 3.1(e).

"Interim Financial Statements" has the meaning set forth in Section 3.1(e).

"Knowledge of the Companies" means any fact or matter of which any officer or management employee of any of the Companies listed on the Knowledge Schedule is actually aware or of which a prudent individual serving as such an officer or management employee should have become aware based upon a reasonable investigation and inquiry with respect to the correctness and validity of the representation, warranty or other matters qualified by Knowledge of the Companies.

"Liability" means any liability (whether known or unknown, whether absolute or contingent, whether liquidated or unliquidated, and whether due or to become due), including any liability for Taxes.

"Loss" means, without duplication, any damage (including, but not limited to, consequential damages and punitive damages), obligation, payment, cost, Taxes, expense, injury, judgment, penalty, fine, interest, or other loss (including, but not limited to, the cost and expense of defending or prosecuting any and all charges, claims, complaints, actions, demands, assessments, litigation, proceedings, hearings, investigations, notices, judgments, orders, decrees and settlements relating thereto, expenses of preparation and investigation thereof and attorneys', experts', consultants' and accountants' fees in connection therewith).

"Material Adverse Change" means any change, event or occurrence which has, or could reasonably be expected to have, a material adverse effect upon the business, financial condition, operations or assets of the Alarm Service Assets taken as a whole, other than those which related solely to the alarm service industry generally or the general economy.

"Multiemployer Plan" has the meaning set forth in Section 3(37) of ERISA.

"Ordinary Course of Business" means the ordinary course of business of the Alarm Subsidiaries with respect to the Alarm Service Assets consistent with past practice (including with respect to quantity, amount and frequency).

CONFIDENTIAL

"Party" or "Parties" means Ameritech, Buyer, Republic, RSC or the Seller individually, and collectively.

"Permitted Liens" means all Liens listed on the Permitted Liens Schedule attached hereto.

"Person" means an individual, a partnership, a corporation, an association, a limited liability company, a joint stock company, a trust, a joint venture, an unincorporated organization, a governmental entity or any department, agency or political subdivision thereof or any other entity.

"Purchase Price" has the meaning set forth in Section 2.5.

"Qualified RMR" means the total recurring amount billed to the accounts of customers subscribing for Services under written and fully executed Customer Contracts for the provision of Services as of the Closing Date which shall be calculated as the sum of the following:

      (i)      the total recurring revenue (net of any sales tax) for a one-month period recognized under GAAP by the Alarm Subsidiaries with respect to the accounts of such customers which have no outstanding receivable balances for Services as of the Closing Date;

      (ii)     Plus the total recurring revenue (net of any sales tax) for a one-month period recognized under GAAP by the Alarm Subsidiaries with respect to the accounts of such customers which, as of the Closing Date, had outstanding receivable balances for Services which were 90 days or less past due from the Billing Date relating to such receivable balances but only so long as the customer with any such account has not canceled its Customer Contract for Services in writing prior to the Closing Date or provided written notice of cancellation to the applicable Alarm Subsidiary prior to the Closing Date;

      (iii)     Minus the total recurring revenue (net of any sales tax) for a one-month period recognized under GAAP by the Alarm Subsidiaries with respect to the accounts of such customers which is included in (i) or (ii) above as of the Closing Date which derives from Customer Contracts which have been canceled effective any time prior to the ninetieth (90th) day following the Closing Date due to an act or omission by any Alarm Subsidiary demonstrated by the Buyer through reasonable evidence to have taken place prior to the Closing Date; provided that Buyer demonstrates through reasonable evidence that Buyer had taken all actions in Buyer's ordinary course of business, consistent with past custom and practice (including with respect to quantity, amount and frequency), to attempt to retain or re-sign the cancelling customer.

"Security Interest" means any mortgage, pledge, security interest, encumbrance, lien, charge of any kind (including any conditional sale or other title retention agreement or lease in the nature

MONTE.11

- 5 -



CONFIDENTIAL

thereof), any sale of receivables with recourse against the Companies, any filing or agreement to file a financing statement as debtor under the Uniform Commercial Code or any similar statute (other than to reflect ownership by a third party of property leased to the Companies under a lease which is not in the nature of a conditional sale or title retention agreement), or any subordination arrangement in favor of another Person, or negative pledge, or the right to impose any of the foregoing.

"Seller Covered Person" means Republic and its Affiliates and their respective accounting and legal representatives (internal and external), as well as their respective officers, directors, employees and agents.

"Services" means electronic burglar alarm services, fire alarm services, closed circuit television and electronic access control services, central station monitoring services, security system maintenance services, leases, fire testing and all other related services provided to the premises of commercial, residential and other customers, including, without limitation, guard response services related thereto, but does not mean the sale, installation, maintenance or monitoring of security systems for automobiles and other vehicles including vehicle tracking or locating services or products such as SatTrak 24.

"Small Contract" means any contract, agreement, purchase order, contractual right and other similar arrangement (other than Customer Contracts), including all amendments thereto, which, as of the Closing, relates exclusively to the Alarm Service Assets, to which one of the Alarm Subsidiaries is a party or otherwise has rights or obligations thereunder and (a) under which the required future payments by the Companies do not exceed $50,000 in the aggregate, (b) under which future payments by the Companies do not exceed $2,000 per month and relate solely to the provision of office supplies, office equipment, employee uniforms, pagers, wireless phones, vehicles, phone directory advertisements, in each case as entered into in the Ordinary Course of Business, or (c) under which the obligations of the Alarm Subsidiaries can be terminated on no more than 30-day's prior notice without the payment of any amount in excess of $50,000, and in any case do not have as a party thereto any Affiliate, employee, officer or director of the Companies or 5% stockholder of Republic.

"Tax" or "Taxes" means any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, communications, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Code Sec. 59A), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transaction, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto.

CONFIDENTIAL

"Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

## ARTICLE 2 - THE TRANSACTION

2.1     Acquired Assets.   On and subject to the terms and conditions of this Agreement, at the Closing, Buyer shall purchase from each Alarm Subsidiary, and each Alarm Subsidiary shall sell, transfer, convey and deliver to Buyer, free and clear of any Security Interest other than Permitted Liens, all of its right, title and interest in and to all of the assets included in or used primarily in the business of the Alarm Service Assets (other than the Excluded Assets) (collectively, the "Acquired Assets"), including, without limitation (subject to retention by the Alarm Subsidiaries pursuant to Section 2.2) all of their right, title and interest in the assets listed on the Acquired Assets Schedule attached hereto and the following assets to the extent used or included in or generated in connection with the operations of the Alarm Service Assets:

(a)     the lock boxes of RSC, Seller and the Alarm Subsidiaries;

(b)     prepaid costs and prepaid expenses;

(c)     accounts, notes and other receivables;

(d)     Inventory including raw materials and supplies, manufactured and purchased parts (including without limitation motion, smoke and heat detectors and alarm control panels whether or not held on the Companies' premises, its customers' premises or elsewhere), work-in-process, finished goods and other items of inventory;

(e)     machinery, equipment, furniture, fixtures, leasehold improvements, vehicles and other tangible personal property including that listed on the Acquired Assets Schedule attached hereto;

(f)     Intellectual Property, goodwill associated therewith, licenses and sublicenses granted and obtained with respect thereto, and rights thereunder, remedies against infringements thereof, and rights to protection of interests therein under the laws of all jurisdictions; the names, trade names, trade dress, and logos as described on the Intellectual Property Schedule attached hereto;

(g)     rights under agreements, contracts, purchase orders, contractual rights and other similar arrangements, including all amendments thereto, that relate to the Alarm Service Assets that are Small Contracts, Customer Contracts or are set forth on the Assumed Contracts Schedule attached hereto (collectively, the "Assumed Contracts");

CONFIDENTIAL

(h)     performance, surety and warranty bonds entered into in the Ordinary Course of Business;

(i)     prepayments and deposits to the extent any benefit therefrom could inure to Buyer after the Closing;

(j)     all claims, refunds, rights of recovery, rights of set off and rights of recoupment of any kind, except with respect to (i) Taxes incurred prior to the Closing Date, (ii) insurance with respect to Excluded Assets and (iii) holdbacks of Republic stock with respect to acquisitions by the Companies prior to the Closing Date;

(k)     all franchises, approvals, permits, licenses, orders, registrations, certificates, variances and similar rights obtained from governments and governmental agencies, to the extent transferable to Buyer;

(l)     rights to the telephone numbers used in the operation of the Alarm Service Assets and rights to receive mail and other communications addressed to the Companies which relate to the Alarm Service Assets (including mail and communications from customers, suppliers, distributors, agents and others and payments with respect to the Acquired Assets);

(m)     books, records, ledgers, files, documents, correspondence, lists, drawings, specifications, advertising and promotional materials, studies, reports and other printed or written materials relating to the Acquired Assets or the Services;

(n)     other property owned by the Alarm Subsidiaries and used primarily in the operations of the Alarm Service Assets at any time prior to the Closing Date.

2.2     Excluded Assets.  Notwithstanding anything in this Agreement to the contrary, the Acquired Assets shall not include the following assets of the Companies (collectively, the "Excluded Assets"):

(a)     cash and cash equivalents, including the Purchase Price;

(b)     minute books and similar corporate records relating to the existence, structure, or equity ownership of the Companies;

(c)     shares of capital stock in any alarm monitoring service entity held by Seller;

(d)     any and all assets used in the sale, installation, maintenance of security alarm systems in vehicles, including, without limitation, the SatTrak 24 business or other vehicle tracking or locating service (the "SatTrak 24 Business");

CONFIDENTIAL

(e)      any and all rights of Republic, RSC and Seller under this Agreement;

(f)      all claims, refunds, rights of recovery, rights of set off and rights of recoupment of any kind with respect to (i) Taxes incurred prior to the Closing Date, (ii) insurance with respect to Excluded Assets and (iii) holdbacks of Republic stock with respect to acquisitions by the Companies prior to the Closing Date;

(g)      any and all assets of Plans (as defined below), including, without limitation, those of the Plans set forth on the Employee Benefits Schedule); and

.  (h)      all rights to receive mail and other communications addressed to the Companies relating to any of the Excluded Assets or the Excluded Liabilities.

2.3    Assumed Liabilities. On and subject to the terms and conditions of this Agreement, Buyer shall assume all of the Liabilities of the Alarm Subsidiaries (other than the Excluded Liabilities), including (a) Liabilities with respect to the performance of or breach of Assumed Contracts, Small Contracts and Customer Contracts (including without limitation any franchise agreement), (b) the Liabilities of the Alarm Subsidiaries relating to the failure to comply with the Worker Adjustment and Retraining Notification Act (and the state law equivalents thereof) in connection with the transactions contemplated hereby, (c) the Liabilities of the Alarm Subsidiaries reflected on the face of the Interim Balance Sheet, (d) the Liabilities of the Alarm Subsidiaries incurred in the Ordinary Course of Business (other than any Liability for Indebtedness) and (e) the Liabilities of the Alarm Subsidiaries disclosed on the Disclosure Schedule or not required by the terms hereof to be so disclosed (collectively, the "Assumed Liabilities"); provided, however, that the designation of a Liability as an Assumed Liability shall not impact the right of Buyer to maintain an indemnification claim relating thereto to the extent permitted under Section 5.3 hereof. The Buyer hereby acknowledges that it is assuming the Assumed Liabilities and the Buyer shall have the sole responsibility to pay, discharge and perform all of the Assumed Liabilities promptly when due.

2.4    Excluded Liabilities. Notwithstanding anything to the contrary contained in this Agreement, Buyer shall not assume or be liable for (a) any of the Companies' liabilities under this Agreement and any agreements and instruments entered into in connection herewith; (b) amounts owed by the Alarm Subsidiaries to Republic or any of its Affiliates; (c) any Indebtedness of any of the Companies, (d) Taxes of any of the Companies; (e) any claims arising out of prior acquisitions by the Companies, including without limitation, from indemnification claims or held back or contingent consideration; (f) any Liability arising under any contract or agreement which is not an Assumed Contract; (g) any and all Liabilities under or relating to the employee benefit plans, programs, policies and arrangements of the Companies (including, without limitation, any and all Liabilities of the Plans, including those set forth on the Employee Benefits Schedule), other than as explicitly assumed by Buyer in Section 5.4; and (h) any Liabilities of any Company with respect to equity securities or any and all rights or options relating to such securities (including, without

CONFIDENTIAL

limitation, any equity financing agreements, stock option or award agreements or plans, or securities law violations) (collectively, the "Excluded Liabilities"). The Seller hereby acknowledges that it is retaining the Excluded Liabilities and the Seller shall have the sole responsibility to pay, discharge and perform all such liabilities and obligations promptly when due.

2.5     Purchase Price. The aggregate purchase price for the Acquired Assets (the "Purchase Price") payable hereunder will be the assumption of the Assumed Liabilities plus cash in an amount equal to ▮▮▮▮▮▮▮▮▮▮ minus certain agreed adjustments equal to ▮▮▮▮▮▮▮▮ or net cash to Seller of ▮▮▮▮▮▮▮▮▮▮▮.

. . . 2.6     Closing Transactions.

(a)     Closing. Subject to the conditions set forth in this Agreement, the closing of the transactions contemplated by this Agreement (the "Closing") will take place at the offices of Republic, commencing at 10:00 A.M. local time, on the first business day following the termination of the waiting period under the Hart-Scott-Rodino Act, or at such other time or place, or on such other date as the Parties may mutually agree upon. The date on which the Closing occurs is referred to herein as the "Closing Date."

(b)     Conditions to the Obligations of the Buyer. The obligation of the Buyer to consummate the transactions contemplated hereby is subject to satisfaction at or prior to the Closing Date of each of the following conditions:

(i)     Republic's, RSC's and the Seller's representations and warranties set forth in Section 3.1 shall be true and correct in all material respects, in each case at and as of the Closing Date, except for representations and warranties that are made by their terms as of a specified date, which shall be true and correct in all material respects as of such specified date;

(ii)     Republic, RSC and the Seller shall have performed and complied in all material respects with all of their covenants and agreements set forth in this Agreement through the Closing Date;

(iii)     Since the date hereof, no Material Adverse Change shall have occurred;

(iv)     The waiting period under the Hart-Scott-Rodino Act shall have expired or shall have been terminated early;

(v)     All consents, waivers and approvals set forth on the Required Consents Schedule will have been duly obtained or waived without conditions or requirements that are materially adverse to the Buyer;

CONFIDENTIAL

(vi)    Republic, RSC and the Seller shall have delivered to the Buyer certificates signed by Republic, RSC and Seller to the effect that each of the conditions specified above in Sections 2.6(b)(i)-(v), inclusive, has been satisfied.

(vii)    No legal judgment, decree, order or injunction shall be issued (and no such judgment, decree, order or injunction shall be in effect) which (A) prevents the consummation of the transactions contemplated by this Agreement or (B) directs any material portion of such transactions to be rescinded following consummation of the transactions contemplated by this Agreement;

(viii)    On the Closing Date, Seller will have delivered to the Buyer each of the following:

(A)    a bill of sale in the form attached hereto as Exhibit A-1 from each of the Alarm Subsidiaries;

(B)    an assumption and assignment agreement in the form attached hereto as Exhibit A-2 from each of the Alarm Subsidiaries and a trademark assignment agreement in the form attached hereto as Exhibit A-3 from each of the Alarm Subsidiaries;

(C)    titles to all vehicles included in the Acquired Assets (other than those disclosed in the Disclosure Schedule under the caption "Leased Assets") or appropriate powers of attorney permitting Buyer to transfer such titles after Closing (which vehicles have been identified by the Seller on the Acquired Assets Schedule attached hereto), assigned to Buyer;

(D)    UCC-3 termination statements terminating all Security Interests existing on the Acquired Assets other than Permitted Liens;

(E)    assignment and assumption agreements in the form of Exhibit B-1 hereto, assigning to Buyer all the leases for the facilities leased by one or more of the Alarm Subsidiaries at the locations set forth on the Real Property Schedule;

(F)    landlord consent and estoppel certificates for the leased real property located at 510 E. Pikes Peak Ave., Colorado Springs, Colorado and 2720 North Thatcher Avenue, River Grove, Illinois in the form of Exhibit B-2 hereto;

(G)    a transitional services agreement in the form attached hereto as Exhibit C between Buyer and Republic;

CONFIDENTIAL

(H)     a legal opinion of James O. Cole, General Counsel of Republic and Akerman, Senterfitt & Eidson, P.A., counsel to Republic, RSC and Seller with respect to the matters set forth in Exhibit D-1 attached hereto addressed to the Buyer and dated as of the Closing Date ("Companies' Legal Opinion");

(I)     special warranty deeds transferring good and marketable fee simple title to the owned real properties set forth in the Real Property Schedule (the "Owned Real Property") to Buyer or Buyer's designee (the "Deeds").

(J)     such other instruments of sale, transfer, conveyance and assignment as Buyer may reasonably request in form satisfactory to Buyer and consistent with the provisions of this Agreement.

The Buyer may waive any condition, in whole or in part, specified in this Section 2.6(b); provided that any waiver of the conditions set forth in Section 2.6(b)(i) must be in a writing executed by Buyer and the mere closing of the transactions contemplated hereby shall not constitute a waiver of such conditions except to the extent provided in Section 4.5; and provided further that all other conditions set forth in Section 2.6(b) shall be deemed to be waived for purposes of indemnification under Section 5.3(a) to the extent Seller discloses that they are unfulfilled in the certificate delivered by the Seller to the Buyer pursuant to Section 2.6(b)(vi) (but solely to the extent so disclosed) if the transactions contemplated by this Agreement are consummated.

(c)     Conditions to the Obligations of Republic, RSC and the Seller.   The obligations of Republic, RSC and the Seller to consummate the transactions contemplated hereby are subject to satisfaction at or prior to the Closing Date of each of the following conditions:

(i)     The representations and warranties set forth in Section 3.2 shall be true and correct in all material respects, in each case at and as of the Closing Date;

(ii)    The Buyer and Ameritech shall have performed and complied in all material respects with all of its covenants and agreements set forth in this Agreement through the Closing Date;

(iii)   The waiting period under the Hart-Scott-Rodino Act shall have expired or shall have been terminated early;

(iv)    The Buyer and Ameritech shall have delivered to Republic, RSC and Seller a certificate signed by an officer of the Buyer to the effect that each of the conditions specified above in Sections 2.6(c)(i)-(iii), inclusive, are satisfied in all material respects;

CONFIDENTIAL

(v)      No legal judgment, decree, order or injunction shall have been issued which could reasonably be expected to (A) prevent the consummation of the transactions contemplated by this Agreement, or (B) cause any of such transactions to be rescinded following consummation;

(vi)      On the Closing Date, the Buyer will have delivered to Seller each of the following:

(A)      cash in the amount required under Section 2.5 by wire transfer of immediately available funds to an account designated by Seller;

(B)      an assumption and assignment agreement in the form attached hereto as Exhibit A-2 from the Buyer;

(C)      legal opinion of Bruce Howat, corporate secretary of Ameritech, and Kirkland & Ellis, counsel to Ameritech and Buyer with respect to the matters set forth in Exhibit D-2 attached hereto addressed to the Seller and dated as of the Closing Date ("Buyer's Legal Opinion"); and

(D)      such other instruments of assumption as the Seller may reasonably request in form satisfactory to the Seller and consistent with the provisions of this Agreement;

The Seller may waive any condition, in whole or in part, specified in this Section 2.6(c).

2.7      Purchase Price Allocation.  The Purchase Price shall be allocated for tax purposes among each item or class of Acquired Assets as mutually agreed to by Buyer and Seller and set forth on a Tax Allocation Schedule to be mutually agreed upon by Buyer and Seller within seventy-five (75) days of the Closing Date.  Seller and Buyer shall prepare and file any notice or other filing required pursuant to Section 1060 of the Code, and any such notices or filings will be prepared based upon such tax allocation for the Purchase Price.

## ARTICLE 3 - REPRESENTATIONS AND WARRANTIES

3.1      Representations and Warranties of Republic, RSC and the Seller.  As a material inducement to Buyer to enter into this Agreement and to consummate the transactions contemplated hereby, Republic, RSC and the Seller hereby each, jointly and severally, represent and warrant to Buyer that the statements contained in this Section 3.1 are correct and complete as of the date of this Agreement except as set forth in the Disclosure Schedule.



(a)     <u>Organization and Corporate Power</u>. RSC is a direct wholly-owned subsidiary of Republic and Seller is a direct wholly-owned subsidiary of RSC. The <u>Alarm Subsidiary Schedule</u> sets forth a list of each subsidiary of Republic, RSC and Seller which is engaged in the provision of, or holds assets used for the provision of Services (collectively, the "<u>Alarm Subsidiaries</u>"). Each of the Alarm Subsidiaries is a wholly-owned subsidiary of Seller and the Alarm Subsidiaries are the sole Affiliates of Republic, RSC and/or the Seller engaged in the provision of Services. Republic, RSC and the Seller do not directly engage in the provision of Services. Each of the Companies is a corporation duly organized, validly existing, and in good standing under the laws of its jurisdiction of incorporation. Each of the Companies has full corporate power and authority to carry on the operations of the Alarm Service Assets and to own and use the properties owned and used by them.

(b)     <u>Authorization of Transaction</u>. Each of the Companies has full corporate power and authority to execute and deliver this Agreement and the other agreements contemplated hereby to which they are a party and to perform their respective obligations hereunder and thereunder. Without limiting the generality of the foregoing, the boards of directors of each of the Companies have each duly authorized the execution, delivery, and performance of this Agreement and the other agreements contemplated hereby to which they are a party. This Agreement and the other agreements contemplated hereby to which the Companies are parties constitute the valid and legally binding obligations of theirs, enforceable against them in accordance with their respective terms, except as enforceability may be limited by bankruptcy, similar laws of debtor relief and general principles of equity.

(c)     <u>Noncontravention</u>. Except as set forth on the <u>Consents Schedule</u>, assuming the accuracy of the representations of Buyer in <u>Section 3.2</u>, neither the execution and the delivery of this Agreement, nor the consummation of the transactions contemplated hereby will (i) violate any statute, regulation, rule, judgment, order, decree, stipulation, injunction, charge, or other restriction of any government, governmental agency, or court to which any of the Companies is subject or any provision of the certificate of incorporation or bylaws of any of the Companies or (ii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any contract, lease, sublease, license, sublicense, franchise, permit, indenture, agreement or mortgage for borrowed money, instrument of Indebtedness, Security Interest, or other arrangement relating to the Acquired Assets to which any of the Companies is a party or by which it or any of them is bound or to which any of its or any of their assets is subject; other than any violation, conflict, breach, default, acceleration or right, individually or in the aggregate, that will not cause and could not reasonably be expected to cause a Material Adverse Change.

(d)     <u>Governmental Consent</u>. Other than as may be required for compliance with the provisions of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "<u>Hart-Scott-Rodino Act</u>") and federal securities laws, neither Republic, RSC, Seller nor the Subsidiaries is required to make any declaration to or registration or filing with, or to obtain any permit, license,

CONFIDENTIAL

consent, accreditation, exemption, approval or authorization from, any governmental or regulatory authority in connection with the execution, delivery or performance of this Agreement or the consummation of any of the transactions contemplated hereby.

    (e)  <u>Financial Statements</u>.

     (i) Attached as the <u>Financial Statement Exhibit</u> is (a) the unaudited consolidated balance sheet of the Alarm Subsidiaries at December 31, 1996 (the "<u>Balance Sheet</u>"), and the related unaudited consolidated statement of income for the fiscal year then ended (collectively the "<u>Financial Statements</u>"), and (b) an unaudited consolidated balance sheet of the Alarm Subsidiaries at August 31, 1997 (the "<u>Interim Balance Sheet</u>") and the related unaudited consolidated statement of income for the eight (8) months then ended, (collectively, the "<u>Interim Financial Statements</u>").

     (ii) The Financial Statements fairly present in all material respects the financial condition and the results of operations of the Alarm Subsidiaries at and as of December 31, 1996 and were prepared in accordance with GAAP except as noted thereon. The Financial Statements were prepared in all material respects in accordance with the accounting principles used in preparing the audited consolidated balance sheets of Republic as of December 31, 1996 (the "<u>Republic Audited Financial Statements</u>").

     (iii) The Interim Financial Statements fairly present in all material respects the financial condition and the results of operations of the Alarm Subsidiaries at and as of August 31, 1997 and were prepared in accordance with GAAP, except as noted thereon and subject to normal year-end audit adjustments none of which are material other than the elimination of intercompany accounts and transactions. The Interim Financial Statements were prepared in all material respects in accordance with the accounting principles used in preparing the Republic Audited Financial Statements, except for the capitalization of certain costs which were expensed in 1996.

     (iv) To the knowledge of the Companies, the books of account and other financial records of the Alarm Subsidiaries fairly reflect in all material respects all transactions, assets and liabilities of the Alarm Subsidiaries, and the information contained in the documents listed or attached to the attached <u>Financial Information Schedule</u> fairly present a description or summary in all material respects of the matters purported to be described or summarized in such documents, and all of the financial information attached to the <u>Financial Information Schedule</u> which is of the kind that is derived from books of account and other financial records has been based on such books and other financial records.


CONFIDENTIAL

(f)    Absence of Undisclosed Liabilities.  Except as set forth on the Disclosure Schedule, there are no Liabilities relating to the Alarm Service Assets or the provision by the Alarm Subsidiaries of Services (whether known or unknown and whether absolute, accrued, contingent, or otherwise) (and, to the Knowledge of the Companies, there is no Basis for any present or future charge, complaint, action, suit, proceeding, hearing, investigation, claim, or demand against the Companies giving rise to any such Liability) except for (1) Liabilities reflected or reserved against in the Interim Balance Sheet, (2) Liabilities incurred in the Ordinary Course of Business since August 31, 1997, and (3) Liabilities under purchase orders entered in the Ordinary Course of Business prior to August 31, 1997 that constitute Small Contracts.  The Knowledge Schedule includes the president or other person responsible for the management of each individual Alarm Subsidiary and the officers of Republic whose responsibility includes the one or more aspects of the operations of the Alarm Subsidiaries.

(g)    Recent Events.  Since July 31, 1997, the Companies have not experienced any Material Adverse Change, and to the Knowledge of the Companies, no event has occurred or circumstance exists that would likely result in such a Material Adverse Change.  Except as expressly contemplated by this Agreement or as set forth on the attached Developments Schedule, since July 31, 1997, the Companies have not, with respect to the Alarm Service Assets: (1) sold, assigned, transferred, leased, licensed or otherwise encumbered (or otherwise entered into an agreement to do any of the foregoing) any of its tangible assets in excess of $100,000, except in the Ordinary Course of Business; (2) deviated from its customary policies and procedures relating to customer credit evaluations and Customer Contract negotiation and execution; (3) delayed or postponed the payment of any accounts payable or any other Liability or agreed or negotiated with any party to extend the payment date of any accounts payable or accelerated the collection of any accounts or notes receivable other than in the Ordinary Course of Business; (4) made any change in any method of accounting or accounting policies, made any change in its cash management policies, or made any material, non-Ordinary Course of Business write-down in the value of its inventory; (5) entered into any other material transaction, whether or not in the Ordinary Course of Business; or (6) agreed, whether orally or in writing, to do any of the foregoing.  Since the later of December 31, 1996 or the date any particular Alarm Subsidiary was acquired directly or indirectly by Republic, each Alarm Subsidiary has not factored any receivables.

(h)    Real Property.  The Real Property Schedule lists and describes briefly all real property included in the Alarm Service Assets.  With respect to each such parcel of Owned Real Property:

(i)    The identified owner has good and marketable title to the parcel of Owned Real Property, free and clear of any Security Interest, easement, covenant, or other restriction, except for taxes not yet due and payable, for installments of special assessments not yet delinquent and easements, covenants, and other restrictions which do not impair the current use or occupancy of the property subject thereto;

MONTE.11

- 16 -

CONFIDENTIAL

(ii)     there are no pending or, to the Knowledge of the Companies, threatened condemnation proceedings, lawsuits, or administrative actions relating to the property, or other matters affecting materially and adversely the current use or occupancy thereof;

(iii)    the legal description for the parcel contained in the deed thereof describes such parcel fully and adequately, the buildings and improvements are located within the boundary lines of the described parcels of land, are not in violation of applicable setback requirements, zoning laws, and ordinances (and none of the properties or buildings or improvements thereon are subject to "permitted non-conforming use" or "permitted non-conforming structure" classifications), and do not encroach on any easement which may burden the land, the land does not serve any adjoining property for any purpose inconsistent with the use of the land, and each property has access to a public roadway, and the property is not located within any flood plain or subject to any similar type restriction for which any permits or licenses necessary to the use thereof have not been obtained;

(iv)    all facilities have received all approvals of governmental authorities (including licenses and permits) required in connection with the ownership or operation thereof and have been operated and maintained in accordance with applicable laws, rules, and regulations;

(v)     there are no leases, subleases, licenses, concessions, or other agreements, written or oral, granting to any party or parties the right of use or occupancy of any portion of the parcel of real property; and

(vi)    there are no outstanding options or rights of first refusal to purchase the parcel of real property, or any portion thereof or interest therein.

The leases described on the Real Property Schedule cover all of the real estate leased, used or occupied by the operations of the Alarm Service Assets in connection with the provision of Services (collectively, the "Real Property"). Except as set forth in the Real Property Schedule, the leases described on the Real Property Schedule are in full force and effect and the Seller holds a valid and existing leasehold interest under each of such leases. Seller has delivered to Buyer complete and accurate copies of each of the leases described in the Real Property Schedule and none of such leases has been modified in any material respect, except to the extent that such modifications are disclosed by the copies delivered to Buyer. Seller is not in default and no circumstances exist which would result in such default, under any of such leases, and to the Knowledge of the Companies, no other party to such leases has the right to terminate, accelerate performance under or otherwise modify (including upon the giving of notice or the passage of time) any of such leases. To the Knowledge of the Companies, no lessor under any such lease is in default in any material respect under any of such leases in its duties to the lessee. None of the Companies has assigned, transferred, conveyed,

CONFIDENTIAL

mortgaged, deeded in trust, or encumbered any interest in any of the leaseholds or subleaseholds described in the Real Property Schedule.

(i)    Title to Assets; Condition and Sufficiency of Assets.  As of the Closing, the Alarm Subsidiaries will have valid title to each of the Acquired Assets and shall convey the same to Buyer free and clear of all Security Interests other than Permitted Liens.  No person or entity has any agreement, option, understanding, commitment or right to purchase from any of the Companies any of the Acquired Assets or any rights or interests therein, other than inventory sold to customers in the Ordinary Course of Business.  The Acquired Assets are in good condition and repair, except for ordinary wear and tear, are fit for use in the provision of Services and conform to the requirements of applicable law and the standards of Underwriters Laboratories in all material respects to the extent applicable.  The Acquired Assets include all assets necessary for, or used by the Companies in, the provision of Services.  Neither Republic nor any of its Affiliates, other than the Alarm Subsidiaries, is engaged in the provision of Services.  None of the assets used in the SatTrak 24 Business are used in the provision of Services.

(j)    Intellectual Property.  Except as set forth under the "Exceptions" heading on the Intellectual Property Schedule attached hereto, the Alarm Subsidiaries own or have the right to use all Intellectual Property necessary for the operation of the Alarm Service Assets or the provision of Services as presently conducted, and all of such Intellectual Property is set forth on the Intellectual Property Schedule.  As of the Closing, each item of Intellectual Property set forth on the Intellectual Property Schedule under the caption "Material Intellectual Property" will be owned or available for use by the Buyer on substantially similar terms and conditions immediately subsequent to the Closing.  With respect to the Alarm Service Assets, to the Knowledge of the Companies, the Companies have not interfered with, infringed upon, misappropriated, or otherwise become engaged in a controversy or dispute arising out of any Intellectual Property rights of third parties, and neither the Companies nor any of their respective directors and officers (and employees with responsibility for Intellectual Property matters) have received any written charge, complaint, claim, or notice alleging any such interference, infringement, misappropriation, or violation for the past two (2) years.  To the Knowledge of the Companies, no third party has interfered with, infringed upon, misappropriated, or otherwise become engaged in a controversy or dispute arising out of any Intellectual Property rights with respect to the Alarm Service Assets for the past two (2) years.

(k)    Contracts.  The Seller has delivered or otherwise made available to Buyer a correct and complete copy of each Assumed Contract (including in each case all amendments thereto) other than Small Contracts and Customer Contracts.  With respect to each Assumed Contract: (A) the contract is legal, valid, binding, enforceable and in full force and effect except as enforceability may be limited by bankruptcy, similar laws of debtor relief and general principles of equity; (B) (other than with respect to the Small Contracts) the contract will, assuming that any required third party consent identified on the Consent Schedule attached hereto with respect to such contract has been obtained, continue to be legal, valid, binding, and enforceable and in full force and



effect on identical terms immediately after the Closing except as enforceability may be limited by bankruptcy, similar laws of debtor relief and general principles of equity and except that no representation or warranty is made as to the enforceability or assignability of any non-competition covenants set forth on the Assumed Contracts Schedule; (C) no Company is, and to the Knowledge of the Companies no other party is, in breach or default (including, without limitation, with respect to any express or implied warranty other than, in the case of Customer Contracts for residential premises, warranty claims incurred in the Ordinary Course of Business), and no event has occurred which with notice or lapse of time would constitute a breach or default by Seller or permit termination, modification, or acceleration, under the contract by any other party thereto; (D) the contract has not been modified or amended in any way other than through a written amendment signed by all parties to such contract; (E) except as otherwise set forth on the Consent Schedule, the assignment of the Companies' rights and obligations to Buyer hereunder under any contract other than Small Contracts will not require the consent of or notice to any other person or entity; and (F) the Work in Process Schedule sets forth a list of the contracts relating to the installation of security systems at non-residential premises for which installation has not been fully completed prior to the Closing Date and for which installation costs will exceed $20,000. The Alarm Subsidiaries provide all of the Services under Customer Contracts.

(l)     Affiliate Transactions. The Affiliate Transaction Schedule contains a true, correct and complete schedule of all intercompany contracts, agreements, receivables, payables and other Liabilities and services regularly provided , between the Alarm Subsidiaries, on the one hand, and Republic or any of its Affiliates (other than the Alarm Subsidiaries), on the other hand, as of the date hereof.

(m)     Insurance. The Insurance Schedule attached hereto, lists each insurance policy maintained by the Alarm Subsidiaries with respect to the Alarm Service Assets and the loss history for all lines of insurance coverage maintained by the Companies with respect to the Alarm Service Assets since the purchase of each respective Alarm Subsidiary.

(n)     Employees. The Employee Schedule attached hereto sets forth as of the dates noted thereon, the names, position and annual salaries of each salaried employee of the Companies working in the business of the Alarm Service Assets. Except as set forth on the Employee Schedule and except for normal attrition in the Ordinary Course of Business, to the actual knowledge of the persons set forth on the Knowledge Schedule, no employees of any Alarm Subsidiary (such, an "Employee," and collectively, the "Employees") has or group of such Employees (other than the Non-Hired Employees) have any plans to cease working for the Alarm Subsidiaries. No Alarm Subsidiary is a party to or bound by any collective bargaining agreement, and the business of the Alarm Service Assets has not experienced any strikes, grievances, other collective bargaining disputes or claims of unfair labor practices relating to Employees. To the actual knowledge of the persons set forth on the Knowledge Schedule, there is no organizational effort presently being made or threatened by or on behalf of any labor union with respect to the Employees.

MONTE.11

CONFIDENTIAL

(o)     Employee Benefits.   The Employee Benefits Schedule attached hereto contains an accurate and complete list of all Plans (as defined below) maintained, contributed to or sponsored by the any of the Companies and made available to the Employees who work in the business of the Alarm Service Assets including all Plans contributed to, maintained or sponsored by each member of the controlled group of companies, within the meaning of Section 414 of the Code, of which any of the Companies is a member.  For purposes of this Agreement, the term "Plans" shall mean: (i) "employee benefit plans," as such term is defined in Section 3(3) of ERISA, whether or not funded and whether or not terminated and (ii) personnel policies, and fringe benefit plans, policies, programs and arrangements, whether or not subject to ERISA, whether or not funded, and whether or not terminated, including without limitation, stock bonus, deferred compensation, pension, severance, bonus, vacation, travel, incentive, and health, disability and welfare plans. No Plan is a Multiemployer Plan.  With respect to the Employees and former Employees, their spouses and dependents, the Companies have no obligation to provide, or Liability for, health care, life insurance, severance or other benefits after termination of employment except (a) continuation coverage as required by Section 601 of ERISA and Section 4980B of the Code and (b) continuation rights and conversion rights under applicable state laws.

(p)     Litigation.   The Litigation Schedule attached hereto sets forth each instance in which any of the Companies with respect to the Alarm Service Assets is (i) subject to any unsatisfied judgment, order, decree, stipulation, injunction, or charge that relates in any way to the Alarm Service Assets or (ii) are a party, or, to the Knowledge of the Companies, have been threatened in writing within the past twelve (12) months to be made a party to any charge, complaint, action, suit, proceeding, hearing, or investigation of or in any court or quasi-judicial or administrative agency of any federal, state, local, or foreign jurisdiction or before any arbitrator, in each case which relates in any way to the Alarm Service Assets.   None of the charges, complaints, actions, suits, proceedings, hearings, and investigations set forth in the Litigation Schedule could result, individually or in the aggregate, in a Material Adverse Change.

(q)     Compliance with Laws: Certain Operations.   Except as set forth on the Legal Compliance Schedule attached hereto (i) with respect to the business of the Alarm Service Assets, each of the Companies is in compliance with and has not violated any applicable law, rule or regulation of any federal, state, local or foreign government or agency thereof which affects the Alarm Service Assets; and (ii) each Company is in compliance with all terms and conditions of all required permits, licenses, certificates, accreditations or other authorizations of foreign, federal, state and local government agencies required for the conduct of the Alarm Service Assets, and is also in compliance with all other limitations, restrictions, conditions, standards, prohibitions, requirements, obligations, schedules and timetables contained in any foreign, federal, state or local law, or any regulation, code, plan, order, decree or judgment issued, entered, promulgated or approved thereunder applicable to the operation of the Alarm Service Assets.



(r)     Environment, Health and Safety.  Except as set forth on the Environmental Schedule, each of the  Companies and their respective predecessors and Affiliates has complied with all Environmental, Health, and Safety Laws with respect to the Alarm Service Assets, and no action, suit, proceeding, hearing, investigation, charge, complaint, claim, demand, or notice has been filed or commenced against any of them alleging any failure so to comply. None of the Companies has any Liability (and none of the Companies and their respective predecessors and Affiliates has handled or disposed of any substance, arranged for the disposal of any substance, exposed any employee or other individual to any substance or condition, or owned or operated any property or facility in any manner that could form the basis for any present or future action, suit, proceeding, hearing, investigation, charge, complaint, claim, or demand giving rise to any Liability) with respect to the Alarm Service Assets for damage to any site, location, or body of water (surface or subsurface), for any illness of or personal injury to any employee or other individual, or for any reason illegal under any Environmental, Health, and Safety Law.  Other than as set forth on the Environmental Schedule, all properties and equipment included in or used in the business of the Alarm Service Assets are free of asbestos, PCB's, methylene chloride, trichloroethylene, 1,2-trans-dichloroethylene, dioxins, dibenzofurans, and Extremely Hazardous Substances.

(s)     Brokers' Fees. Except for a fee payable by Republic to Allen & Company, Incorporated, none of the Companies has any Liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated by this Agreement and neither Buyer nor any Affiliate of Buyer could become liable or otherwise obligated with respect to any such Liability.

(t)     Taxes. Except as set forth on the Taxes Schedule, with respect to the Alarm Service Assets, none of the Companies has failed to (i) file, or cause to be filed, in respect of the business of the Alarm Service Assets, any required foreign, federal, state, county and local Tax returns which are required to be filed and or (ii) pay any Taxes which have become due pursuant to applicable Tax law.  With respect to the Alarm Service Assets, neither the Companies nor any Affiliate of the Companies has failed to (a) collect or withhold any monies required to be withheld by the Companies or any Affiliate of the Companies from employees of the Companies for income taxes, social security and other payroll Taxes, or (b) either pay to the respective governmental agencies, set aside, in accounts for such purpose, or accrue, reserve against and enter upon the books of the Companies amounts sufficient to cover Taxes. With respect to the Alarm Service Assets, none of the Companies is obligated to make any payment, and is not a party to any agreement that under certain circumstances could obligated it to make any payment that will not be deductible under Code Section 280G.

(u)     Qualified RMR.  The Qualified RMR as of the Closing Date is as set forth on the RMR Schedule.



3.2    <u>Representations and Warranties of Buyer and Ameritech</u>. As a material inducement to Republic, RSC and Seller to execute this Agreement and consummate the transactions contemplated hereby, Buyer and Ameritech hereby jointly and severally represent and warrant to Republic, RSC and the Seller that the statements contained in this <u>Section 3.2</u> are correct and complete as of the date of this Agreement.

(a)    <u>Organization</u>. Each of Buyer and Ameritech is a corporation duly organized, validly existing, and in good standing under the laws of the State of Delaware.

(b)    <u>Authorization of Transaction</u>. Each of Buyer and Ameritech has full corporate power and authority to execute and deliver this Agreement and the other agreements contemplated hereby to which it is a party and to perform its obligations hereunder and thereunder.  Without limiting the generality of the foregoing, the board of directors of Ameritech and the sole stockholder of Buyer have each duly authorized the execution, delivery, and performance of this Agreement and the other agreements contemplated hereby to which they are a party. This Agreement and the other agreements contemplated hereby to which the Buyer and Ameritech are a party constitute the valid and legally binding obligation of the Buyer and Ameritech, enforceable against the Buyer and Ameritech in accordance with their respective terms, except as enforceability may be limited by bankruptcy, similar laws of debtor relief and general principles of equity.

(c)    <u>Noncontravention</u>. Assuming the accuracy of the representations of Republic, RSC and the Seller in <u>Section 3.1</u>, neither the execution and the delivery of this Agreement, nor the consummation of the transactions contemplated hereby will (i) violate any statute, regulation, rule, judgment, order, decree, stipulation, injunction, charge, or other restriction of any government, governmental agency, or court to which Buyer or Ameritech is subject or any provision of the certificate of incorporation or bylaws of Buyer or Ameritech or (ii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any contract, lease, sublease, license, sublicense, franchise, permit, indenture, agreement or mortgage for borrowed money, instrument of Indebtedness, Security Interest, or other arrangement to which Buyer or Ameritech is a party or by which any of them is bound or to which any of its or any of their assets is subject; other than any violation, conflict, breach, default, acceleration or right, individually or in the aggregate, that will not cause and could not reasonably be expected to cause a Material Adverse Change.

(d)    <u>Governmental Consent</u>. Other than as may be required for compliance with the provisions of the Hart-Scott-Rodino Act and the federal securities laws, Buyer is not required to make any declaration to or filing with, or to obtain any permit, license, consent, accreditation, approval or authorization from, any governmental or regulatory authority in connection with the execution, delivery or performance of this Agreement or the consummation of any of the transactions contemplated hereby.

CONFIDENTIAL

(e)     Brokers' Fees.  Buyer has no Liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated by this Agreement for which the Companies could become liable or obligated.

(f)     Adequate Financing Available.   Buyer and Ameritech have sufficient, unrestricted cash on hand from readily available internal and external financing sources to pay the cash portion of the Purchase Price in full at the Closing, and the transactions contemplated hereby are not subject to any financing contingencies.

## ARTICLE 4 - PRE-CLOSING COVENANTS

4.1     Covenants Concerning the Alarm Service Assets.  At all times prior to the Closing Date, Republic, RSC and the Seller, jointly and severally, covenant and agree to:

(a)     cause the Alarm Subsidiaries to conduct the business and operations of the Alarm Service Assets only in the Ordinary Course of Business;

(b)     cause the Alarm Subsidiaries to maintain their cash management practices with respect to the Alarm Service Assets and all related policies, practices and procedures with respect to collection of trade accounts receivable, accrual of accounts receivable, inventory control, prepayment of expenses, payment of trade accounts payable, accrual of other expenses, deferral of revenue, and acceptance of customer deposits in the Ordinary Course of Business;

(c)     cause current insurance policies with respect to the Alarm Service Assets not to be canceled or terminated or any of the coverage thereunder to lapse, unless, simultaneously with such termination, cancellation or lapse, replacement policies providing coverage equal to or greater than the coverage under the canceled, terminated or lapsed policies to the extent practicable for market premiums are in full force and effect;

(d)     maintain, repair and replace Alarm Service Assets consistent with past practices;

(e)     use all reasonable efforts to retain (1) substantially all Employees (other than Non-Hired Employees) who are in good standing and (2) maintain all relationships with agents, distributors, licensees, suppliers and customers which are material to the Alarm Service Assets;

(f)     maintain books, accounts and records in accordance with past practice as used in the preparation of the Interim Financial Statements;

(g)     maintain in full force and effect the existence of all material Intellectual Property which is used or owned in connection with the business of the Alarm Service Assets;

MONTE.11

- 23 -

CONFIDENTIAL

(h)     comply with all material legal requirements and contractual obligations applicable to or binding upon the Companies with respect to the Alarm Service Assets;

(i)     maintain all material authorizations, consents, accreditations, licenses, permits and approvals pertaining to the Companies with respect to the Alarm Service Assets;

(j)     not mortgage, pledge or subject to any Security Interest (except those for Taxes not yet due and payable) any of the properties or assets included in the Alarm Service Assets;

(k)     not sell, assign or transfer any of the Customer Contracts and shall not sell, assign or transfer any other remaining Alarm Service Assets (except in the Ordinary Course of Business) or cancel without fair consideration any debts or claims owing to any Company or held by any Company which is an Acquired Asset;

(l)     confer with Buyer before taking any actions outside the Ordinary Course of Business and confer with Buyer concerning any development of a Material Adverse Change, in each case with respect to the Alarm Service Assets; and

(m)     agree or commit to do any of the matters described in (j) or (k) above or to not do any other matter described in this Section 4.1.

4.2     Reasonable Access.  Republic, RSC and Seller will permit the Buyer, its Affiliates, and their respective employees, accountants, legal counsel and other representatives to have reasonable access at all reasonable times upon advance notice, and in a manner so as not to interfere with the normal business operations of the Alarm Service Assets, to such premises, properties, personnel, books, records, contracts, Tax records, and documents of or pertaining to the Alarm Service Assets, as is reasonably necessary or desirable for the Buyer.  All information given to the Buyer and its representatives shall be subject to the Confidentiality Agreement to the extent of the terms thereof.

4.3     Exclusivity.  Neither Republic nor any Affiliates of or Persons acting in concert with Republic shall at any time prior to the Closing Date (or earlier if this Agreement is terminated pursuant to Article 6 hereof): (i) solicit, initiate, or encourage the submission of any proposal or offer from any Person relating to any (A) liquidation, dissolution, or recapitalization of RSC, Seller or any of the Alarm Subsidiaries, (B) merger or consolidation or share exchange of RSC, Seller or any of the Alarm Subsidiaries, (C) acquisition or purchase of securities or assets of RSC, Seller or any of the Alarm Subsidiaries, or (D) similar transaction or business combination involving the Alarm Service Assets, RSC, Seller or the Alarm Subsidiaries or (ii) participate in any discussions or negotiations regarding, furnish any information with respect to, assist or participate in, or facilitate in any other manner any effort or attempt by any person to do or seek any of the foregoing.

CONFIDENTIAL

Republic will notify the Buyer immediately if any Person makes any proposal, offer, inquiry, or contact with respect to any of the foregoing.

4.4     General Obligation to Close. Each of the Parties will use their best efforts to take all actions and to do all things necessary to consummate and make effective the transactions contemplated hereby.

4.5     Notice of Developments. The Companies may supplement the Disclosure Schedule prior to the Closing, by notice given in accordance with Section 7.7, to update the disclosures made thereunder or to otherwise include information which would have been required to be set forth or described in the Disclosure Schedule or to have been noted as an exception to the representations and warranties in Section 3.1 had it existed on the date hereof. For purposes of determining the accuracy of the representations and warranties of the Companies contained in Article 3.1 in order to determine the fulfillment of the conditions set forth in Section 2.6(b), the Disclosure Schedule delivered by the Companies shall be deemed to include only that information contained therein on the date of this Agreement and shall be deemed to exclude any information contained in any subsequent supplement or amendment thereto but if the Closing occurs, the Disclosure Schedule as supplemented pursuant to this Section 4.5 shall be deemed to modify the representations and warranties set forth in Section 3.1 for purposes of determining whether an indemnification obligation exists under Section 5.3(a) and shall be deemed to constitute a waiver of the right to indemnification under Section 5.3(a) for the matters disclosed in any such supplement or amendment (but solely to the extent so disclosed). Buyer shall retain the right to add names to the Non-Hired Employees Schedule at any time prior to the Closing Date.

4.6     Obligation to Remove Liens. Republic, RSC and the Seller, jointly and severally, covenant and agree to remove all of the Liens set forth on the Permitted Liens Schedule within 90 days after the Closing Date, other than the Liens indicated with an asterisk on such schedule.

## ARTICLE 5 - CERTAIN COVENANTS

5.1     Post-Closing Assistance Matters.

(a)     Post Closing Assistance. In case at any time after the Closing any further action is necessary or desirable to carry out the purposes of this Agreement and to effect, consummate, confirm or evidence the consummation of the transactions contemplated hereby (including, without limitation, with respect to obtaining all licenses, permits, authorizations, accreditations and consents necessary in connection therewith and with respect to conveying title to vehicles, leases and land), each of the Parties will take such further action (including, without limitation, the execution and delivery of such further instruments and documents) as any other Party reasonably may request, at the sole cost and expense of the requesting Party (except to the extent

MONTE.11

- 25 -

CONFIDENTIAL

such expenses are subject to indemnification under <u>Section 5.3</u> or are subject to <u>Section 7.12</u> or such action is related to fulfilling any of the closing conditions under <u>Section 2.6</u>).

(b)    <u>Nonassignable Contracts</u>. To the extent that the assignment to Buyer of any contract, commitment, license, lease or other agreement of the Alarm Subsidiaries included in the Acquired Assets (the "<u>Contracts</u>") is deemed necessary by Buyer and is not permitted without the consent of any other party to the Contract, this Agreement shall not be deemed to constitute an assignment of any such Contract if such consent is not given or if such assignment otherwise would constitute a breach of, or cause a loss of contractual benefits under, any such Contract. The Alarm Subsidiaries shall advise Buyer promptly in writing with respect to any and all Contracts which will not receive required consent prior to the Closing. If any such consent is not obtained and such transactions are consummated, the Companies shall cooperate with Buyer to provide Buyer with the rights and benefits (subject to the obligations) under such Contracts, including, if requested by Buyer and at the Buyer's expense, (i) by enforcing for the benefit of Buyer any and all rights of the Alarm Subsidiaries against any other person arising out of any breach or cancellation of any such Contract by such other person, (ii) acting as an agent on behalf of Buyer, (iii) subcontracting to Buyer the right to perform under any such Contract on the same economic terms as applied to the Alarm Subsidiaries prior to the Closing and (iv) acting as Buyer shall otherwise reasonably require.

5.2    <u>Survival Period</u>. All of the representations and warranties provided in this Agreement shall survive the Closing for one (1) year; except with respect to a claim arising under <u>Section 3.1(e)</u> ("Broker's Fee"), <u>Section 3.1 (r)</u> ("Environment, Health and Safety") and <u>Section 3.1(t)</u> ("Taxes"), which shall survive until the expiration of the applicable statute of limitations; except with respect to a claim arising under <u>Section 3.1(a)</u> ("Authorization of Transaction") or the first sentence of <u>Section 3.1(i)</u> ("Title to Assets; Condition and Sufficiency of Assets"), which shall survive forever; and except with respect to a claim arising under <u>Section 3.1(u)</u>("Qualified RMR") which shall survive the Closing for 150 days. All claims arising out of the representations and warranties provided in this Agreement shall be unaffected by any investigations made by or on behalf of any Party hereto. Notwithstanding anything in <u>Section 5.2</u> to the contrary, in the event of any breach of a representation or warranty by a Party that constitutes fraud, the representation or warranty shall survive consummation of the transactions contemplated in this Agreement and continue in full force and effect forever thereafter with respect to such fraud. Unless otherwise specifically limited by this Agreement, all of the covenants and agreements made in this Agreement shall survive the Closing for the period necessary for their performance.

5.3    <u>Indemnification</u>.

(a)    <u>Indemnification by Republic, RSC and the Seller</u>. Each of Republic, RSC and Seller agrees, jointly and severally, that regardless of any investigation made at any time by or on behalf of Buyer, Republic, RSC and Seller shall, jointly and severally, indemnify and save and hold harmless the Buyer Covered Persons from and against any Loss, suffered or incurred by any

CONFIDENTIAL

such Covered Person arising out of or resulting from or in respect of: (1) Any inaccuracy in any representation or the breach of any warranty (except the representation and warranty set forth in Section 3.1(u) ("Qualified RMR")) made by Republic, RSC or Seller pursuant to this Agreement; (2) Any failure by Republic, RSC or the Seller duly to perform or observe any term, provision, covenant, agreement or condition in this Agreement on the part of any such Party to be performed or observed; (3) Any Excluded Liability; and (4) Any inaccuracy in any representation or the breach of any warranty contained in Section 3.1(u) ("Qualified RMR") measured in accordance with the RMR Schedule.

(b)     Indemnification by Ameritech and Buyer. Ameritech and Buyer agree that regardless of any investigation made at any time by or on behalf of the Seller, Buyer and Ameritech, jointly and severally, shall indemnify and save and hold harmless the Seller Covered Persons from and against any Loss suffered or incurred by any such Seller Covered Person and will pay in cash such Seller Covered Person the amount of any Loss arising out of or resulting from or in respect of and payable from: (1) Any inaccuracy in any representation or the breach of any warranty made by Buyer pursuant to this Agreement; (2) Any failure by Buyer duly to perform or observe any term, provision, covenant, agreement or condition in this Agreement on the part of Buyer to be performed or observed; and (3) Any Assumed Liability.

(c)     Cooperation. If any third party (including, without limitation, any taxing authority) shall make or assert a claim against any Party (the "Indemnified Party") with respect to any matter which may give rise to a claim for indemnification against any other Party (the "Indemnifying Party") under this Section 5.3(a) or 5.3(b), then the Indemnified Party shall notify each Indemnifying Party thereof promptly; provided, however, that no delay on the part of the Indemnified Party in notifying any Indemnifying Party shall relieve the Indemnifying Party from any liability or obligation under this Agreement unless (and then solely to the extent) the Indemnifying Party is damaged or prejudiced thereby. In the case of any such claim pursuant to which only the recovery of a sum of money is being sought and the Indemnifying Party acknowledges in a writing delivered to the Indemnified Party that the Indemnifying Party shall be fully responsible (with no reservation of rights other than the right to be subrogated to the rights of the Indemnified Party) for all Losses relating to such claim, the Indemnifying Party may, by written notice to the Indemnified Party, assume the defense thereof. In the case where the Indemnifying Party has so assumed such defense, (A) the Indemnifying Party will defend the Indemnified Party against such matter with counsel of its choice reasonably satisfactory to the Indemnified Party and (B) the Indemnified Party may retain separate co-counsel at its sole cost and expense (except that the Indemnifying Party will be responsible for the fees and expenses of any separate counsel to the Indemnified Party incurred prior to the date upon which the Indemnifying Party effectively assumes control of such defense). The Indemnifying Party may retain separate co-counsel at its sole cost and expense to participate in any defense which it does not assume, and, in any event the Party which has assumed the defense of any claim in accordance with the provisions hereof shall (i) provide the other Party with all material information requested by such other Party relating to the defense of such claim, (ii) confer

MONTE.11

CONFIDENTIAL

with such other Party as to the most cost-effective manner in which to defend such claim and (iii) use its reasonable efforts to minimize the cost of defending such claim. The Indemnified Party shall make available to the Indemnifying Party and its attorneys and accountants, at all reasonable times, all books and records relating to such suit, claims or proceedings, and the Parties will render to each other such assistance as may reasonably be required of each other in order to insure proper and adequate defense of any such suit, claim or proceeding. In the event that an Indemnifying Party has assumed the defense of any claim pursuant to this Section 5.3(a), such Indemnifying Party shall not make any settlement of any such claim without the written consent of the Indemnified Party, unless such settlement (i) includes only the payment of money damages, (ii) includes an unconditional release of all Liability which may be asserted with respect to the facts or circumstances with respect to which the claim or claims have been made and (iii) does not, in the reasonable judgment of the Indemnified Party, otherwise materially adversely affect its business. No Indemnified Party shall make a settlement of any claim assumed by any Indemnifying Party without the express written consent of the Indemnifying Party.

(d)     Determination of Loss. Any amounts paid by the Seller under Section 5.3(a) shall be treated as an adjustment to the Purchase Price for Tax and accounting purposes. A Loss arising from the inaccuracy of more than one representation or the breach of more than one warranty or covenant or any combination of inaccuracies or breaches shall only be recovered once. The Indemnifying Party shall also indemnify the Indemnified Party against any Tax imposed upon the Indemnified Party as a result of the receipt of any indemnification payment by such Indemnified Party (including any Taxes imposed on any such payments which are themselves made with respect to Taxes on indemnification payments). The Losses with respect to which any Indemnifying Party is obligated to indemnify an Indemnified Party from and against shall be adjusted to take into account the present value of any Tax benefit actually realized by the Indemnified Party as a result of incurring such Loss and shall also take into account the relevant effective Tax rates applicable to the Indemnified Party.

(e)     Payment for Losses. If and to the extent that any Loss shall arise and be payable pursuant to an order or judgment by a court of proper jurisdiction or written agreement of the Parties then, subject to the limitations set forth in subsection (f) below, the Parties shall pay an Indemnified Party in immediately available funds.

(f)     Limitations.

(A)     With respect to any claim for the inaccuracy of any representation or breach of any warranty contained in this Agreement (except as provided in Section 5.3(f) (B) and subject to Section 5.3(f)(C) below), the Companies shall not have any obligation to indemnify any Covered Person from and against any Loss with respect to such claims (A) until the Covered Persons have collectively suffered aggregate Losses (excluding each Single Loss less than $50,000) with respect to such claims in excess of $1,500,000 (the "Basket")

CONFIDENTIAL

MONTE.11

and (B) to the extent amounts paid by Republic, RSC and Seller to Buyer Covered Persons exceeds the Purchase Price (the "Cap"); it being understood that each of the Basket and the Cap shall be applied on an aggregate basis (i.e. not on a per claim basis). When the Buyer Covered Persons have collectively suffered aggregate Losses with respect to such claims in excess of the Basket, Republic, RSC and Seller shall have the obligation to indemnify each Buyer Covered Person for the full amount of all Losses suffered by the Buyer Covered Persons, dollar for dollar from the first dollar of Loss suffered, until the Cap is reached.

(B)     In the event of fraud, or with respect to a claim arising under Section 3.1(a) ("Authorization of Transaction"), Section 3.1(e) ("Broker's Fee") or Section 3.1(u) ("Qualified RMR"), the Companies' obligations to indemnify the Covered Persons for Losses shall not be limited by the Basket and in the event of fraud or a claim arising under Section 3.1(a) ("Authorization of Transaction") the Companies' obligations to indemnify the Covered Persons for Losses shall not be limited by the Cap.

(C)     None of Republic, RSC or Seller shall be obligated to indemnify the Buyer Covered Persons for any single Loss covered by Section 5.3(a) (consolidating into any single Loss any series of related events, facts or circumstances giving rise to Liability on the same or a substantially related legal and factual basis (after giving effect to such consolidation, a "Single Loss")) that arises out of a breach or inaccuracy of the representations and warranties set forth in Sections 3.1 (other than any breach or inaccuracy in Section 3.1 (a) ("Authorization of Transactions"), Section 3.1(e) ("Brokers' Fees") or Section 3.1(u) ("Qualified RMR")) unless such Single Loss exceeds $50,000, in which case Seller shall be obligated to indemnify the Covered Persons for the full amount of such Single Loss (including the portion below $50,000) subject to the Basket and the Cap to the extent they apply under Section 5.3(f).

(g)     Remedies.  The indemnification provisions set forth in this Section 5.3 shall constitute the Parties' sole and exclusive remedy with respect to claims for money damages (other than claims arising out of or relating to acts of wilful misconduct or fraud) arising out of or related to this Agreement. Except as aforesaid, the Parties will each have and retain all other rights and remedies existing in their favor in equity, including, without limitation, any actions for specific performance and/or injunctive or other equitable relief (including, without limitation, the remedy of rescission) to enforce or prevent any violations of any provision of this Agreement.

5.4     Employees and Employee Benefit Plans.

(a)     Immediately after the Closing, Buyer (or an affiliate thereof) shall offer employment to substantially all Employees who work in the business of the Alarm Service Assets other than those listed on the Non-Hired Employees Schedule attached hereto; provided that the terms of this Section 5.4 shall not entitle any Employee to remain in the employment of Buyer or

CONFIDENTIAL

affect the right of Buyer to terminate any Employee at any time, or to establish, modify or terminate any employee benefit plan as defined in Section (3)(3) of ERISA or any benefit under any such plan at any time (each Employee who accepts such offer, a "Transferred Employee"). Buyer and the Seller shall mutually agree on the written announcements provided to Employees pursuant to this Section 5.4. Buyer shall have no liability whatsoever with respect to any Employee or former employee of the business of the Alarm Service Assets except as expressly provided in this Asset Purchase Agreement.

(b) Each Transferred Employee shall participate in the existing employee benefit plans of Buyer in accordance with the terms of such plans if and only if such Transferred Employee is a member of the group of employees to which such plans are extended and such Transferred Employee meets all of the participation requirements of such plans (including, without limitation, eligibility, service and employee contribution requirements), subject to paragraph (c) below. Buyer shall not be required to amend any of its employee benefit plans to provide for such participation or to change any participation requirement of any such plan.

(c) For purposes of each vacation policy of Buyer that on or after the Closing Date covers Transferred Employees, employment with the Companies prior to the Closing Date shall be considered as employment with Buyer. With respect to any accrued but unused vacation time to which any Transferred Employee is entitled as of the Closing Date pursuant to the vacation policy of the Companies applicable to such employee, Buyer shall permit such employee to use such accrued vacation time; provided, however, that if Buyer in its sole discretion deems it necessary to disallow such employee from using such accrued vacation time, Buyer shall pay to such employee the cash equivalent of such unused time. With respect to the Ameritech Medical Benefits Plan ("Buyer's Medical Plan") that on or after the Closing Date covers Transferred Employees, employment with the Companies prior to the Closing Date shall be considered as employment with Buyer solely for the purposes of the initial participation waiting period and the preexisting condition limitation period.

(d) The Seller shall cooperate with Buyer and promptly provide to Buyer such records and data with respect to the Employees as Buyer may reasonably request for Buyer to satisfy its obligations under this Section 5.4.

5.5     Noncompete and Nonsolicitation.

(a) In consideration of the Purchase Price, but without any portion of the Purchase Price being specifically allocated hereto, Republic, RSC and Seller agree that during the period beginning on the Closing Date and ending on fifth anniversary of the Closing Date (the "Noncompetition Period"), Republic, RSC and Seller shall not directly or indirectly, including through any Alarm Subsidiary, either for itself or for any other Person, Participate in any business or enterprise which provides Services or permit the names of the Alarm Subsidiaries to be used by

CONFIDENTIAL

any business or enterprise which provides Services in the United States, Canada, Mexico and Europe. For purposes of this Agreement, the term "Participate" includes any direct or indirect interest in any enterprise, whether as an officer, director, employee, partner, sole proprietor, agent, representative, independent contractor, consultant, franchisor, franchisee, creditor, owner or otherwise; provided that the term "Participate" shall not include ownership of less than two percent of any company or other entity and shall not include any interest in SatTrak 24 or any business which relates to the sale, installation, maintenance or monitoring security systems for automobiles and other vehicles (excluding manufactured housing), including, without limitation, the sale, use, distribution or manufacture of vehicle tracking or locating services or products.

(b)     During the period ending on the fifth anniversary of the Closing Date (the "Nonsolicitation Period"), Republic, RSC and Seller shall not, directly or indirectly, including through any Alarm Subsidiary, either for itself or for any other Person, (1) induce or attempt to induce any customer of Services to cease doing business or to decrease its business with Buyer and its subsidiaries, (2) induce or attempt to induce any Employee to leave their employ with Buyer or in any way interfere with the relationship between Buyer and its subsidiaries and any of the Employees or (3) induce or attempt to induce any supplier, agent, licensee, licensor, franchisee, or other business relation of Buyer or its subsidiaries to cease doing business with them or in any way interfere with the relationship between Buyer or its subsidiaries and any customer or business relation with respect to the provision of Services.

(c)     If, at the time of enforcement of any of the provisions of this Section 5.5, a court holds that the restrictions stated herein are unreasonable under the circumstances then existing, the Parties hereto agree that the maximum period, scope or geographical area reasonable under such circumstances shall be substituted for the stated period, scope or area. Each of the Parties acknowledges and agrees that the Buyer would be damaged irreparably in the event any of the provisions of this Section 5.5 are not performed in accordance with their specific terms or otherwise are breached. Accordingly, each of the Parties agrees that the Buyer shall be entitled to an injunction or injunctions to prevent breaches of the provisions of this Section 5.5 and to enforce specifically this Section 5.5 and the terms and provisions hereof in any action instituted in any court of the United States or any state thereof having jurisdiction over the Parties and the matter, in addition to any other remedy to which it may be entitled, at law or in equity.

(d)     Republic, RSC and Seller agree that the covenants made in Section 5.5 shall be construed as an agreement independent of any other provision of this Agreement and shall survive any order of a court of competent jurisdiction terminating any other provision of this Agreement.

5.6     Cooperation with Tax Matters. The Seller and Buyer shall (i) each provide the other with such assistance as may reasonably be requested by any of them in connection with the preparation of any Tax Return, audit or other examination by any taxing authority or judicial or administrative proceedings relating to liability for Taxes, (ii) each retain and provide the other with

MONTE.11

- 31 -



CONFIDENTIAL

any records or other information which may be relevant to such Tax Return, audit or examination, proceeding or determination, and (iii) each provide the other with any final determination of any such audit or examination, proceeding or determination that affects any amount required to be shown on any Tax Return of the other for any period. Without limiting the generality of the foregoing, the Seller and Buyer shall retain until the applicable statutes of limitations (including any extensions) have expired, copies of all Tax Returns, supporting work schedules and other records or information which are relevant to such returns for all tax periods or portions thereof ending before or including the Closing Date and shall not destroy or otherwise dispose of any such records without first providing the other party with a reasonable opportunity to review and copy the same.

.  5.7    Confidentiality. Notwithstanding anything to the contrary set forth herein, the Confidentiality Agreement shall remain in full force and effect in accordance with its terms. In addition, each Party shall not disclose and shall hold confidential the terms and conditions hereof, including, without limitation, the consideration to be paid hereunder and the structure of the transactions contemplated hereby, except to the extent that such information is required to be disclosed by law and except for press releases and announcements pursuant to Section 7.1. In the event any Party hereto is required to disclose such information pursuant to applicable law, such Party shall notify each other Party in writing in advance of such disclosure, which notification shall include the nature of the legal requirement and the extent of the required disclosure, such Party shall cooperate with each other Party to preserve the confidentiality of such information consistent with applicable law and such disclosure will be in form and substance reasonably satisfactory to the other party; provided, however, that the Parties acknowledge that Republic will file a current report on Form 8-K and other federal securities law filings and disclosure obligations disclosing the transactions contemplated hereby in accordance with Section 7.1.

5.8    Hart-Scott-Rodino Act Filing. The Parties will diligently proceed to seek termination of the waiting period under the Hart-Scott-Rodino Act and shall take all reasonable actions related thereto (e.g. promptly and completely responding to any second request for information regarding the transactions contemplated hereby).

5.9    Retention of Records. Without cost to any other Party, each Party shall retain all books and records of the Companies ("Records") transferred to or retained by it pursuant to this Agreement for the greater of four (4) years from the Closing Date or such longer periods of time as required by applicable statutes, rules and regulations. For a period of four (4) years after the Closing Date, and for such longer period as the Records are maintained, each Party will, during normal business hours and so as not to disrupt unreasonably normal business, afford any other Party and its representatives upon advance written notice, reasonable access (and copying at the expense of the requesting person, if desired, except to the extent such expenses are subject to indemnification under Section 5.3) to the books and records relating to the Acquired Assets, Excluded Assets, Assumed Liabilities or Excluded Liabilities in the possession of such Party as such other Party may reasonably request subject to appropriate assurances of confidentiality.

MONTE.11

CONFIDENTIAL

5.10    Real Property.

(a)    Within twenty (20) days after the Closing Date, Seller shall deliver to Buyer; (i) a commitment for an ALTA Owners Policy of Title Insurance Form B-1970 (the "Title Commitments") for each parcel of Owned Real Property issued by First American Title Insurance Company ("Title Insurer"), in such amounts as Buyer and Seller mutually and reasonably determine to be the fair market value (including all improvements thereon), insuring good and marketable title in Buyer or Buyer's designee in such parcel subject to the exceptions thereto set forth in the Title Commitments, and (ii) copies of all underlying and recorded documents referred to in the Title Commitments. If Buyer elects to obtain title insurance policies based on the Title Commitments (including reasonable endorsements), then Seller will pay the premiums.

(b)    Within forty (40) days after the Closing Date, Seller shall deliver to Buyer, at Seller's sole cost and expense, current surveys of each parcel of owned real property dated no more that thirty (30) days after the Closing Date, prepared by a licensed surveyor and conforming to 1992 ALTA/ASCM Minimum Detail Requirements for Urban Land Title Surveys including Table A Item Nos. 1-4 and 6-13 (the "Surveys"), and such standards as the Title Insurer may require as a condition to removal of survey exceptions from the Title Policy, and certified to Buyer and Buyer's designee. The Survey shall disclose the location of all improvements, easements, party walls, sidewalks, roadways, utility lines and matters shown customarily on such surveys and show access, if any, to public streets and roads.

(c)    Within one hundred eighty (180) days after the Closing Date, Seller shall remove, at Seller's sole cost and expense, all storage tanks (whether above ground or underground) located on the Owned Real Property and perform in a timely manner thereafter all remedial measures in connection with such removal (collectively, the "Removal Process"). Nothwithstanding any other provision contained herein, Seller shall fully indemnify and save and hold harmless each of the Buyer Covered Persons from and against any Loss suffered as a result of the Removal Process. In addition, Seller shall use Seller's best efforts to minimize interference with Buyer's business operations during the Removal Process. Buyer agrees to grant access to Seller to undertake the Removal Process.

(d)    With respect to each leased real property set forth in the Real Property Schedule, Seller must use commercially reasonable efforts to procure and deliver to Buyer within sixty (60) days after the Closing Date a landlord consent and estoppel certificate for each lease agreement (except for those landlord consent and estoppel certificates to be delivered at closing) in a form mutually acceptable to the Parties. To the extent any landlords under the lease agreements condition consent to the assignment of Seller's rights and obligations under the lease agreement to Buyer upon the receipt of a fee, such amount shall be borne equally by Buyer and Republic.

MONTE.11

- 33 -

CONFIDENTIAL

## ARTICLE 6 - TERMINATION

6.1    Termination Events. This Agreement may, by notice given prior to or at the Closing, be terminated:

(a)    by either Buyer or Seller if a material breach of any covenant of this Agreement has been committed by Buyer, on the one hand, or Republic, RSC or the Seller, on the other, and such breach has not been waived or cured within the period allowed;

(b)    by Buyer if satisfaction of any of the conditions in Section 2.6(b) is or becomes unlikely to be satisfied (other than through the failure of Buyer to comply with its obligations under this Agreement) and Buyer has not waived such condition and Republic, RSC and the Seller have not been able to satisfy such condition within 10 days after notice by Buyer of its intention to terminate this Agreement under the provisions of this Section 6.1(b); or

(c)    by Seller if satisfaction of any of the conditions in Section 2.6(c) is or becomes unlikely to be satisfied (other than through the failure of Republic, RSC or the Seller to comply with their respective obligations under this Agreement) and Seller have not waived such condition and the Buyer has not been able to satisfy such condition within 10 days after notice by Seller of its intention to terminate this Agreement under the provisions of this Section 6.1(c);

(d)    by the mutual consent of Buyer and Seller; or

(e)    by either Buyer or Seller if the Closing has not occurred (other than through the failure, of Buyer if Buyer is seeking to terminate this Agreement or Seller if Seller is seeking to terminate this Agreement, to comply fully with its obligations under this Agreement) on or before such date forty-five (45) calendar days from the date hereof, or such later date as the Parties may agree upon.

6.2    Effect of Termination/Remedies. If any Party terminates this Agreement pursuant to this Article 6, all obligations of the Parties hereunder shall terminate without any Liability of any Party to any other Party, except that (a) Republic, RSC and the Seller shall remain responsible for any breach by them of the provisions of Article 4, Section 5.7 ("Confidentiality"), in the event and to the extent that any such breach is the grounds for termination and (b) Ameritech and Buyer shall remain responsible for any breach by them of the provisions of Article 4 or Section 5.7 ("Confidentiality"), in the event and to the extent that any such breach is the grounds for termination.

## ARTICLE 7 - MISCELLANEOUS

CONFIDENTIAL

7.1     Press Releases and Announcements.   All press releases and other public announcements and all announcements to the Companies' customers, suppliers, licensees or employees relating to the transactions contemplated hereby (including with respect to any termination of this Agreement) shall be prepared jointly by Buyer and the Seller and shall be made at such time and in such manner and forum as shall be mutually agreed to by the Parties, other than public filings under the securities laws which shall be in substance consistent with the press release prepared jointly by Buyer and Seller to announce the transactions contemplated hereby. The Parties shall issue such a press release no later than the business day following the execution of this Agreement.

7.2     No Third Party Beneficiaries. This Agreement (other than Section 5.3 to the extent it purports to confer rights upon the Covered Persons) shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

7.3     Entire Agreement. This Agreement (including the documents referred to herein) constitutes the entire agreement between the Parties and supersedes any prior understandings, agreements, or representations by or between the Parties, written or oral, that may have related in any way to the subject matter hereof (excluding the Confidentiality Agreement) and the Parties agree that prior drafts of this Agreement shall be deemed to not provide any evidence as to the meaning of any provision hereof or the intent of the Parties with respect hereto.

7.4     Succession and Assignment. This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns.  Prior to the Closing, no Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of the other Parties hereto; provided, however, that prior to Closing, Buyer may, without the consent of, but with notice to, the Seller, assign its rights and obligations under this Agreement (but not Ameritech's) and the right to acquire the Acquired Assets to one of its subsidiaries or Affiliates.

7.5     Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.

7.6     Headings. The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

7.7     Notices. All notices, requests, demands, claims, and other communications hereunder will be in writing. Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given (i) when delivered, if personally delivered, (ii) when receipt is electronically confirmed, if faxed (with hard copy to follow via first class mail, postage prepaid) or (iii) one

CONFIDENTIAL

business day after deposit with a reputable overnight courier, in each case addressed to the intended recipient as set forth below:

    If to Republic, RSC or Seller:

        Republic Industries, Inc.
        450 East Las Olas Blvd, Suite 1200
        Ft. Lauderdale, Florida 33301
        Attention: James O. Cole, General Counsel
        Telephone #: (954) 713-5200
        Facsimile #:  (954) 713-2111

    with a copy (which shall not constitute notice) to:
        Akerman, Senterfitt & Eidson, P.A.
        One S.E. Third Avenue, Suite 2800
        Miami, FL 33131-1704
        Attn:  Jonathan L. Awner, Esq.
        Telephone #: (305) 374-5600
        Facsimile #: (305) 374-5095

    If to Buyer:

        Ameritech Monitoring Services, Inc.
        Two Mid America Plaza
        Suite 200
        Oakbrook Terrace, Illinois 60181
        Attn: Mary E. Tudela, President
        Telephone #: (630) 573-1570
        Facsimile #: (630) 571-1403

    with a copy (which shall not constitute notice) to:

        Ameritech Monitoring Services, Inc.
        Two Mid America Plaza
        Suite 200
        Oakbrook Terrace, Illinois 60181
        Attn:  Marc P. Katz, Esq., Vice President and General Counsel
        Telephone #: (630) 573-1575
        Facsimile #: (630) 571-1065


    7.8    Governing Law.  This Agreement shall be governed by and construed in accordance with the domestic laws of the State of Delaware without giving effect to any choice of law or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

CONFIDENTIAL

7.9     Amendments and Waivers. No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each Party. No waiver by any Party of any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, shall be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

7.10    Severability.   Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction. If the final judgment of a court of competent jurisdiction declares that any term or provision hereof is invalid or unenforceable, the Parties agree that the court making the determination of invalidity or unenforceability shall have the power to reduce the scope, duration, or area of the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement shall be enforceable as so modified after the expiration of the time within which the judgment may be appealed.

7.11    Expenses. Except as otherwise provided in this Agreement, Ameritech and Buyer will bear their own costs and expenses (including, without limitation, legal fees and expenses) incurred in connection with, or arising out of, this Agreement and the transactions contemplated hereby. Except as otherwise provided in this Agreement, Republic, RSC and Seller will bear their own costs and expenses (including, without limitation, legal fees and expenses) and the costs and expenses of the Companies incurred in connection with, or arising out of this Agreement or the transactions contemplated hereby.

7.12    Transfer Taxes. All documentary, sales, use, registration and other transfer taxes (including, but not limited to, all applicable vehicle licensing, real estate transfer or stock transfer Taxes, but not including other Taxes such as employment withholding Taxes) and fees incurred in connection with the sale of the Acquired Assets and the other transactions contemplated hereby shall be borne and controlled by the Buyer.

7.13    Construction. The Parties have jointly participated in the negotiation and drafting of this Agreement. In the event of an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumptions or burdens of proof shall arise favoring any Party by virtue of the authorship of any of the provisions of this Agreement. Any reference to any federal, state, local, or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. The Parties intend that each representation, warranty, and covenant contained herein shall have independent significance. If any Party has breached any representation, warranty, or covenant

MONTE.11

CONFIDENTIAL

contained herein in any respect, the fact that there exists another representation, warranty, or covenant relating to the same subject matter (regardless of the relative levels of specificity) which the Party has not breached shall not detract from or mitigate the fact that the Party is in breach of the first representation, warranty, or covenant.  The mere listing (or inclusion of a copy) of a document or other item shall not be deemed adequate to disclose an exception to a representation or warranty made herein (unless the representation or warranty relates solely to the existence of the document or other items itself).  Subject to the foregoing, disclosures set forth on any Disclosure Schedule relating to one representation and warranty with reasonable particularity and describes the relevant facts in sufficient detail to identify an item shall be deemed a disclosure under all other representations and warranties that related to such item. By including information on a Disclosure Schedule, such information shall not necessarily be deemed to mean that such information is "material" or that such information is strictly required to be included on such Disclosure Schedule, and the listing of an item on a Disclosure Schedule shall not serve as evidence that a similar or analogous item not listed on a Disclosure Schedule was required to also be so listed.

7.14   <u>Incorporation of Exhibits and Schedules</u>.  The Exhibits and Disclosure Schedules identified in this Agreement are incorporated herein by reference and made a part hereof.

7.15   <u>Directly or Indirectly</u>.  Where any provision in this Agreement refers to action to be taken by any person or entity, or which such person or entity is prohibited from taking, such provision shall be applicable whether the action in question is taken directly or indirectly by such person or entity.

*     *     *     *     *



IN WITNESS WHEREOF, the Parties hereto have executed this Asset Purchase Agreement as of the date first above written.

**REPUBLIC**

REPUBLIC INDUSTRIES, INC.

By: _H. Wayne Huizenga_

Its: _Chairman and Co-Chief Executive_

**RSC**

REPUBLIC SECURITY COMPANIES HOLDING CO., INC.

By: _Thos W. Hawley_

Its: _Vice President_

**SELLER**

REPUBLIC SECURITY COMPANIES HOLDING CO. II, INC.

By: _Thos W. Hawley_

Its: _Vice President_

**BUYER:**

AMERITECH MONITORING SERVICES, INC.

By: _____

Title: _____

**AMERITECH:**

AMERITECH CORPORATION

By: _____

Title: _____

CONFIDENTIAL

IN WITNESS WHEREOF, the Parties hereto have executed this Asset Purchase Agreement as of the date first above written.

REPUBLIC

REPUBLIC INDUSTRIES, INC.

By: _____

Its: _____

RSC

REPUBLIC SECURITY COMPANIES HOLDING CO., INC.

By: _____

Its: _____

SELLER

REPUBLIC SECURITY COMPANIES HOLDING CO. II, INC.

By: _____

Its: _____

BUYER:

AMERITECH MONITORING SERVICES, INC.

By: _Mary E. Tudela_____

Title: _PRESIDENT_____

AMERITECH:

AMERITECH CORPORATION

By: _Richard C. Notebaert_____

Title: _Chairman & Chief Executive Officer__

CONFIDENTIAL

TOTAL P.02

Form of Legal Opinion of the Seller's Counsel


1.     Each of Republic, RSC and Seller is a corporation duly organized, validly existing and in good standing under the laws of Delaware, with all requisite corporate power and authority (a) to execute and deliver the Asset Purchase Agreement and the documents relating to the transactions contemplated thereby (collectively, the "Transaction Documents"), (b) to consummate the transactions contemplated under the Transaction Documents and (c) to perform its obligations thereunder.  The execution, delivery and performance of the Transaction Documents have been duly authorized by all necessary corporate actions of each of Republic, RSC and Seller, and each of the Transaction Documents constitutes a valid and binding obligation of each of Republic, RSC and Seller, enforceable against each of Republic, RSC and Seller to the extent they are a party thereto, in accordance with their respective terms, except to the extent the enforceability thereof may be limited by any bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other similar laws relating to creditors' rights generally, or may be subject to general principles of equity (whether such enforceability is considered in a proceeding in equity or at law) and except as to any non-competition covenants made or assigned by Republic, RSC and/or Seller (as to which no opinion is expressed). [Add additional customary exceptions and qualifications.]

2.     Neither the execution and delivery of the Transaction Documents nor the consummation of the transactions contemplated thereby will (a) violate any provision of the certificate or articles of incorporation or by-laws of any of Republic, RSC or Seller or (b) violate any Federal or Delaware corporate statute, law or regulation, or any judgment, decree, order or rule known to us of any court or other governmental body, applicable to any of each of Republic, RSC and Seller except with respect to Section 275 of the Communications Act of 1934, as added by the Telecommunications Act of 1996 (as to which no opinion is expressed) and except in the case of violations, conflicts, defaults, terminations, accelerations or encumbrances described herein, for such matters which would not have a material adverse effect on the condition of the Companies or the Alarm Service Assets and would not prevent the consummation of the transactions contemplated thereby.

CONFIDENTIAL

# ADDITIONAL INDEMNIFICATION AGREEMENT

THIS ADDITIONAL INDEMNIFICATION AGREEMENT (this "Additional Indemnification Agreement") is made and entered into as of September 26, 1997, by and among Republic Industries, Inc., a Delaware corporation ("Republic"), Republic Security Companies Holding Co., Inc., a Delaware corporation wholly owned by Republic ("RSC"), Republic Security Companies Holding Co. II, Inc., a Delaware corporation wholly owned by RSC and indirectly wholly owned by Republic ("Seller"), Ameritech Corporation, a Delaware corporation ("Ameritech") and Ameritech Monitoring Services, Inc., a Delaware corporation wholly owned by Ameritech ("Buyer").

WHEREAS, the parties to this Additional Indemnification Agreement are the parties to an Asset Purchase Agreement, dated as of the date hereof (the "Asset Purchase Agreement"), and desire to clarify certain representations and warranties in the Asset Purchase Agreement and provide for additional cooperation and indemnification agreements. Unless otherwise indicated, capitalized terms used herein which are defined in the Asset Purchase Agreement shall have the meanings set forth in the Asset Purchase Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties, and covenants herein contained, the Parties hereby agree as follows:

## ARTICLE 1 - REPRESENTATIONS AND WARRANTIES

1.1    Representations and Warranties of the Parties. Notwithstanding anything in the Asset Purchase Agreement to the contrary, the Parties hereby agree that no representation or warranty contained in the Asset Purchase Agreement shall cover in any respect Section 275 of the Communications Act of 1934, added by the Telecommunications Act of 1996, and any rules or regulations promulgated by the United States Federal Communications Commission with respect thereto ("Section 275"), such that each representation and warranty contained in the Asset Purchase Agreement shall be read as if the phrase "except with regard to Section 275" were deemed to modify each such representation and warranty. Notwithstanding the foregoing, Ameritech and Buyer hereby represent and warrant, jointly and severally, to Republic, RSC and Seller that the transactions contemplated by the Asset Purchase Agreement do not violate any outstanding judicial or administrative order, rule or regulation with respect to Section 275. As an additional condition to Republic, RSC and Seller's obligation to close the transactions contemplated by the Asset Purchase Agreement, the foregoing representation and warranty of Ameritech and Buyer shall be certified by Ameritech at the Closing to be true and correct in all material respects as of the Closing Date with such exceptions as shall be specified in such certificate. If such certificate specifies that a Section 275 Injunction (as defined below) exists, Republic, RSC and Seller shall not have as a result thereof a basis to terminate the Asset Purchase Agreement, it being the express understanding of the Parties

CONFIDENTIAL

that a Section 275 Injunction shall give rise to rights and obligations on behalf of the Parties only to the extent provided for hereunder. In addition, the representation and warranty set forth in this Section 1.1 shall survive the Closing for one (1) year.

1.2     Authorization of Agreement by Republic, RSC and Seller. Each of Republic, RSC and Seller has full corporate power and authority to execute and deliver this Additional Indemnification Agreement and to perform its obligations hereunder and thereunder. Without limiting the generality of the foregoing, the boards of directors of each of Republic, RSC and Seller have each duly authorized the execution, delivery, and performance of this Additional Indemnification Agreement. This Additional Indemnification Agreement constitutes the valid and legally binding obligations of Republic, RSC and Seller, enforceable against them in accordance with their respective terms, except as enforceability may be limited by bankruptcy, similar laws of debtor relief and general principles of equity.

1.3     Authorization of Agreement by Buyer and Ameritech. Each of Buyer and Ameritech has full corporate power and authority to execute and deliver this Additional Indemnification Agreement and to perform its obligations hereunder. Without limiting the generality of the foregoing, the board of directors of Ameritech and the sole stockholder of Buyer have each duly authorized the execution, delivery, and performance of this Additional Indemnification Agreement. This Additional Indemnification Agreement constitutes the valid and legally binding obligation of the Buyer and Ameritech, enforceable against the Buyer and Ameritech in accordance with their respective terms, except as enforceability may be limited by bankruptcy, similar laws of debtor relief and general principles of equity.

## ARTICLE 2 - COVENANTS

2.1     Cooperation with respect to Injunctions. Notwithstanding any provision in the Asset Purchase Agreement to the contrary, in the event that any legal judgment, decree, order or injunction is issued under Section 275 relating to the transactions contemplated by the Asset Purchase Agreement (a "Section 275 Injunction") and is in effect, (a) Buyer and Ameritech shall use their best efforts to have such Section 275 Injunction removed as expeditiously as possible, (b) the Companies shall cooperate with Buyer and Ameritech in such efforts and (c) Buyer and Ameritech shall pay the Section 275 Losses incurred by the Companies as a result of their cooperation under clause (b) above to remove such Section 275 Injunction. For purposes of this Additional Indemnification Agreement, the term "Section 275 Losses" means, without duplication, any directly incurred damage (including punitive damages), payment, expense, judgment, penalty, fine, interest, or other loss (including, but not limited to, the cost and expense of defending or prosecuting any and all charges, claims, complaints, actions, demands, assessments, litigation, proceedings, hearings, investigations, notices, judgments, orders, decrees and settlements relating thereto, expenses of preparation and investigation thereof and reasonable attorneys', experts', consultants' and accountants' fees in connection therewith); it being expressly understood, however, that the term Section 275 Losses shall not



include any consequential damages or any loss or damage such as opportunity costs (including gains or profits not realized as a result of the inability to close any of the transactions contemplated by the Asset Purchase Agreement or by the inability of the Companies to close any similar transactions with others on terms any less favorable to the Companies as those set forth in the Asset Purchase Agreement or to close such transactions with others at all), injury to reputation, diminution in equity value, increased financing costs, time spent by management or other personnel time and other losses which do not require the payment of money by any Seller Covered Person.

2.2    Restructuring.  The Companies agree to discuss and consider in good faith any proposals by Ameritech or Buyer to modify the transactions contemplated by the Asset Purchase Agreement in any manner which is not prohibited by the terms of the Section 275 Injunction or any settlement thereof so long as such modification (a) provides to the Companies no less value on an after-tax basis than the transactions contemplated by the Asset Purchase Agreement (unless Ameritech agrees to gross up the Purchase Price for any such difference), (b) is not otherwise violative of law, and (c) does not create any material risk that any of the Companies or their respective employees, officers or directors would be subject to fines or penalties as a result of their cooperation in the modification of such transactions.  In the event that the Companies agree to proceed with any such modification of such transactions, Buyer and Ameritech shall pay the Section 275 Losses incurred by the Companies to modify such transactions.

2.3    Termination of Asset Purchase Agreement.  Notwithstanding anything in Section 6.1(c) of the Asset Purchase Agreement to the contrary, Seller shall have the right to terminate the Asset Purchase Agreement because of a Section 275 Injunction only in the event that such Section 275 Injunction has not been removed on or prior to the 20th day after the date such Section 275 Injunction is put into effect and then, only so long as Republic, RSC and Seller have complied with the terms and conditions of this Additional Indemnification Agreement.  In the event the Asset Purchase Agreement is terminated pursuant to this Section 2.3, all obligations of the Parties under this Additional Indemnification Agreement and under the Asset Purchase Agreement shall terminate without any Liability of any Party to any other Party, except that Ameritech and Buyer shall remain responsible, jointly and severally, for their obligations under Article 2 of this Additional Indemnification Agreement.

2.4    Indemnification by Ameritech and Buyer.  Ameritech and Buyer jointly and severally, shall indemnify and save and hold harmless the Seller Covered Persons from and against any Section 275 Losses suffered or incurred by any such Seller Covered Person as a result of (i) the application or impact of Section 275 in any manner on the transactions contemplated by the Asset Purchase Agreement, or (ii) any Seller Covered Person being named as a party to, or compelled to testify or otherwise participate as a witness in, any litigation, proceedings, hearings, investigations arising out of Section 275.  If for any reason the foregoing indemnification is held unenforceable, then Ameritech and Buyer jointly and severally shall contribute to Republic for the Section 275 Losses for which such indemnification is held unenforceable in such proportion as is appropriate to reflect


CONFIDENTIAL

the relative fault of Ameritech and the Buyer and any other relevant equitable considerations with respect to such Section 275 Losses. The provisions of this <u>Section 2.4</u> shall remain in effect indefinitely, notwithstanding the completion of the transactions contemplated by the Asset Purchase Agreement or the termination of the Asset Purchase Agreement.

      2.5   <u>Indemnification Assurance of Republic and its Successors</u>. For the longer of the eighteen (18) month period following the Closing Date or the period which a claim by any Buyer Covered Person under Section 5.3 of the Asset Purchase Agreement remains outstanding if such claim was first made during such eighteen-month period, in connection with any sale or transfer of all or substantially all of the assets of Republic in one or a series of related transactions, Republic shall either (i) cause the purchaser or purchasers of such assets to assume the obligations of Republic hereunder or (ii) provide reserves of cash or other liquid assets to be set aside for such obligations, in each case on terms and conditions reasonably acceptable to Ameritech and Buyer.

      2.6   <u>Cooperation</u>. If any third party (including, without limitation, any governmental authority) shall make or assert a claim against any Seller Covered Person (the "<u>Indemnified Party</u>") with respect to any Section 275 matter for which indemnification would be available hereunder, then the Indemnified Party shall notify Ameritech and Buyer thereof promptly (but in no event later than three business days after receiving written notice of such claim); <u>provided, however,</u> that no delay on the part of the Indemnified Party in notifying Ameritech and Buyer shall relieve Ameritech or Buyer from any liability under this Additional Indemnification Agreement unless (and then solely to the extent) Ameritech or Buyer are damaged or prejudiced thereby. If Ameritech and Buyer acknowledge in a writing delivered to Republic that Ameritech and Buyer shall be fully responsible (with no reservation of rights other than the right to be subrogated to the rights of the Indemnified Party) for all Section 275 Losses relating to such claim, Ameritech and Buyer shall have the right, by written notice to the Indemnified Party, to assume the defense thereof. In the case where Ameritech and Buyer assume such defense, they will defend the Indemnified Party against any such Section 275 matter with counsel of their choice reasonably satisfactory to the Indemnified Party and the Indemnified Party may retain separate co-counsel at its sole cost and expense. The Indemnified Party shall make available to Ameritech and Buyer and their attorneys and accountants, at all reasonable times, all books and records relating to such Section 275 claim, and the Indemnified Parties will render to Ameritech and Buyer such assistance as may reasonably be required to insure proper and adequate defense of any such Section 275 claim. No Indemnified Party shall make any settlement of any Section 275 claim without the express written consent of Ameritech and Buyer and Ameritech and Buyer shall not make any settlement of any such Section 275 claim unless such settlement includes an unconditional release of the Indemnified Parties (if such Indemnified Parties are named in such Section 275 claim).

      2.7   <u>Remedies</u>. Notwithstanding anything contained in the Asset Purchase Agreement to the contrary, the indemnification provisions set forth in this Additional Indemnification Agreement shall constitute the sole and exclusive remedy of the Seller Covered Persons against Ameritech,


CONFIDENTIAL

Buyer and their Affiliates with respect to Section 275 matters and the Seller Covered Persons shall have no other remedy or rights with respect to Section 275 matters other than as set forth herein.

## ARTICLE 3 - OTHER

3.1    <u>Entire Agreement</u>.  This Additional Indemnification Agreement constitutes the entire agreement among the Parties regarding the subject matter hereof and supersedes any prior understandings, agreements, or representations by or between the Parties, written or oral, that may have related in any way to the subject matter hereof, including the Asset Purchase Agreement, and the Parties agree that prior drafts of this Additional Indemnification Agreement shall be deemed to not provide any evidence as to the meaning of any provision hereof or the intent of the Parties with respect hereto.

3.2    <u>Counterparts</u>.  This Additional Indemnification Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.

3.3    <u>Headings</u>.  The section headings contained in this Additional Indemnification Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Additional Indemnification Agreement.

3.4    <u>Notices</u>.  All notices, requests, demands, claims, and other communications hereunder will be in writing.  Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given (i) when delivered, if personally delivered, (ii) when receipt is electronically confirmed, if faxed (with hard copy to follow via first class mail, postage prepaid) or (iii) one business day after deposit with a reputable overnight courier, in each case addressed to the intended recipient as set forth below:

<u>If to Republic, RSC or the Seller</u>:

Republic Industries, Inc.
450 East Las Olas Blvd, Suite 1200
Ft. Lauderdale, Florida 33301
Attention: James O. Cole, General Counsel
Telephone #: (954) 713-5200
Facsimile #:  (954) 713-2111



<u>with a copy (which shall not constitute notice) to</u>:

    Akerman, Senterfitt & Eidson, P.A.
    One S.E. Third Avenue, Suite 2800
    Miami, FL 33131-1704
    Attn:  Jonathan L. Awner, Esq.
    Telephone #: (305) 374-5600
    Facsimile #: (305) 374-5095

<u>If to Buyer or Ameritech</u>:

    Ameritech Monitoring Services, Inc.
    Two Mid America Plaza
    Suite 200
    Oakbrook Terrace, Illinois 60181
    Attn: Mary E. Tudela, President
    Telephone #: (630) 573-1570
    Facsimile #: (630) 571-1403

<u>with a copy (which shall not constitute notice) to</u>:

    Ameritech Monitoring Services, Inc.
    Two Mid America Plaza
    Suite 200
    Oakbrook Terrace, Illinois 60181
    Attn:  Marc P. Katz, Esq., Vice President and General Counsel
    Telephone #: (630) 573-1575
    Facsimile #: (630) 571-1065

    3.5    <u>Governing Law</u>.  This Additional Indemnification Agreement shall be governed by and construed in accordance with the domestic laws of the State of Delaware without giving effect to any choice of law or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

    3.6    <u>Amendments and Waivers</u>.  No amendment of any provision of this Additional Indemnification Agreement shall be valid unless the same shall be in writing and signed by each Party.  No waiver by any Party of any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, shall be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

    3.7    <u>Severability</u>.  Any term or provision of this Additional Indemnification Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the

AIA-MON.06



offending term or provision in any other situation or in any other jurisdiction. If the final judgment of a court of competent jurisdiction declares that any term or provision hereof is invalid or unenforceable, the Parties agree that the court making the determination of invalidity or unenforceability shall have the power to modify any term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Additional Indemnification Agreement shall be enforceable as so modified after the expiration of the time within which the judgment may be appealed.

3.8     Construction. The Parties have jointly participated in the negotiation and drafting of this Additional Indemnification Agreement. In the event of an ambiguity or question of intent or interpretation arises, this Additional Indemnification Agreement shall be construed as if drafted jointly by the Parties and no presumptions or burdens of proof shall arise favoring any Party by virtue of the authorship of any of the provisions of this Additional Indemnification Agreement. Any reference to any federal, state, local, or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. The Parties intend that each representation, warranty, and covenant contained herein shall have independent significance.

3.9     Directly or Indirectly. Where any provision in this Additional Indemnification Agreement refers to action to be taken by any person or entity, or which such person or entity is prohibited from taking, such provision shall be applicable whether the action in question is taken directly or indirectly by such person or entity.

*     *     *     *     *



IN WITNESS WHEREOF, the Parties hereto have executed this Additional Indemnification Agreement as of the date first above written.

**REPUBLIC**

REPUBLIC INDUSTRIES, INC.

By: _H. Wayne Huizenga_

Its: _Chairman and Co-Chief Executive_

**RSC**

REPUBLIC SECURITY COMPANIES HOLDING CO., INC.

By: _Thos W. Hawkins_

Its: _Vice President_

**SELLER**

REPUBLIC SECURITY COMPANIES HOLDING CO. II, INC.

By: _Thos W. Hawkins_

Its: _Vice President_

**BUYER**

AMERITECH MONITORING SERVICES, INC.

By: _____

Title: _____

**AMERITECH**

AMERITECH CORPORATION

By: _____

Title: _____



SEP. -26'97(FRI) 14:41   TUDELA. SECURITYLINKK        TEL:630 571 1403              P. 002

IN WITNESS WHEREOF, the Parties hereto have executed this Additional Indemnification Agreement as of the date first above written.

**REPUBLIC**

REPUBLIC INDUSTRIES, INC.

By: _____

Its: _____

**RSC**

REPUBLIC SECURITY COMPANIES HOLDING CO., INC.

By: _____

Its: _____

**SELLER**

REPUBLIC SECURITY COMPANIES HOLDING CO. II, INC.

By: _____

Its: _____

**BUYER**

AMERITECH MONITORING SERVICES, INC.

By: _____

Title: _____

**AMERITECH**

AMERITECH CORPORATION

By: _____

Title: Chairman & Chief Executive Officer

CONFIDENTIAL

<u>BILL OF SALE</u>

**THIS BILL OF SALE** is made as of this 3ʳᵈ day of October, 1997, by **KERTZ SECURITY SYSTEMS, INC.,** a Florida corporation ("<u>Company</u>") for the benefit of **AMERITECH MONITORING SERVICES, INC.,** a Delaware corporation ("<u>Buyer</u>").

**WHEREAS,** pursuant to an Asset Purchase Agreement dated as of September 26, 1997 (the "<u>Asset Purchase Agreement</u>") by and among Republic Industries, Inc., a Delaware corporation ("<u>Republic</u>"), Republic Security Companies Holding Co., Inc., a Delaware corporation wholly owned by Republic ("<u>RSC</u>"), Republic Security Companies Holding Co. II, Inc., a Delaware corporation wholly owned by RSC and indirectly wholly owned by Republic ("<u>Seller</u>"), Ameritech Corporation, a Delaware corporation ("<u>Ameritech</u>") and Buyer, Company desires to sell and assign to Buyer and Buyer wishes to purchase and accept from Company, for the consideration and upon the terms and conditions set forth in the Asset Purchase Agreement, certain of the assets, properties and rights of Company; and

**WHEREAS,** capitalized terms used and not defined herein shall have the same meaning ascribed in the Asset Purchase Agreement.

**NOW, THEREFORE,** pursuant to the Asset Purchase Agreement and in the consideration of the premises, and for good and valuable consideration, the receipt and sufficiency of which are hereby expressly acknowledged by the parties, it is hereby agreed that:

A.    **<u>Conveyance</u>.** Upon the terms and subject to the conditions of the Asset Purchase Agreement, Company does hereby sell, assign and convey to Buyer the Acquired Assets.

B.    **<u>The Asset Purchase Agreement</u>.** Nothing contained in this Bill of Sale shall be deemed to supersede any of the obligations, agreements, covenants or warranties of Company or Buyer contained in the Asset Purchase Agreement.

\*   \*   \*   \*   \*


CONFIDENTIAL

IN WITNESS WHEREOF, the parties hereto have caused this Bill of Sale to be executed as of the date first above written.

KERTZ SECURITY SYSTEMS, INC.
("COMPANY")

By: _____

Its: __VICE   PRESIDENT_____


AMERITECH MONITORING SERVICES,
INC. ("BUYER")

By: _____

Its: __Vice President_____

CONFIDENTIAL

## BILL OF SALE

**THIS BILL OF SALE** is made as of this 3ʳᵈ day of October, 1997, by **KERTZ SECURITY SYSTEMS II, INC.,** a Florida corporation ("Company") for the benefit of **AMERITECH MONITORING SERVICES, INC.,** a Delaware corporation ("Buyer").

**WHEREAS,** pursuant to an Asset Purchase Agreement dated as of September 26, 1997 (the "Asset Purchase Agreement") by and among Republic Industries, Inc., a Delaware corporation ("Republic"), Republic Security Companies Holding Co., Inc., a Delaware corporation wholly owned by Republic ("RSC"), Republic Security Companies Holding Co. II, Inc., a Delaware corporation wholly owned by RSC and indirectly wholly owned by Republic ("Seller"), Ameritech Corporation, a Delaware corporation ("Ameritech") and Buyer, Company desires to sell and assign to Buyer and Buyer wishes to purchase and accept from Company, for the consideration and upon the terms and conditions set forth in the Asset Purchase Agreement, certain of the assets, properties and rights of Company; and

**WHEREAS,** capitalized terms used and not defined herein shall have the same meaning ascribed in the Asset Purchase Agreement.

**NOW, THEREFORE,** pursuant to the Asset Purchase Agreement and in the consideration of the premises, and for good and valuable consideration, the receipt and sufficiency of which are hereby expressly acknowledged by the parties, it is hereby agreed that:

A.     **Conveyance.** Upon the terms and subject to the conditions of the Asset Purchase Agreement, Company does hereby sell, assign and convey to Buyer the Acquired Assets.

B.     **The Asset Purchase Agreement.** Nothing contained in this Bill of Sale shall be deemed to supersede any of the obligations, agreements, covenants or warranties of Company or Buyer contained in the Asset Purchase Agreement.

*     *     *     *     *

CONFIDENTIAL

IN WITNESS WHEREOF, the parties hereto have caused this Bill of Sale to be executed as of the date first above written.

KERTZ SECURITY SYSTEMS II, INC. ("COMPANY")

By: _____

Its: _____VICE PRESIDENT_____

AMERITECH MONITORING SERVICES, INC. ("BUYER")

By: _____

Its: _____Vice President_____

CONFIDENTIAL

Alarm Subsidiary Schedule

CONFIDENTIAL



CONFIDENTIAL

<u>Intellectual Property Schedule</u>



<u>Intellectual Property Schedule</u>

<u>Material Intellectual Property</u>

11)     Cana First Corporation d/b/a Scott Security Systems, TATS Corporation of Jax d/b/a Scott Alarm Home Office, Scott Alarm of Birmingham, Inc., Scott Alarm of Orlando, Inc., Scott Alarm of Charlotte, Inc., Scott Alarm of Sarasota, Inc., Scott Alarm of Cocoa, Inc., Scott Alarm of Savannah, Inc., Scott Alarm of Fort Myers, Inc., Scott Alarm of Tallahassee, Inc., Scott Alarm of Gainesville, Inc., Scott Alarm of Tampa Bay, Inc., Scott Alarm of Jensen Beach, Inc., Scott Alarm of West Palm Beach, Inc., Scott Alarm of Lakeland, Inc., Scott Alarm of Nashville, Inc., Scott Alarm of St. Augustine, Inc., and all derivatives thereof and logos related thereto.

2)     Crime Blocker, Inc.: "Crime Blocker" is a registered trademark, U.S. Patent Office, Registration Office, Registration No. 1,869,295. Registration effective 12/27/1994 through 12/27/2000.

3)     Crime Blocker, Inc.: Additional names utilized in conducting business: Crime Blocker, Inc., Crime Blocker Central Station Services, Inc., Crime Blocker Security Systems, Inc., Crime Blocker of Alabama, Inc., Crime Blocker of Texas, Inc.,  CBI Monitoring Corporation, APC Automatic Alarms, Inc. and D&H Alarm & Security, Inc.

4)     Austronic Security Systems, Inc.: Federally registered trademark (Logo). In addition there are slogans which are currently used which include "Your Protection is Our Profession", and "We have more than just a reputation to protect".

5)     A trademark included in Classification No. 100 renewed on November 26, 1985 extending such Mark for ten years from April 14, 1986. The Mark is described as follows and was filed with the State of Carolina: "Shield carrying the Name Denver Burglar Alarm (A)"

6)     United States of America Certificate of Registration No. 1099817 for a 20 year term. This Mark is of the D.B.A. Shield including name disclosure of "Denver Burglar Alarm." Registration is for the Composite term "Denver Burglar Alarm" and excludes either terms "Denver" or "Burglar Alarm" as separate marks. Notice in file suggests that at the end of six years the Registrant was to file an affidavit of continued use. It is not currently known if such affidavit was timely filed.

7)     Registration of Trademark of Servicemark for the words "Veri Eye Cam" and "Veri-Eye" from the Colorado Secretary of State - Corporation Section.

8)     Acadiana Alarm Systems, Inc.: S.A.F.E. America Security Systems of Baton Rouge, Inc., S.A.F.E. America Security Systems of Beaumont, Inc., S.A.F.E. America Security Systems of Shreveport, Inc., S.A.F.E. America Security Systems of Lake Charles, Inc., S.A.F.E. America Security Systems of Arkansas, Inc., S.A.F.E. America Security Systems of Mississippi, Inc., S.A.F.E. America Security Systems of Alabama, L.L.C., S.A.F.E. America Security Systems of Gulf South, L.L.C., Start Free Security Systems, Inc., STARTFREE - trademark, Safe America Security

CONFIDENTIAL

System and S.A.F.E. America.

9)     Kertz Security Systems, Inc. and all derivatives thereof and Kertz Security Systems II, Inc. and all derivatives thereof.

10)    Associated Security Corporation of America, Inc., ASCOA and all derivatives thereof and logos related thereto.

11)    Forest Security Systems, Inc.: Service mark Registration for the name No. 1,376,282 registered 12/17/85.

12)    Rainbow Security Systems, Inc. and all derivatives thereof and logos related thereto.

13)    Nationwide Security Systems, Inc. and all derivatives thereof and logos related thereto.

14)    St. Augustine Total Security, Inc. and all derivatives thereof and logos related thereto.

15)    Alarms by Securacom SW, Inc., Alarms by Securacom of South Florida, Inc. and ABS Monitoring, Inc. and all derivatives thereof and logos related thereto.

16)    Arressco, Inc. and all derivatives thereof and logos related thereto.

17)    Vital Link, Vital Communications, Inc., and Vital Link of Florida are registered in Gwinnett County, Georgia. Vital Communications, Inc., and Vital Link of Florida are registered as fictitious names in Florida.

18)    Southeastern Security Systems and Services, Inc. and all derivatives thereof and logos related thereto.

19)    Alarm Systems of Florida and Kertz Burglar Alarm Company.

20)    Scott Alarm of Tampa, Inc.

21)    The Alarm Subsidiaries have developed certain alarm central station and other applications software unique to its business.  Portions of this software have been licensed to other non-competitive alarm companies in prior years and remain the property of the Alarm Subsidiaries. All other monitoring, accounting and other software used in the business is owned by the Alarm Subsidiaries.
The Alarm Subsidiaries have no agreements or other arrangements to provide any support or other services with respect to such software.

<u>Exceptions</u>

(None.)

CONFIDENTIAL

# BELLSOUTH

Las <u>Verdaderas</u>
Páginas Amarillas™

TM



*The Real Yellow Pages*®

**See Maps Inside**
Vea Mapas Adentro

**Community Information Pages**
Páginas de Información Sobre la Comunidad

**Getting to Know "The Real Yellow Pages"**
Familiarizate con "Las <u>Verdaderas</u> Páginas Amarillas"™

**Visit The Real Yellow Pages® Online.** www.yp.bellsouth.com

## Greater Miami

*A-H*



EXHIBIT
C

**October 1998** © 1998 BAPCO
**Use Until October 1999**
**Use Hasta Octubre 1999**


100% Recyclable
Printed on Recycled Paper

**Includes customer listings for all local telecommunications companies.**

® BELLSOUTH®
Find Maps To ... ONLINE



**Everybody Needs Security**

# CIRCLE
## SECURITY SYSTEMS, INC.
### Serving South Florida For Over 20 Years

WATCHALERT

AlarmNet

# BURGLAR & FIRE ALARMS
### HOME THEATER & SOUND DISTRIBUTION SYSTEMS
• Residential-Commercial • Quality Custom Systems
• 24 Hr. Central Station Monitoring • Closed Circuit TV
• Financing Available • Se Habla Español

## CALL FOR A FREE SECURITY SURVEY

TOLL FREE
(305) 667-0444  1-800-367-7888
7340 S.W. 61ST. COURT • SOUTH MIAMI, FL • #EF0000848

---

SECURITY SYSTEM SPECIALISTS
RESIDENTIAL          COMMERCIAL

**PROTECTED BY**
SecurityLink
from Ameritech



Put the resources of a national leader in security monitoring to work securing your home and business

■ Free installation program
■ Free on-site analysis
■ Custom design & installation
■ Burglar & Fire Alarms
■ Closed Circuit TV and Card Access
■ 24 Hour UL Listed Central Station Monitoring

*Providing Peace of Mind to over a million customers in North America*

# 305-759-7500
8515 Biscayne Blvd, Miami
www.ameritech.com



Lic= EF0000769

---

# Don't You Owe It To Them?
*The Best Time To Get Home Security Is Before You Need It.*

We've Helped Protect More Families, Their Homes and Their Businesses In Florida For Almost 50 Years.
We're Back For The Next 50!



## INSTALLATION • SERVICE • MONITORING
### RESIDENTIAL • COMMERCIAL

PROTECTED BY


# KERTZ
## SECURITY SYSTEMS, INC.
### SINCE 1949

ASK ABOUT OUR DISCOUNTED
CONVERSION RATES

**NO MONEY DOWN**

Security Systems • Fire Alarms
Sprinkler / Monitoring
Closed Circuit TV
Card Access Systems

AlarmNet



UC# EFA000963

# (305) 269-1949

---

# FREE
# FirstGuard™
## HOME SECURITY INSTALLATION*

LET WESTEC HOME SECURITY PROTECT
YOUR HOME WITH THE LATEST TECHNOLOGY.

•Over 35 years of home monitoring
•Over 680,000 systems installed worldwide
Call today for details on our affordable
**FirstGuard** protection system!


Westec SECURITY   Home Security

•Reliable Response to Alarms Since 1962•

*Call Westec Home Security Today at:*

# 800 4-WESTEC
## 800 493-7832
### 7255 Corporate Center Drive, Bay E, Miami, FL 33126

24 month monitoring agreement required. Free installation on standard packages only. Installation charges do apply on additional protection. Certain restrictions apply. Call for details.

# **BELL**SOUTH



*The Real Yellow Pages*®

*Improved Government Section*

*See Customer Guide Inside*

*See Community Information Pages Inside*

Visit The Real Yellow Pages® Online.   www.yp.bellsouth.com

# Greater West Palm Beach

Yellow Pages



100% Recyclable
Printed on Recycled Paper

September 1998
Use Until September 1999

Includes customer listings for all
local telecommunications companies.

BELLSOUTH   311
Find Maps To These Local Businesses ONLINE   www.yp.bellsouth.com

# Don't You Owe It To Them?

*The Best Time To Get Home Security Is Before You Need It.*

We've Helped Protect More Families, Their Homes and Their
Businesses In Florida For Almost 50 Years.
We're Back For The Next 50!

INSTALLATION • SERVICE • MONITORING
RESIDENTIAL • COMMERCIAL

ASK ABOUT OUR DISCOUNTED
CONVERSION RATES

NO MONEY DOWN

24 HOUR CENTRAL STATION

Security Systems • Fire Alarms
Sprinkler / Monitoring
Closed Circuit TV
Card Access Systems

**PROTECTED BY**
**KERTZ**
SECURITY SYSTEMS, INC.
SINCE 1949





Lic# EF0000963

## 1-877-776-8328

---

# FREE

## FirstGuard
HOME SECURITY INSTALLATION*

LET WESTEC HOME SECURITY PROTECT
YOUR HOME WITH THE LATEST TECHNOLOGY.

•Over 35 years of home monitoring
•Over 680,000 systems installed worldwide
Call today for details on our affordable
*FirstGuard* protection system!



**Westec** SECURITY  Home Security

•Reliable Response to Alarms Since 1962•

*Call Westec Home Security Today at:*

## 800 4-WESTEC
800 493-7832

7255 Corporate Center Drive, Bay E, Miami, FL 33126

---

# FREE

## FirstGuard
HOME SECURITY INSTALLATION*

LET WESTEC HOME SECURITY PROTECT
YOUR HOME WITH THE LATEST TECHNOLOGY.

•Over 35 years of home monitoring
•Over 680,000 systems installed worldwide
Call today for details on our affordable
*FirstGuard* protection system!



**Westec** SECURITY  Home Security

•Reliable Response to Alarms Since 1962•

*Call Westec Home Security Today at:*

## 626-3631
14255 US HWY 1 JUNO BEACH

---

# ADT

## Top 10 Reasons To Call
## ADT Security Services.

10. America's largest, most experienced security company.
9. Helping to protect homes & businesses since 1874.
8. U.L. approved 24-hr, ADT Customer Monitoring.
7. Burglar, Fire, Medical Emergency, Card Access, CCTV.
6. Used by over 85% of the *Fortune* 500 companies.
5. Homeowners insurance premium discounts up to 20%.
4. FREE home relocation offer.
3. Moneyback 6-mo. Safewatch® Service Excellence Guarantee.
2. Low monthly monitoring fee & local office quality service.
1. U.L. listed equipment.

### Call for your FREE security review.

New Residential Sales
## 1 800 238-3009
Service, Billing & Commercial Sales
## 561 655-4557
1052 S Powerline Road · Deerfield



Lic # EF0001085



# KERTZ SECURITY SYSTEMS, INC.

### Corporate Offices
1015 West Newport Center Drive, Suite 104
Deerfield Beach., Fl 33442
954-725-7990 • Fax 954-725-7490 • Toll Free 877-776-8328
License EFA*000963

**Miami Branch**                          **Orlando Branch**
305-279-1949 • Toll Free  877-732-8731        407-351-9029 • Toll Free  888-510-8482

AUGUST 28,1998

Dear Friends and Customers,

It has now been more than three years since Kertz, then the largest and oldest security company in Florida, made a strategic alliance with Wayne Huizenga's Republic Industries. At the time, we had hoped that the wave of consolidation sweeping across the alarm industry would result in improved and more affordable services to our loyal customers. In the intervening years, however, Republic turned its attention to the automobile retailing industry, and sold the security division of Republic. This turn of events surprised and disappointed us, as we witnessed longtime valued customers cope with inconsistent and unimproved service, maintenance, and monitoring. As you are probably aware, ultimately the alarm division fell into the hands of a large national telecommunications company called Ameritech. With the passage of time, and following discussions with many of you regarding your dissatisfaction with the quality of your alarm service and monitoring, **it is our pleasure to report that we have taken the decision to return to the alarm industry.**

In our short absence from the industry, much has changed. Many of the local alarm companies with long track records of outstanding service to the community have been absorbed by larger regional and national entities. The "good old days" of Kertz when any customer could call with no special arrangements and speak with the representative who designed their alarm or the installer who installed it have given way to impersonal, long distance, and inconsistent service. It is our goal to return things to the way they were. As part of this effort, many of the individuals responsible for the high level of performance at Kertz in the past have joined with the new Kertz in order to provide our customers with high quality levels of service, monitoring; and maintenance.

Please note that you may currently be bound by contract to another company. Many, if not all alarm companies require their customers to sign contracts of various terms. It is specifically not our intention to interfere with any valid contractual arrangements; rather we merely seek to inform you of your options after the term of any contract expires. In the meantime, please feel free to contact us at 954-725-7990 or 1-877-776-8328 to discuss any of your security needs at this time.

We look forward to regaining your trust and confidence as we reassemble a new Kertz family for the future.

With many thanks and best personal regards,

Sincerely,

Kertz Management



EXHIBIT

D

EXHIBIT

ξ

## AGREEMENT

THIS AGREEMENT made and entered into this 17 day of December , 1993 by and between AMERITECH MONITORING SERVICES, INC., including without limitation all subsidiaries (hereinafter "Employer") and SETH LEVINE , (hereinafter "Employee").

## WITNESSETH:

WHEREAS, Employer is engaged in the security alarm business, including the sale, installation, service, leasing and/or monitoring of electronic security and fire alarm systems and has agreed to employ or continue to employ Employee; and

WHEREAS, Employee has received or will be receiving valuable training and acknowledges that, in the course of his/her employment with Employer will develop valuable business skills and contacts at great expense to Employer, and that employer thereby is entitled to protection with respect thereto; and

WHEREAS, Employee further acknowledges that as a result of his/her employment with Employer he/she will, of necessity, become privy to certain trade-secrets and other confidential information pertaining to Employer's business and the business of Employer's customers and suppliers, including but not limited to technical and/or non-technical data, formulas, patterns, compilations, programs, devices, methods, techniques, processes, financial data, and lists of actual or potential customers or suppliers.

NOW THEREFORE, in consideration of the employment and/or continued employment of Employee by Employer and for other good and valuable consideration, the receipt and legal sufficiency of which is hereby acknowledged, IT IS AGREED as follows:

1.     Employee hereby agrees that at all times during his/her employment with the Employer, he/she shall not own, operate, manage or have any interest (other than a passive investment interest of less that 5%), in any other firm, association, partnership, corporation or other entity, engaged in the electronic security and/or alarm business.

2.     Employee further agrees that from and after the termination of his/her employment, without regard to the reason for such termination, and for a period of two years thereafter, he/she shall not recruit, solicit or otherwise contact with the intent to recruit or solicit an existing employee of the Employer, to leave Employer and become employed, including as an independent contractor, with any other person, firm, association, partnership, corporation or other entity engaged in the electronic security and/or fire alarm business.

3.     Any and all materials provided to the Employee by the Employer, or any material, information, data or documentation otherwise obtained by the Employee during course of his/her employment with the Employer, shall not be disclosed, divulged or otherwise disseminated to any person, firm, association, partnership, corporation or other entity.   Any and all such materials, information, data or documentation, whether it is codified on paper or other hard copy, computer or other electronic media, or whether it was verbally or orally transmitted shall expressly remain the property of the Employer. Any such codified materials, information, data or documentation shall be returned to the Employer upon termination of employment.

4.     Employee further agrees that for a period of three years from and after the termination of his/her employment, without regard to the reason for such termination, and provided the Employer, or any successor thereto, is engaged in the electronic security and/or fire alarm business, the Employee shall not, without written permission of the Employer, or its successor thereto, either directly or indirectly, for himself/herself, or as agent of, or on behalf of, or in conjunction with any person, firm, association, partnership, corporation, or other entity submit any proposal or id to provide any form of alarm service to a then existing alarm customer of the Employer.

5.     In the event of a breach or threatened breach by the Employee of any of the provisions of this Agreement, the parties hereto acknowledge and agree  that the damages to Employer would be substantial but not easily ascertainable, and therefore, Employer shall be entitled to seek, in addition to other forms of relief, an injunction prohibiting the Employee from committing a breach hereunder.

6.     If any term or provision of the Agreement or any application thereof shall be held to be invalid or unenforceable, the remainder of the Agreement and any other application of such provision shall not be affected thereby.

It is further understood and agreed by the parties hereto that anything contained herein to the contrary notwithstanding, Employee's employment with Employer may be terminated at will by either party for any reason whatsoever.  The provisions of the Agreement, however, shall survive such termination.

IN WITNESS WHEREOF, the parties have executed this Agreement the date and year first above written.

EMPLOYER:

AMERITECH MONITORING SERVICES, INC.
(including without limitation all subsidiaries)

By: _____

Title: _Sales Manager_____
          (Manager, Director or Vice President)

EMPLOYEE:

_____
Signature

_____
Printed Name

## CONSULTING AGREEMENT

This Consulting Agreement (the "Agreement") is made and entered into as of August___, 1996 by and between Republic Industries, Inc., a Delaware corporation ("Republic"), and Michael Brauser, an individual residing in the State of Florida ("Consultant").

### RECITALS

Consultant is currently an employee of Kertz Security Systems, Inc., a wholly owned subsidiary of Republic ("Kertz"). Consultant has advised Republic of his intention to terminate his employment relationship with Kertz. Following such termination, Republic desires to engage Consultant to provide consulting services to Republic and Kertz with respect to the electronic security services businesses conducted by them and their respective Affiliates (as defined in Section 4.3) (collectively, the "Business"), and Consultant desires to provide such consulting services to Republic and Kertz, all as herein provided and on the terms and conditions hereinafter set forth.

### COVENANTS

In consideration of the mutual covenants and subject to the conditions herein contained, the parties hereto agree as follows:

1. **Consulting Engagement; Fee and Expenses.**  Republic hereby agrees to engage Consultant to provide consulting services with respect to the Business, and Consultant hereby agrees to provide such consulting services, for the period commencing on the date hereof and terminating on August 30, 1998, unless sooner terminated in accordance with the provisions of Section 5 hereof. In consideration of Consultant providing such consulting services, Republic shall pay to Consultant a fee of $50,000 per year. Republic shall pay such fee in accordance with its customary payroll practices, with payments beginning in September 1996 and continuing for the remainder of the term of this Agreement. Consultant shall be entitled to reimbursement for all reasonable business expenses actually incurred or paid by him in the performance of services pursuant to this Agreement, provided such expenses are pre-approved by Robert A. Guerin, Senior Vice President of Republic.

2. **Consulting Services.** Consult agrees to consult with and advise Republic with respect to the Business. Consultant agrees to be available during the term of this Agreement for such consultation and advice at the request of Republic from time to time. Any failure of Republic to request such services shall not terminate this Agreement or alter, change or diminish the obligation of Republic to Consultant hereunder. Consultant and Republic agree that Consultant is an independent contractor and is not entitled to any benefits or privileges given or extended by Republic to its employees, except as otherwise specifically provided herein.

3. **Vesting of Previously Granted Stock Options.** Republic acknowledges that, in connection with his employment by Kertz, Consultant has previously been granted an option to purchase a certain number of shares of Republic common stock, $.01 par value per share. Republic further acknowledges that the services to be provided by Consultant hereunder will count for vesting purposes of such option, provided, however, that if this Agreement is terminated, in accordance with



the provisions of Section 5 hereof, prior to the expiration of its term, vesting of such option shall immediately cease.

**4. Confidential Information; Non-Competition.**

4.1  Consultant acknowledges that (i) during the course of his employment by Kertz he made use of, acquired and added to confidential information relating to the Business and to the processes, apparatus, products, services, marketing methods, customer lists, trade secrets and the like, of Republic, Kertz and their Affiliates and (ii) in the course of providing consulting services hereunder he will be making use of, acquiring and adding to confidential information relating to the Business and to the processes, apparatus, products, services, marketing methods, customer lists, trade secrets and the like, of Republic, Kertz and their Affiliates (collectively, the "Confidential Information").   The parties recognize that the Confidential Information, whether or not developed by Consultant, is the exclusive property of Republic and Kertz.  Therefore, Consultant agrees that neither he nor any of his Affiliates will, except for the sole benefit of or with the written consent of Republic:

(a)  during or at any time after the term of this Agreement, retain in his possession, use or disclose to any person, firm or corporation for any purpose whatsoever any of the Confidential Information, for so long as and to the extent that the Confidential Information has not become generally known to or available for use by the public other than by any act or omission of Consultant; or

(b)  during or at any time after the term of this Agreement, use any corporate or trade name or trademark of Republic, Kertz or any of their Affiliates for any purpose whatsoever; or

(c)  during the term of this Agreement or within three years thereafter, in the State of Florida, engage (as an individual or as a stockholder, trustee, partner, financier, agent, employee or representative of any person, firm, corporation or association), or have any interest, direct or indirect, in any business in competition with the Business; provided, however, that the beneficial ownership of less than 5% of the outstanding shares of stock of any corporation having a class of equity securities traded on a national securities exchange or the over-the-counter market shall not be deemed, in and of itself, to violate the provisions of this subparagraph (c).

4.2  Consultant further agrees that neither he nor any of his Affiliates will, during the term of this Agreement or within three years thereafter:

2

(a)   induce any customer of Republic, Kertz or their Affiliates to patronize any business similar to the Business;

(b)   canvass, solicit or accept from any customer of Republic, Kertz or their Affiliates any business similar to the Business; or

(c)   request or advise any individual or company which is a customer of the Business to withdraw, curtail or cancel any such customer's business with Republic, Kertz or their Affiliates.

4.3   As used in this Agreement, the term "Affiliate" means, with respect to a specified person, any other person which directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the person specified.

4.4   If any provision of this Section 4, as applied to any party or to any circumstances, is adjudged by a court to be invalid or unenforceable, the same will in no way affect any other provision of this Section or any other part of this Agreement, the application of such provision in any other circumstances or the validity or enforceability of this Agreement. If any such provision, or any part thereof, is held to be unenforceable because of the duration of such provision or the area covered thereby, the parties agree that the court making such determination will have the power to reduce the duration and/or area of such provision, and/or to delete specific words or phrases, and in its reduced form such provision will then be enforceable and will be enforced. Upon breach of any provision of this Section 4, Republic will be entitled to injunctive relief, since the remedy at law would be inadequate and insufficient. In addition, Republic will be entitled to such damages as it can show it and its Affiliates have sustained by reason of such breach.

## 5. Termination

5.1   This Agreement will terminate automatically (i) upon Consultant's death or (ii) upon Consultant's becoming physically or mentally disabled, whether totally or partially, so that he is prevented from performing services pursuant to this Agreement for a period of six consecutive months or for shorter periods resulting from the same disability aggregating six months in any twelve-month period.

5.2   Upon written notice to Consultant, Republic may terminate this Agreement for "cause". Termination for "cause" means termination by Republic because of (i) Consultant's gross negligence, proven dishonesty, willful breach of this Agreement or violation of any reasonable rule or regulation of Republic or any of its Affiliates, the violation of which results in damage to Republic or any of its

3

Affiliates or (ii) any written or oral statement made by Consultant about or relating to Republic ( including, without limitation, any statement about or relating to (a) any Affiliate of Republic, (b) any business of Republic or any of its Affiliates, (c) any business transaction proposed to be entered into by Republic or any of its Affiliates, or (d) any director, officer, employee, consultant, shareholder or agent of Republic or any of its Affiliates), which statement, in the opinion of Republic, in its sole discretion, causes Republic or any of its Affiliates to suffer any damage, adverse publicity or negative consequence, or which otherwise causes Republic or any of its Affiliates to be perceived in a manner less favorable than if such statement had not been made.

     5.3 Upon termination of this Agreement, Consultant shall not be entitled to any further compensation, and the vesting of the stock option described in Section 3 shall immediately cease.

     **6. Survivability.** The provisions of Section 4 shall survive any termination of this Agreement.

     **7. Waiver.** The waiver by Republic of a breach of any provision of this Agreement by the Consultant shall not operate or be construed as a waiver of any subsequent breach by Consultant.

     **8. Notices.** Any notice, request, information or other document to be given hereunder shall be in writing and delivered personally or sent by certified mail, postage prepaid, as follows:

If to Republic, addressed as follows:

     Republic Industries, Inc.
     Attn: General Counsel
     200 East Las Olas Blvd., #1400
     Ft. Lauderdale, FL 33301
     Telecopy: (954) 522-8219

If to the Consultant, addressed as follows:

     Michael Brauser
     3700 N.E. 27th Avenue
     Lighthouse Point, FL 33064

Any party may change the address to which notices hereunder are to be sent to it by giving written notice of such change of address in the manner herein provided for giving notice. Any notice delivered personally shall be deemed to have been given on the date it is so delivered, and any notice delivered by registered or certified mail shall be deemed to have been given on the date it is received.

4

9. **Governing Law.** This Agreement shall be governed, construed and enforced in accordance with the laws of the State of Florida.

10. **Entire Agreement; Amendment.** This Agreement contains the entire Agreement of the parties with regard to the subject matter hereof and supersedes any and all prior oral or written understandings and agreements between them. This Agreement may be amended or modified only by an Agreement in writing signed by both parties hereto.

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed as of the day and year first above written.

REPUBLIC INDUSTRIES, INC.

By: _____

Robert A. Guerin
Senior Vice President


_____

Michael Brauser

5





**EXHIBIT**

G









5

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I.(a) PLAINTIFFS**
SECURITYLINK FROM AMERITECH, INC.,
f/k/a AMERITECH MONITORING SERVICES,
INC., a wholly owned subsidiary of
AMERITECH CORPORATION and AMERITECH
CORPORATION

**DEFENDANTS**
TITAN SECURITY SYSTEMS, INC., a
dissolved Florida Corporation; KERTZ
SECURITY SYSTEMS, INC., a Florida
Corporation; MICHAEL HOWARD BRAUSER;
SETH LEVINE; DAVID ORLANDO GRAY;
HOLLIE SUE GRAY; and MICHAEL MAPES

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
(EXCEPT IN U.S. PLAINTIFF CASES)

*DADE 98CV/2985/SH/LRJ*

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
SEE ATTACHED

ATTORNEYS (IF KNOWN)

**(d) CIRCLE COUNTY WHERE ACTION AROSE:**
DADE, MONROE, BROWARD, PALM BEACH, MARTIN, ST. LUCIE, INDIAN RIVER, OKEECHOBEE, HIGHLANDS

| II. BASIS OF JURISDICTION | III. CITIZENSHIP OF PRINCIPAL PARTIES |
|---|---|
| (PLACE AN X ONE BOX ONLY) | (For Diversity Case Only) (PLACE AN X IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) |

(PLACE AN X ONE BOX ONLY)

☐ 1. U.S. Government Plaintiff
☒ 3. Federal Question (U.S. Government Not a Party)
☐ 2. U.S. Government Defendant
☐ 4. Diversity (Indicate Citizenship of Parties in item III)

(For Diversity Case Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.
DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

15 U.S.C. § 1125 et seq.

**IVa.** 5 days estimated (for both sides) to try entire case

**V. NATURE OF SUIT** (PLACE AN X IN ONE BOX ONLY)

| A CONTRACT | A TORTS | B FORFEITURE/PENALTY | A BANKRUPTCY | A OTHER STATUS |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 States Reappointment |
| ☐ 120 Marine | ☐ 310 Airplane   ☐ 362 Personal Injury-Med Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability   ☐ 365 Personal Injury-Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | **A PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander   ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | ☐ 820 Copyrights | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability   **PERSONAL PROPERTY** | ☐ 640 R.R. & Truck | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine   ☐ 370 Other Fraud | ☐ 650 Airline Regs | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl Veterans) | ☐ 345 Marine Product Liability   ☐ 371 Truth in Lending B | ☐ 660 Occupational Safety/Health | **B SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits B | ☐ 350 Motor Vehicle   ☐ 380 Other Personal Property Damage | ☐ 690 Other | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholder's Suits | ☐ 355 Motor Vehicle Product Liability   ☐ 385 Property Damage Product Liability | **A LABOR** | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 710 Fair Labor Standards Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | ☐ 720 Labor Management Relations B | ☐ 864 SSID Title XVI | ☐ 892 Economic Stabilization Act |
| **A REAL PROPERTY** | **A CIVIL RIGHTS**   **B PRISONER PETITIONS** | ☐ 730 Labor Management Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting   ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 740 Railway Labor Act | **A FEDERAL TAX SUITS** | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure B | ☐ 442 Employment   ☐ 530 General | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations   ☐ 535 Death Penalty | ☐ 791 Employee Ret. Inc. Security Act B | ☐ 871 IRS-Third Party 26 USC 7609 | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare   ☐ 540 Mandamus & Other | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights   ☐ 550 Civil Rights * A or B | | | ☐ 890 Other Statutory Actions * A or B |
| ☐ 290 All Other Real Property | | | | |

**VI. ORIGIN** (PLACE AN X IN ONE BOX ONLY)

☒ 1. Original Proceeding
☐ 2. Removed From State Court
☐ 3. Remanded from Appellate Court
☐ 4. Refiled
☐ 5. Transferred from another district (Specify)
☐ 6. Multidistrict Litigation
☐ 7. Appeal to District Judge from Magistrate Judgment

**VII. REQUESTED IN COMPLAINT**
CHECK IF THIS IS A **CLASS ACTION** ☐ UNDER F.R.C.P. 23
**DEMAND $**
☒ Check YES only if demanded in complaint
JURY DEMAND: ☒ YES ☐ NO

**VIII. RELATED CASE(S) IF ANY** (See Instructions)
JUDGE _____   DOCKET NUMBER _____

DATE   DECEMBER 8, 1998
SIGNATURE OF ATTORNEY OF RECORD

UNITED STATES DISTRICT COURT
S/F I-2
REV. 9/94

FOR OFFICE USE ONLY: Receipt No. 702148   Amount: 150.00
Date Paid: 12/08/98   M/fp: _____

## ATTACHMENT

**Attorney for Plaintiffs:**

Leslie J. Lott
David K. Friedland
Mark E. Stein
LOTT & FRIEDLAND, P.A.
255 Alhambra Circle
Suite 555
Coral Gables, Florida  33134

(305) 448-7089  Telephone
(305) 446-6191  Telecopier